IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WONDERLAND NURSERYGOODS
CO., LTD.,

    Plaintiff,

      v.

KIDS II, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:13-CV-1114-TWT

## OPINION AND ORDER

This case is before the Court to construe the disputed claim terms in three

patents relating to infant playpens. The Court held a Markman hearing on February

25, 2014. The first patent, United States Patent No. 7,770,245 (the "'245 Patent") has

seven terms that need construction. The second, United States Patent No. 6,954,949

(the "'949 Patent") has six disputed claim terms. The last, United States Patent No.

RE43,919 (the "'919 Patent") has one disputed term.

## I. Background

Wonderland, the Plaintiff here, is a manufacturer of children's products. It is

seeking to enforce its rights under three patents for infant playpens. The '245 Patent

describes a playpen with a removable, adjustable-height bassinet and a reach-through

opening that allows the user to fold up the playpen without removing the bassinet. The '949 Patent covers a playpen in which each corner has an inner column and an outer column, and the fabric comprising the walls of the playpen threads between the two columns. Finally, the '919 Patent describes a playpen that can be assembled with ease. Kids II, the Defendant, is also a producer of children's products, including playpens. Kids II proposes narrower constructions of most of the disputed terms, and argues that five of the disputed terms in the '245 Patent are indefinite.

## II.  Claims Construction Rules

The construction of claims in a patent case is a matter of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).  In construing patent claims, the Court looks first to the intrinsic evidence.  The intrinsic evidence consists of the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence.  Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1346 (Fed. Cir. 2004).  However, not all intrinsic evidence is equal. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998).  First among intrinsic evidence is the claim language.  Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999).  A "bedrock principle" of patent law is that the claims of the patent define the patentee's invention.  Phillips v. AWH

Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Thus, the Court's focus must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1370 (Fed. Cir. 2005) (quoting Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)); see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").  When reading claim language, terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. Phillips, 415 F.3d at 1313-14.

As a result, an objective baseline from which to begin claims construction is to determine how a person of ordinary skill in the relevant art would understand the terms.  Phillips, 415 F.3d at 1313.  Although "the claims of the patent, not its specifications, measure the invention," Smith v. Snow, 294 U.S. 1, 11 (1935), the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification, rather than solely in the context of the particular claim in which the disputed term appears.  Phillips, 415 F.3d at 1313.  For

instance, the patentee may act as his own lexicographer and set forth a special definition for a claim term.  Id. at 1316.

Claims are part of a "fully integrated written instrument" and, therefore, "must be read in view of the specification, of which they are a part." Phillips, 415 F.3d at 1315.  In fact, the specification is "the single best guide to the meaning of a disputed term" and is often dispositive.  Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." Phillips, 415 F.3d at 1317.  Nevertheless, the Court must be careful not to read a limitation into a claim from the specification. Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004).  In particular, the Court cannot limit the invention to the specific examples or preferred embodiments found in the specification.  Phillips, 415 F.3d at 1323; see also Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.").  In addition to the specification, the prosecution history may be used to determine if the patentee limited the scope of the claims during the patent prosecution.  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).  The prosecution history helps

to demonstrate how the patentee and the Patent and Trademark Office ("PTO") understood the patent.  Phillips, 415 F.3d at 1317.  However, because the prosecution history represents the ongoing negotiations between the PTO and the patentee, rather than a final product, it is not as useful as the specification for claim construction purposes.  Id.

Extrinsic evidence – such as expert and inventor testimony, dictionaries, and learned treatises – is only considered when the claim language remains genuinely ambiguous after considering all of the patent's intrinsic evidence.  Tegal Corp. v. Tokyo Electron America, Inc., 257 F.3d 1331, 1342 (Fed. Cir. 2001).  Although less reliable than the patent and prosecution history in determining construction of claim terms, extrinsic evidence may be used to help the Court understand the technology or educate itself about the invention.  Phillips, 415 F.3d at 1317; Vitronics Corp., 90 F.3d at 1584.  In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms.  Phillips, 415 F.3d at 1318.  But extrinsic evidence, including dictionary definitions, cannot be used to vary or contradict the terms of the patent claims.  Tegal Corp., 257 F.3d at 1342; see also Vitronics Corp., 90 F.3d at 1584 n.6 (courts are free to consult dictionaries "so long

as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"); <u>Phillips</u>, 415 F.3d at 1322-23.

### III. Discussion

#### A.    The '245 Patent

##### 1.    "mounted on"

The '245 Patent provides a playard, or playpen, with an optional bassinet feature. The first disputed term is the term "mounted on," as used in claim 1. Wonderland proposes that "mounted on" means "attached to" while Kids II proposes that "mounted on" means "directly attached to." Claim 1 provides for a "playard, comprising: ... a bassinet mounted on the frame body." ('245 Patent; 3:62-66). Based on the language as used in the claims and the specification, the Court concludes that Kids II's construction is too restrictive and that Wonderland's definition is more appropriate. When describing the preferred embodiment, the specification states that the side panels can connect to the bottom panel with a "connector," such as a "hook or any connecting device in the prior art." ('245 Patent; 2:43-49). In this example, the bassinet is mounted to the frame body via a hook. In other words, the bassinet is not "directly" mounted onto the frame body. Claims should be read in view of the specification and, although the specification should not limit the scope of the claims,

the claims should at the very least encompass the examples in the specification. See
Phillips, 415 F.3d at 1315, 1323; SanDisk Corp. v. Memorex Products, Inc., 415 F.3d
1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred
embodiment, moreover, is 'rarely, if ever, correct.'").   Accordingly, the phrase
"mounted on" is construed as "attached to."

### 2.    "plurality of side panels"

The next dispute concerns the use of the phrase "plurality of side panels." Kids
II insists that this language means "all of the side walls of the bassinet" while
Wonderland contends the language only means "at least two of the side walls of the
bassinet." The language is first introduced in claim 1 of the patent, providing for a
playard comprising "a plurality of side panels, each connecting to the bottom panel
with one end and to the frame body with the other end." ('245 Patent; 4:1-3).[1] Kids
II argues that "plurality of side panels" consistently means "all the side panels"
throughout the claim language and specification. The claim language itself describes
"a height adjustment device configured on the plurality of side panels" and a "height
adjustment device comprising a first engaging component and a second engaging
component mounted on the plurality of side panels." ('245 Patent; 4:58-65). If the

---

[1] Independent claims 11 and 19 also include "a plurality of side panels." (See
'245 Patent; 4:47-65, 6:5-12).

height adjustment devices were only attached to two of four side panels, Kids II argues, the bassinet would tilt and would not achieve the desired effect of providing two different, even levels for a baby. Thus, the claim language itself, along with every use in the specification, requires that a "plurality of side panels" means "all of the side panels of the bassinet." Kids II also points to language in the prosecution history suggesting that "plurality" must mean "all."

However, despite the fact that plurality typically means all in the intrinsic evidence, Kids II's proposed definition improperly adds a limitation to the claim language based on the examples in the specification. See Liebel-Flarsheim Co., 358 F.3d at 904. While it is possible that including height adjustment devices on fewer than all of the side panels would lead to an uneven surface within the playpen, there is no requirement within the claim language that the bassinet's interior surface remain level. Indeed, in the prosecution history, Wonderland argued for amendments to claims 11 and 20 stating that the height adjustment devices could be used to change the available volume in the playpen. (See Kids II's Claim Construction Brief, Ex. 6, at 12). This argument supports a reading of the claims where only some of the side panels have a height adjustment device, and therefore where the "plurality of side panels" does not mean all the side panels. Accordingly, the Court will construe "a plurality of side panels" as "at least two of the side walls of the bassinet."

### 3. "located above the folding device" and "located right above the folding device"

The next dispute concerns two related terms used in the '245 Patent. Independent claim 1 describes an opening "located above the folding device" while dependent claim 9 describes an opening "located right above the folding device." As discussed above, the folding device allows the user to fold the playpen without having to remove the bassinet, and it can be engaged when the bassinet is in the upper or lower position. Kids II argues that these terms should be construed as "located at a higher position directly over the folding device" and "located at a lower position directly over the folding device." However, Wonderland's proposed constructions of "situated at a position over the folding device" and "situated at a position directly over the folding device" are more consistent with the claim language and the use of the folding device in the specification. Kids II's definition improperly restricts the scope of the claims. The plain language of claims 1, 9, and 11 indicates that, in one state, there is a folding device located below an opening and, at another state, a folding device located right below – as in immediately beneath – an opening. Accordingly, the Court construes "located above the folding device" and "located right above the folding device" as "situated at a position over the folding device" and "situated at a position directly over the folding device," respectively.

### 4.     "cover"

The next dispute concerns the definition of the word "cover." Kids II proposes that this term be construed as "a flap" while Wonderland seeks to define the term as "an overlay that closes an opening." The claim language provides for a playpen:

> wherein the bottom panel has an opening positioned distally from said plurality of side panels and located above the folding device of the frame body sized to permit a user's hand to pass through and a cover configured near the opening and capable of opening or closing relative to the opening, the playard folded by operating the folding device through the opening when the cover opens relative to the opening.

('245 Patent; 4:4-11). The essential functions of the cover are to separate the folding device from the main part of the playard while permitting a user to access the folding device with little effort. Kids II's definition of a "flap" is not specific enough to capture the cover's functions of separating the playard from the folding device and allowing access to the folding device – a "flap" could simply be any piece of loose fabric. However, Wonderland's definition is too broad as it only captures one of the essential functions of the cover: its ability to open. The cover referred to in claim 1 specifically relates to access to the folding device. Accordingly, the Court will construe the definition of cover as "an overlay that separates the interior of the playard from the folding device and is capable of opening and closing."

### 5.    "first using state" and "second using state"

The next dispute concerns the terms "first using state" and "second using state," as found in claim 4. Kids II proposes constructions of a "state in which the entire bottom panel is at a higher position relative to the bottom of the frame body" and a "state in which the entire bottom panel is at a lower position relative to the bottom of the frame body." Wonderland's proposed definitions are not as detailed: it proposes "a first position in which the bassinet may hold a sleeping baby" and "a second position in which the bassinet may hold a sleeping baby." The claim language itself and the specification indicate that Kids II's definition is more appropriate. The Abstract states that the playard's bassinet has an option to be used in "a first using state that has a shallow depth or in a second using state that has a deep depth." ('245 Patent, Abstract). The specification also distinguished prior art by noting that the new invention allows users to change the depth of the bottom panel allowing for one state "for younger baby sleeping" and another state "so that an older child can sleep or play therein." ('245 Patent; 1:25-35). Furthermore, Wonderland's proposed definition would render meaningless the distinction between using states given in the claim language. Claim 4 provides:

> The playard of claim 1, wherein the bassinet comprises a height adjustment device configured on the plurality of side panels and comprising a first engaging component and a second engaging

component, and the bassinet selectively set on a first using state where the first engaging component is engaged with the second engaging component and a second using state where the first engaging component is disengaged from the second engaging component.

('245 Patent; 3:60-4:11). The using states, as described in claim 4, are part of a "height adjustment device." Thus, the two using states are necessarily engaged at different heights. Wonderland's proposed construction would allow the using states to be at any height, without reference to the other using state. Because the claim language itself, as well as the examples in the specification, indicate that the using states are connected to the playard's height adjustment device, the Court will construe the disputed terms as a "state in which the entire bottom panel is at a higher position relative to the bottom of the frame body" and a "state in which the entire bottom panel is at a lower position relative to the bottom of the frame body."

### B.    The '949 Patent

#### 1.    "column(s)"

The parties dispute the meaning of the term "column(s)" as used in the '949 Patent. Kids II's proposed construction is "vertical load bearing support(s)" while Wonderland's proposed construction is "a rigid, relatively slender, upright support." Neither proposed construction is consistent with the claim language. Claim 1 in the '949 Patent lists "column(s)" several times: "A playpen with double columns at each

corner of said playpen," "a plurality of first columns, each said first column having two opposite ends," "a plurality of second columns," and "a boundary sheet extends through each said gap and covers the first columns." ('949 Patent; 4:10-35). Kids II's definition is ambiguous in terms of whether the column is vertical or the load being supported by the column is vertical. Further, Kids II's definition could encompass the playpen's walls themselves. Wonderland's definition includes the detail that the columns are "relatively slender," which is also ambiguous. The term "column" itself, however, implies a thin structure. And the examples in the specification all show rod-like structures around the exterior of the playpen. The Court will accordingly construe "column(s)" as "upright support rod(s)."

## 2.  "first corner component" and "second corner component"

The parties dispute the meaning of the terms "a first corner component" and "a second corner component." Wonderland proposes a construction as "a distinct part of an assembly at a place at which two converging surfaces meet," as the definition for both the first and second corner components. Kids II contends the terms are indefinite.[2] "Because claims delineate the patentee's right to exclude, the patent statute

_____

[2] Wonderland argues that Kids II did not comply with the Patent Local Rules in asserting indefiniteness. Patent Local Rule 4.3(4) requires a party seeking to oppose a claim of patent infringement to serve opposing parties with a Disclosure of Invalidity Contentions, including "[a]ny grounds of invalidity based on any applicable

requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." Biosig Instruments v. Nautilus, Inc., 715 F.3d 891, 897-98 (Fed. Cir. 2013) (quoting Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008)). "A claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'" Id. at 898 (quoting Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005)).

Kids II proposes that the terms are indefinite because both the fifth and sixth claim limitations in claim 1 of the '949 Patent refer to "a first corner component" and "a second corner component." Because the use of an indefinite article prevents a user with ordinary skill in the art from knowing whether the limitations refer to the same or different sets of corner components, Kids II contends the terms are indefinite. But that does not mean the terms are not amenable to any construction. Claim terms should not be analyzed for indefiniteness in a vacuum. Rather, they should be reviewed "in light of (A) the content of the particular application disclosure; (B) the teachings of prior art; and (C) the claim interpretation that would be given by one

---

provision of 35 U.S.C. § 112." N.D. Ga. Patent L.R. 4.3(a)(4). Kids II did not include allegations of indefiniteness with its invalidity contentions. (See Wonderland's Claim Construction Brief, Ex. F). However, because the Court concludes that Kids II cannot show that any of the claims in the '949 Patent are indefinite, the Court need not address whether Kids II complied with the Patent Local Rules.

possessing the ordinary level of skill in the pertinent art at the time the invention was made." In re Skvorecz, 580 F.3d 1262, 1268 (Fed. Cir. 2009). Here, the intrinsic evidence shows that the first and second corner components are distinct parts of the playpen and that someone with prior skill in the art would understand the scope of the patent despite the use of an indefinite article. The specification notes that some of the objectives of the new playpen are to provide a light playpen with double columns capable of providing a feeling of structure, allowing for additional decorations, and allowing for double columns at each corner. ('949 Patent; 1:40-60). Furthermore,

> To achieve these and other advantages and according to the purpose of the present invention, as embodied and broadly described, the playpen with the double columns comprises: a plurality of first corners; a first rod unit connecting the first corners; a plurality of second corners; a second rod unit connecting the second corners; a plurality of first columns each having two opposite ends, one being connected to the first corner, another end being connected to the second corner; a plurality of second columns each having two opposite ends, one end being connected to the second corner; ... wherein the length of the two opposite second columns is larger than that of the two opposite first columns, and a gap exists between the adjacent first column and the second column with a boundary sheet extending through each gap and covering the first columns.

('949 Patent; 1:57-2:5). The invention thus includes two column structures and corner components attaching them. Kids II's contention that the lack of reference to specific first and second corner components renders the invention inoperable is without merit in the face of this discussion. The first and second corner components clearly relate

to the first and second columns and first and second rod units. Contrary to Kids II's contention, a person skilled in the art would understand to connect columns to corner components that form an exterior around the playpen rather than connecting corner components diagonally across the playpen. Wonderland's identical proposed constructions cannot suffice, because the Court "must presume that the use of [] different terms in the claims connotes different meanings." CAE Screenplates Inc. v. Heinrich Fiedler GmbH, 224 F.3d 1308, 1317 (Fed. Cir. 2000). And the detailed description of the invention and the accompanying figures show that the first corner components are in the lower part of the playpen while the second corner components are in the upper part of the playpen. Accordingly, the Court construes the terms "first corner component" and "second corner component" as "a distinct part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components," and "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components."

3.      "a distance between," "the two first columns," and "the two second columns"

Kids II also argues that the terms "a distance between," "the two first columns," and "the two second columns" are indefinite as used in claim 1 of the '949 Patent. The claim provides for a plurality of first and second columns and requires that "a distance

between the two second columns is larger than that between the two first columns, whereby a gap is formed between an adjacent first column and a second column." ('949 Patent; 4:29-32). Kids II argues that the claim is indefinite because when a patent claims a measurement it must provide sufficient guidance on how to take the measurement. As with the previous assertion of indefiniteness, however, Kids II vastly under-credits the person skilled in the art.

In Honeywell Int'l, Inc. v. International Trade Commission, 341 F.3d 1332, 1339-40 (Fed. Cir. 2003), on which Kids II relies, the Federal Circuit concluded that a claim was indefinite when different methods could be used to determine a melting point elevation, and the choice of method affected whether the accused product infringed the patent. But, in Honeywell, the intrinsic record did not provide sufficient guidance on how to properly assess the melting point. In the '949 Patent, by contrast, the specification and the accompanying figures clearly delineate the intent of the claim language. The upper and lower corner components discussed above are pictured as joining two separate columns at each corner of the playpen. The first columns are pictured as the inner columns and the second columns are pictured as the outer columns, as indicated by the claim language that the distance between second columns (the outer columns) is greater than the distance between the first columns (the inner columns). (See '949 Patent, Fig. 5). Again, the Court does not think a person of

ordinary skill in the art would consider the reference to "two second columns" to be insolubly ambiguous because the phrase could arguably refer to two first columns that are diagonal from each other and therefore farther apart than two second columns that are adjacent. Rather, the person with skill in the art of playpens would understand the typical exterior of a playpen and would be able to glean the intended meaning of the claim terms from the intrinsic record. Further, Kids II has not shown that the arguably ambiguous antecedents in this claim language or in the "corner component" claim language render the terms indefinite. "[T]he failure to provide explicit antecedent basis for terms does not always render a claim indefinite," and, here, the intrinsic record clearly shows a person of ordinary skill in the art the scope of the claim language. See Energizer Holdings, Inc. v. International Trade Commission, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quoting The Manual of Patent Examining Procedure § 2173.05(e) (8th ed. Rev. 2, May 2004)). Accordingly, the Court agrees with Wonderland's proposed constructions. They are as follows: "a distance between" is construed as "the amount of space separating"; "the two first columns" is construed as "two of the plurality of first columns; the first column is the inner column of a double column arrangement at a corner of the playpen;" and "the two second columns" is construed as "two of the plurality of second columns; a second column is the outer column of a double column arrangement at a corner of the playpen."

### C.      The '919 Patent

#### 1.      "attachment structure"

The parties only dispute one term in the '919 Patent: "attachment structure."

Claim 20 provides for:

> A baby crib comprising:
> a frame structure including a plurality of support tubes, wherein each of
> the support tubes has an outer wall that defines an outer contour shape
> of the upright tube;
> an enclosure member including a plurality of side panels having edge
> portions; and
> an attachment structure configured to mount and secure the edge portions
> of the enclosure member along the support tubes,
> whereby the side panels surround an enclosed space, and each of the side
> panels extends generally between two of the support tubes substantially
> out of contact with outwardly facing surfaces of the outer walls thereof,
> such that the outwardly facing surface of each of the upright tubes is
> exposed to an outside of the enclosure member.

('919 Patent; 5:37-6:8). Kids II contends that in this sense "attachment structure"

should mean "a device that makes physical connections to the inside of the support

tubes." Wonderland proposes that the term means "a device that holds something in

position." Kids II's contention that the attachment mechanism must be limited to the

inside of the support tubes is not supported by the intrinsic record. Although the

embodiment may require that the structure connects to the inside of the support tubes

– as the object of the invention is to obviate the need for screws which increase

assembly time – the record specifically provides that "while sleeve portions are formed on the fabric member by sewing so as to enclose the positioning posts within the disclosed embodiment, alternative methods are available for mounting the positioning posts fixedly to the fabric member." ('919 Patent; 3:30-35). Accordingly, the attachment structure by which the enclosure member is secured to the support tubes is not limited to the interior of the support tubes. Indeed the claim language itself allows for the fabric to be mounted "along" the support tubes, which is not restrictive to the interior of the tubes. ('919 Patent; 6:1-4). However, Wonderland's own definition is too broad. Wonderland's definition would include a screw as an attachment structure even though the intrinsic history specifically claims that removing the need for screws as devices to attach the fabric to the tubes is an object of the invention. ('919 Patent; 3:36-46). The Court accordingly construes the term "attachment structure" as a "device that connects fabric to the support tubes."

## IV. Conclusion

For the reasons set forth above, the Court construes the disputed terms as follows:

| Term | Construction |
| --- | --- |
| "mounted on" | "attached to" |

| Term | Construction |
|------|--------------|
| "plurality of side panels" | "at least two of the side walls of the bassinet" |
| "located above the folding device" and "located right above the folding device" | "situated at a position over the folding device" and "situated at a position directly over the folding device" |
| "cover" | "an overlay that separates the interior of the playard from the folding device and is capable of opening and closing" |
| "first using state" and "second using state" | "state in which the entire bottom panel is at a higher position relative to the bottom of the frame body" and a "state in which the entire bottom panel is at a lower position relative to the bottom of the frame body" |
| "column(s)" | "upright support rod(s)" |
| "first corner component" and "second corner component" | "a distinct part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components," and "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" |
| "a distance between," "the two first columns," and "the two second columns" | "the amount of space separating"; "two of the plurality of first columns; the first column is the inner column of a double column arrangement at a corner of the playpen"; and "two of the plurality of second columns; a second column is the outer column of a double column arrangement at a corner of the playpen" |

| Term | Construction |
| --- | --- |
| "attachment structure" | "device that connects fabric to the support tubes" |

SO ORDERED, this 20 day of May, 2014.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge