1

<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3
      WONDERLAND NURSERYGOODS CO.,   )
 4    LTD.,                          )
                                     )
 5              Plaintiff,           )
                                     )
 6    -vs-                           )  Case No. 1:13-CV-1114-TWT
                                     )
 7    KIDS II, INC.,                 )  February 25, 2014
                                     )  Atlanta, Georgia
 8              Defendant.           )  2:01 p.m.
      _____)
 9

10
                  TRANSCRIPT OF THE MARKMAN HEARING
11           BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
                    U.S. DISTRICT COURT JUDGE
12

13
      APPEARANCES OF COUNSEL:
14
      On behalf of the Plaintiff:    Tucker Ely
15                                   FELLOWS LaBRIOLA, LLP

16                                   David Roche
                                     BAKER & MCKENZIE, LLP
17
      On behalf of the Defendant:    Scott Amy
18                                   Jason Perilla
                                     THOMAS HORSTEMEYER, LLP
19

20

21           Proceedings recorded by mechanical stenography
               and computer-aided transcript produced by
22
                     SUSAN C. BAKER, RMR, CRR
23                    2194 U.S. COURTHOUSE
                     75 SPRING STREET, S.W.
24                    ATLANTA, GA  30303
                       (404) 215-1558
25
</pre>

2

1          (Proceedings held in Atlanta, Georgia, February 25,

2     2014, 2:01 p.m., in open court.)

3          THE COURT:  All right.  This is the case of

4     Wonderland Nurserygoods Company versus Kids II, Inc., Case

5     Number 13-CV-1114.

6          First let me ask counsel for the parties to identify

7     yourselves for the record and the parties you represent

8     beginning with the Plaintiff.

9          MR. ELY:  Your Honor, Tucker Ely on behalf of

10    Wonderland Nurserygoods here with David Roche who is co-counsel

11    admitted pro hac vice.

12         THE COURT:  Good afternoon, gentlemen.

13         MR. AMY:  Good afternoon.  Scott Amy here on behalf

14    of Kids II.  Also with me is Joseph Staley.  He's vice

15    president of legal for Kids II.  He's also admitted in the

16    case.  And then one of my associates, Jason Perilla.

17         THE COURT:  Good afternoon, gentlemen.

18         MR. AMY:  Good afternoon.

19         THE COURT:  All right.  This is a Markman hearing in

20    this case.  I've given each side one hour.  Do y'all have any

21    agreement or understanding as to who's going to go first?

22         MR. ROCHE:  We talked about it, Judge.  I think as

23    Plaintiff and since we filed simultaneous briefs I'm going to

24    go first.

25         THE COURT:  All right, Mr. Roche.

1    MR. ROCHE:  Thank you.  Good afternoon, Your Honor.

2         First, let me just give a little bit of background

3    about who Wonderland is.  Wonderland is a manufacturer of

4    infant products and has been for, I think, 15 years, maybe 20,

5    the exclusive supplier of products to Graco.  Graco is an

6    Atlanta-based company that is one of the leading retailers of

7    -- not retailer but distributors of infant products such as car

8    seats, these kinds of playards that are the subject of this

9    case and lots of related things, swings, baby swings and that

10   kind of thing.

11        So Wonderland is the manufacturer, the exclusive

12   manufacturer.  And, essentially, Wonderland's almost exclusive

13   customer is Graco.  So there's a very close working

14   relationship between Wonderland and Graco.  So that's who

15   Wonderland is.

16        Here we are talking about three different patents,

17   and in some of the patents there's a number of terms.  In the

18   third patent, there is really only one term that's in dispute.

19   And then this case has what I would characterize is a

20   relatively unusual issue which is indefiniteness.  Rather than

21   propose a term definition for a number of terms, Kids II has

22   taken the position that the terms in question are indefinite

23   and, therefore, the claim is invalid under Section 112.

24        So what I have done here, Your Honor -- and I have a

25   hard copy of this if you -- I think if you want to have this in

4

1   hard copy you can use it to take notes.  I'm going to be --

2   this is really the joint chart that we submitted that I have

3   highlighted with what I believe are the differences in our

4   positions.  So if you -- this is a set of three different

5   exhibits.  The first exhibit is two pages.

6          And, as I indicated, this chart which is two pages

7   lists the respective proposed definitions for the terms in

8   dispute.  And I believe in almost every instance what's going

9   on is the Plaintiff is proposing that the ordinary meaning be

10  used; and we're relying primarily on the case law that says the

11  ordinary meaning is what's used unless the Plaintiff has done

12  either of two things, either defined the term in a special way

13  in the specification or in the file history or has disavowed a

14  broader meaning as a result of arguments made.  And sometimes

15  that disavow actually occurs in the specification but more

16  likely in the file history.  So unless there's some reason to

17  deviate from the ordinary meaning, the courts say that's what

18  you use.

19         Now, in one instance, the first one actually, we

20  actually disagree on what the ordinary meaning is.  So we can

21  both agree that the ordinary meaning should apply, but we

22  differ as to what that is.  In the case of mounted on, Kids II

23  is urging that it be directly attached to; and I believe that

24  as long as it's attached to by some other intermediate thing

25  then that's going to be sufficient.

5

1            So I think for many of these terms our papers say

2      everything that we could possibly say, and so I'm not going to

3      dwell too long on disputes like that.  I do think it's

4      important to keep in mind this general rule that the ordinary

5      meaning applies unless it's been disavowed or unless the term

6      has been redefined.

7            Now, in every other term, I believe that Kids II is

8      not advocating that what the Court should do is adopt the

9      ordinary meaning.  For example, in the plurality of sides term,

10     I think everybody would understand that the ordinary meaning of

11     plurality means more than one.  That's the way it's used in the

12     patent game all the time.  A plurality is one of these terms

13     that appears in thousands and thousands of patent claims.  It's

14     a way of saying more than one, and that's what everybody

15     understands it to mean.

16           Here Kids II is urging that it means all sides.

17     Whether it's a three- or four- or five-sided playard, they

18     think or are urging the Court to adopt a definition of

19     plurality that is all.  Well, that's not the ordinary meaning;

20     and there's nothing in the specification or in the file history

21     that would suggest that that term plurality was defined in a

22     special way or disavowed.  So I think that they're just wrong

23     on that one.

24           Now, the next group of limitations, I think they go

25     together, this located above the folding device, and then in a

6

1    dependent claim the term is located right above the folding

2    device.  Now, here Kids II is urging a relative height

3    limitation in connection with this difference.

4              THE COURT:  Just a second, Mr. Roche.

5              MR. ROCHE:  Yes, sir.

6              (Pause.)

7              THE COURT:  Go ahead, Mr. Roche.

8              MR. ROCHE:  Yeah, I don't think there's anything in

9    the specification or in the file history to suggest that the

10   use of the -- here is another copy for you, by the way -- that

11   this right above means closer or at a different height.  I

12   think that they are trying to again as they are with many of

13   these proposed definitions they're trying to create for

14   themselves a non-infringement position.  It's not based on

15   anything in the ordinary meaning, and it's not based on

16   anything in the specification or the file history.

17             I think that the ordinary meaning of located above

18   means it's located above.  And when it says located right

19   above, I think that's just a more precise saying -- a way of

20   saying it's not generally above, it's right above.  So, again,

21   there's nothing in the specification that suggests that this

22   right above means somehow that I'm closer to it or that there's

23   a difference in height with these two limitations.

24             Now, the next one I think is another example of --

25   and this is the term "cover".  Kids II is suggesting that cover

1    means flap.  Well, where did they get that?

2            They got that from the specification.  That's what we

3    show is in one of the examples as a cover for an opening that

4    you use to reach through the bassinet to operate the folding

5    mechanism.  But one thing that the Phillips case, I think,

6    really made clear -- I mean, the Phillips case as, I think,

7    Your Honor knows from the most recent Markman hearing that you

8    did or Markman ruling that you issued, the Phillips case has

9    got something for everyone in it by way of dicta.  But the --

10           THE COURT:  Well, the Senate would say the Federal

11   Circuit law as a whole has something in it for everybody.

12           MR. ROCHE:  Well, and I think there's some truth to

13   that.  There's a lot of differing opinions at that court.  In

14   fact, there's -- they just issued an en banc ruling on a very

15   important issue whether claim construction gets deference on

16   their review.  They stuck to their guns.  They stuck to the

17   Cybor case and said no --

18           THE COURT:  Which means whatever I do in this case

19   there's about a 50 percent chance I am going to be reversed.

20           MR. ROCHE:  Unfortunately, I think that's true.  And

21   that's been a problem with claim construction ever since the

22   Markman case came out.  And I don't know the answer, but we

23   have to keep plugging away.

24           But the point I was making is that the Phillips case,

25   I think, is a -- they carefully chose -- I think they carefully

1    chose that case because they reversed their own panel first of

2    all.  So they reversed a three-judge panel, and they reversed

3    the district court.  And what happened in that case is that

4    both the district court and the three-judge panel had construed

5    the term, I think it was barrier or something.  But they had

6    done it based on the fact that the examples in the patent only

7    showed a particular design.

8             And the Phillips case held and went out of its way --

9    I mean, they reversed their own panel and reversed the district

10   court -- to say that you do not construe a term based on the

11   examples in the patent.  And that's exactly what's going on

12   here with the term "cover".  A cover is anything that you put

13   on top of something else to close off an opening.  And to

14   construe cover as a flap here would, I think, be doing exactly

15   what the Federal Circuit said you do not do in the Phillips

16   case.

17            The next set of terms are these first using state and

18   second using state.  And, again, the same issue is here as it

19   is in the located above the folding device and located right

20   above.  Kids II is trying to generate a non-infringement

21   defense based on a relative height limitation, but these using

22   states don't say anything about height.  The claim is not

23   directed to that, and the specification doesn't suggest that

24   that's what these terms are being used to do.  I think Kids II

25   is simply trying to create a non-infringement defense by urging

9

1  some very specific language that is not justified under the

2  rules of claim construction.

3         So let's look at the next two patents.  There's only

4  one term in the '949 patent aside from the indefiniteness

5  issues which I'm going to talk about later.  Here we're -- I

6  think we're close actually.  The term vertical load-bearing

7  supports it's not clear to me whether Kids II is suggesting

8  that vertical modify load or whether vertical is modifying

9  supports.  If they're saying it's a vertical support, I don't

10 -- I mean, a column is something that's vertical.  But if it's

11 got to support a vertical load, I don't think that that's

12 warranted.

13        Let's bear in mind what we are talking about are

14 playards.  The corner posts on a playard do not support a

15 vertical load.  So the columns -- in fact, the columns in a

16 playard typically hold a fabric; and there's way more

17 horizontal load on the columns of a playard than there is

18 vertical load.  So I think again they're not using the term as

19 it would be understood by a person of ordinary skill.  Columns

20 in a playard are not vertical load-bearing supports.  They're

21 vertical, and they're supports; but they generally support the

22 fabric.  And that's typically a horizontal force more than a

23 vertical one.

24        So if the word vertical modifies support, I could

25 live with that definition.  But if they're talking about a

1    vertical load, then I think they're off base.

2           Now, I'm going to skip because I want to talk

3    separately about the indefiniteness limitations.  We'll go down

4    to the last one which is the only disputed term in that patent

5    except, of course, for the issue on the summary judgment

6    motion.  But I don't want to address that unless Your Honor

7    would like to.  There is a term in that patent that's the

8    subject of their motion for partial summary judgment that I

9    believe may need to be construed, but it wasn't briefed.  It

10   wasn't identified in our process for identifying terms.  I'm

11   prepared to talk about it if Your Honor would be interested.

12          But let's talk about the one that we did identify,

13   and that is the attachment structure.  And, again, I think

14   looking at the term "attachment structure" it's a very general

15   term.  I think to a person of ordinary skill it would mean

16   something that holds something in position, and yet Kids II is

17   trying to get very specific.  I don't think they are using the

18   ordinary meaning of attachment structure because they are

19   inserting a physical connection to a specific location in the

20   tube.  I just think you're reading way more into that based on

21   the example in the specification just like the court said

22   you're not supposed to do in the Phillips case, and I think

23   that's what they're trying to do here.

24          So, in general, for the terms where we've got

25   competing actual constructions, the general difference here is

1    that we're urging the ordinary meaning as would be understood

2    by a person of ordinary skill reading the patent as a whole.

3    And Kids II is trying to bring things in from these specific

4    examples typically.  And I think our briefs generally lay this

5    out and lay the law and the specifics out.

6            What I'd like to do now is talk a little bit about

7    the indefiniteness issues.  And I have -- as far as -- I'm

8    going to back up here a second.

9            There are two sets of limitations that are really two

10   separate arguments on indefiniteness, the first corner and

11   second corner components.  That's one -- as far as I can tell,

12   that's one argument that they are making.  There's

13   indefiniteness associated with them.  The other three

14   limitations are really a combination of three things that is a

15   second argument regarding indefiniteness.

16           So let's talk about the first one.  Here I believe

17   that Kids II' position is that there's no way to tell whether

18   there is more than one first or second component at each

19   corner.  I think that's a quote from their brief.  The fact

20   that you could perhaps make a playard with multiple corner

21   components I don't think is relevant to the question of

22   indefiniteness.  If you constructed a playard with multiple

23   corner components theoretically, what we have here is -- by way

24   of explanation here is what are the corner components in the

25   examples in the patent.

12

1          There's second corner components which are the upper

2     ones.  There's four of them, one at each corner of the upper

3     square that defines the top opening of the playard.  And then

4     there's four more at the bottom.  Those are the second and

5     first respectively corner components.  They are numbered.  They

6     are described.  And I have here a portion of the specification

7     that explains that there are four and that they are situated at

8     the upper and lower corners respectively.  I just don't think

9     that there's very much that's not clear or indefiniteness --

10    indefinite about this in any way.

11         Now, we lay out in the claim -- and this is where

12    Kids II, I believe, is alleging indefiniteness arises.  We say

13    that the first columns that is the -- I believe the first

14    columns are the inner ones, 15, and the outer ones are 16.  So

15    we say that the first ones are connected to a first corner

16    component.  That means a lower one.  And a second corner

17    component means an upper one.  And then we lay it out for the

18    second columns which is the outer columns, and we say those are

19    connected to a first corner component and to a second corner

20    component.

21         I don't think there's anything unclear about that.  I

22    mean, it's patent lawyer language; but it's not indefinite.  I

23    just don't see.  The fact that you could add maybe another one

24    which seems to be Kids II's issue here, adding components

25    doesn't devoid infringement.  I mean, this is a longstanding

principle of patent law.  Basic patent law holds that a party
may not avoid infringement of a patent claim that uses an open
transitional phrase like comprising in the beginning of a claim
which almost every claim does by adding additional elements.
So the fact that they might have another corner component --
I'm not sure why you'd want to do.  And that's a quote from
Free Motion Fitness, a 2005 case at 423 F.3d 1343.  So adding
components doesn't detract from the fact that you have got four
lower components and four upper ones which is what we're
talking about here.

So that's the first indefiniteness issue.  And I am
going to reserve some of my time to hear what Kids II has to
say.  I mean, it's their burden.  And it's not only their
burden to show indefiniteness, it's their burden by clear and
convincing evidence.

And the cases on indefiniteness really they set the
bar pretty high because this is what is called a technical
defense.  And, generally speaking, you know, a claim doesn't
have to be absolutely clear.  Absolute clarity and precision in
claiming is not required.  That's from a case that they cited,
the Accentra case where the court reversed a finding of
indefiniteness.

And, generally, the presumption of validity means
that anytime that there's a close call on indefiniteness it
goes in the patentee's favor.  That's how the courts articulate

14

1    how the presumption works when it comes to indefiniteness.

2            So let's talk about the second basis for

3    indefiniteness.  Here Kids II complains that it's not clear

4    what distance we are talking about when we talk about wherein

5    there's a distance between the two second columns and the

6    distance between the two first columns, the distance between

7    them being greater for the outer or the second column than it

8    is for the first.

9            Again, this language, it may not be perfect and it

10   may be somewhat obtuse and there may be an antecedent basis

11   problem with the fact that we talk about the two; although I'm

12   not even sure that there is there.  But the point here is the

13   cases that Kids II is relying on, the main case that they are

14   relying on which is Honeywell versus ITC, in that case what it

15   involved was a claim on a process for making yarns and the

16   yarns when they underwent the process would have an increased

17   melting point.  And there was no way to determine -- there were

18   several ways to determine whether something had undergone a

19   change in melting point, and yet the specification gave no clue

20   at all as to what method you would use to determine whether the

21   yarn as processed by the claim would have a different melting

22   point or an increase in the melting point.

23           And so what the case basically stands for is the

24   proposition that if you've got a critical measurement that

25   you're making and there's nothing in the specification, nothing

1    at all to help you figure out what it is that you're supposed

2    to do, then you may have an indefiniteness problem.

3            Here we're talking about the distance between second

4    columns being larger than the distance between the first

5    columns.  I think reading the entire claim and the fact that

6    there's talking about gaps between them, just reading the claim

7    language itself I don't find -- I don't think it's indefinite

8    at all to a person of ordinary skill.  But when you do what the

9    court suggests in the Honeywell case and in several other

10   cases, including the Accentra case which is cited in the

11   footnote in Kids II's brief, look to the specification.

12           What does the specification here say about the

13   distance?  And which columns are we talking about?

14           Well, I think it's pretty clear they are talking

15   about the distance between opposite second columns versus the

16   distance between opposite first columns.  And I show this in

17   this diagram here.  The distance between the opposite larger

18   columns, the outer ones, is greater than the distance than the

19   inner ones such that there's a gap and that's where the fabric

20   goes.  And that's what the claim says, the boundary sheets

21   extend through each gap to cover the first or the inner

22   columns.

23           So, again, I think that -- I mean, I'll reserve some

24   of my time here.  Do you know how much I've got left?

25           MR. ELY:  We are about 30 minutes in.

1          MR. ROCHE:  Okay.  So I've got plenty of time.

2          I'll be interested to hear and I will want to respond

3     to Kids II's position on indefiniteness.  I mean, after all, it

4     is their burden.  But I think that the cases are

5     distinguishable readily because that Honeywell case there was a

6     complete absence of anything in the specification to give

7     clues.  I think the Court used the term to help discern or give

8     clues about how to give meaning to the language.

9          Here we have, I think, a very clear explanation.

10    This explanation together with the very simple drawings, this

11    is not a case where there is indefiniteness by clear and

12    convincing evidence.

13         So with that, Your Honor, I think I'll unplug my

14    machine and sit down unless you have any questions.

15         THE COURT:  Thank you, Mr. Roche.

16         Mr. Amy?

17         MR. AMY:  Yes, Your Honor.

18         Good afternoon, Your Honor.

19         Let me give you some context as to why there's a

20    dispute here.  It's not quite as simple as Plaintiff's counsel

21    would suggest.  And the parties apparently have a fundamental

22    dispute over how to approach claim construction.  Under our

23    approach, Your Honor, you not only consider the claim terms,

24    but you also have to consider the surrounding words of the

25    claims as well as the teachings of the specification in the

1    file history.  And what Wonderland is essentially trying to do

2    here is have you pick these terms out of the claim and construe

3    them in a vacuum.  And they assert that anytime you look beyond

4    the claim language, you look beyond this vacuum you are doing

5    something improper; and that's not what the Federal Circuit has

6    held.

7              So why are they taking this approach?

8              Well, to some degree, they don't have a choice.

9    They've got to attempt to improperly broaden the scope of these

10   claims in order to manufacture an infringement case here.  And

11   let me give you but one glaring example of this.

12             So Plaintiff's counsel has mentioned the term

13   "cover", and the term "cover" appears in the '245 patent which

14   is the first patent Mr. Roche discussed this afternoon.  And

15   the '245 patent is essentially directed to a bassinet that's

16   mounted on a playard frame.  So here you can see we have a

17   bassinet that's mounted on a playard frame.  The patent also

18   states that the bassinet has a cover and an opening in the

19   bottom of the bassinet which is indicated in red.  And then the

20   patent also teaches that you can put a cushion or a mattress on

21   top of the cover.

22             Now, the whole purpose of this feature, the

23   invention, is when it comes time to fold up your playard you

24   don't have to remove the bassinet from the playard.  In prior

25   art playards, you had to remove the bassinet in order to fold

1  the frame.  Now all you do is you pull back your mattress, you

2  reach through the cover, and you pull up on a folding device,

3  and it folds up the playard with your bassinet in place.

4          So here is the issue with how they are approaching

5  the term "cover".  The patent separately defines the cover of

6  the invention as a separate and distinct structural and

7  functional component from the cushion or mattress of the

8  invention.  And in such instances, the Federal Circuit in the

9  Tessera case has said that it would be improper to construe one

10 component when it's defined in the specs separate and apart

11 from another component -- it would be improper to construe one

12 component so broadly that it would encompass the other

13 component.

14         And that makes sense.  If you define two components

15 in the specification and talk about how they have separate

16 structural and functional purposes, then you shouldn't be able

17 to argue later on that one can be construed so broadly to

18 encompass the other.  But that's exactly what they're trying to

19 do with the term "cover".  And so what they'd like to have you

20 do is construe the term "cover" in a vacuum such that it would

21 encompass both a mattress or a cushion.

22         And why is this?

23         Well, they're well aware that our products on the

24 market they don't have a cover, but they do have a mattress.

25 Of course, we've got a mattress in the bottom of our bassinet.

19

1    No one is going to put a child in the bottom of a bassinet

2    without some type of mattress or some type of cushion for your

3    child.

4              Now, this is but one example of their approach to

5    claim construction; but it's an issue that pervades many, if

6    not all, of their constructions.  And it really gets back to

7    this idea that they'd like to construe these terms in a vacuum

8    and not look at the surrounding words of the claims, not look

9    to the specification, not look to the prosecution history.

10             So with this, their approach in mind, I think it's

11   worthwhile just to revisit some principles of claim

12   construction real briefly here at the outset that show why it's

13   improper to construe terms in a vacuum.

14             So we don't disagree with what Phillips said.  We

15   have all read it.  The claims define the scope of the

16   invention.  But there's more to Phillips than that.  In

17   Phillips -- pardon me.  There's more to Phillips than that, and

18   there's more to claim construction.  You have to consider the

19   surrounding words of the claims in addition to just the claims

20   themselves, so you can't simply construe the terms in a vacuum.

21   You have to consider the surrounding words of the claims.

22             More importantly -- and this was what I was about to

23   get to -- the Phillips case has stated that it's also improper

24   to construe terms in a vacuum because you've got to consider

25   the teachings of the specification.  And so what the Phillips

1    case said was the specification is always highly relevant to

2    the claim construction analysis.  Usually it is dispositive.

3    It is the single best guide to the meaning of a disputed term.

4    So in Phillips they stated that usually it is dispositive.

5              Looking beyond the specification, you also need to

6    consider the file history, yet another reason why it's improper

7    to construe terms in a vacuum.  So you're not entitled to a

8    claim construction that's divorced from what you said in the

9    file history before the USPTO, and essentially what this means

10   is you can't argue one thing to the PTO in favor of an

11   allowance of a patent and then when it comes time to assert

12   your patent against an accused infringer argue something else.

13             Similarly, you have to consider how the invention

14   works.  It's yet another reason why construing terms in a

15   vacuum is improper.  So, for example, if you propose a

16   construction that's going to render the claimed invention

17   inoperable, you should view that with extreme skepticism.  And

18   also a construction that excludes the preferred embodiment --

19   and when I mean preferred embodiment, I'm just talking about

20   the example in the specification, Your Honor.  A claimed

21   interpretation that would exclude the example from the scope of

22   the claim is rarely, if ever, correct.

23             And we have already talked about this one in the

24   context of the term "cover".  If you've got two components and

25   you describe them in the specification as separate and

21

1   distinct, it's improper or generally improper to construe one

2   in a manner that would encompass the other.  That's the holding

3   of the Tessera case, and we will talk about that some more in

4   the context of the term "cover".

5          And then, finally, a party can't in effect rewrite

6   its claims to suit its needs in a case.  And I believe this

7   really sums up what they are trying to do here, Your Honor.

8   They want to construe the terms in a vacuum to impermissibly

9   broaden the scope of the claims and suit their needs in this

10  litigation.

11         Now, with those principles in mind, let's move onto

12  the disputed terms.  You have already heard there's three

13  patents in dispute.  There's seven claim terms in the first,

14  six disputed claim terms in the second and one disputed claim

15  term in the third patent.  And I will take them in that order

16  this afternoon, Your Honor.

17         So the first patent just to give you a little

18  background is the '245 patent.  As I've mentioned, this can

19  really be broken up into two features.  The invention can be

20  broken up into two features.  We have already discussed the

21  first feature.  It's a playard.  It's mounted on -- pardon me

22  -- a bassinet that's mounted on the frame of a playard.  The

23  bassinet has an opening in the bottom panel.  The patent also

24  teaches that you can put a mattress or a cushion on top of the

25  opening.

22

1          And like I mentioned earlier, the whole purpose is

2     when it comes time to fold it up you just pull back your

3     mattress, reach through the opening, and then you can fold up

4     your playard without removing the bassinet from the playard.

5     And to give you some indication of what this looks like, here

6     is Figure 6 again.  Once again, you can see the cushion and the

7     mattress defined and described as a separate component from the

8     cover of the invention.

9          So the second feature of the invention, the bassinet

10    and the playard essentially have the same general construction;

11    but the difference here is now the bassinet has what's

12    described as a height adjustment device on the plurality of

13    side panels.  And when they are talking about the plurality of

14    side panels, they are talking about the side panels that form

15    the enclosure of the bassinet.  In order to have a bassinet,

16    you've got to have an enclosure.  Otherwise, the child would

17    roll out the side.

18          And so they describe how you can use this

19    height-adjustment device to move the bassinet from what's

20    described as a first using state into a second using state.

21    And the first using state is just generally when the bassinet

22    is set in a shallower depth, so it has a more traditional

23    bassinet, what you think of as a more traditional bassinet

24    configuration.  And the second using state is when you can drop

25    it down to a more traditional playpen configuration.

1       So I'm sure Your Honor has seen a playpen before, but

2    a playpen is a much deeper depth.  It's for an older toddler

3    where a toddler can stand and play without actually getting out

4    the boundary of the playpen.  So to give you some indication of

5    what this looks like, Figure 5 shows the bassinet actually set

6    in what's described as the second using state.  And the

7    height-adjustment device is shown here, Your Honor.

8       Your Honor, can you see my laser pointer up here?  Is

9    that --

10      THE COURT:  Yes, sir.

11      MR. AMY:  Okay.  So the height-adjustment device

12   would be located along what would be highlighted in red.  And

13   this shows that we have extended it.  Normally these two lines

14   here and here if we were in the first using state would be

15   together.  In the second using state, we have extended the

16   plurality of side panels now so the bassinet has a deeper

17   depth.

18      So the terms in this first patent, I'll just briefly

19   review them.  They're -- the terms are mounted on a plurality

20   of side panels located above the folding device versus located

21   right above the folding device; cover; and then there's two

22   additional terms, first using state and second using state.

23      So turning to the first term, the first term is the

24   term "mounted on".  And I want to give you some context here as

25   to why there is a dispute over this term.  During the claim

24

1    construction process when we are required under the local

2    patent rules to meet and confer about our constructions, Kids

3    II proposed that this term be given its plain meaning.  And in

4    response, Wonderland rejected that proposal and insisted that

5    we redefine this term.

6         Well, that begs the question why.  Well, we believe

7    that Wonderland wants to read ambiguity into this term so it

8    includes both direct and indirect attachments.  And so what

9    they'd essentially have you do by redefining the term is define

10   it as a bassinet indirectly mounted on the frame body.  And,

11   once again, the reason for this is they have to rewrite the

12   term in order to have an infringement case.

13        Now, as I discussed earlier, Your Honor, just to use

14   this as an example, if this is a bassinet, I don't have the

15   figure of Kids II's bassinet, but Kids II's bassinet is not

16   mounted on the frame here.  Kids II's bassinet is actually

17   mounted to the side panels, so it would be mounted down here.

18   And then it's in turn either mounted to like a hook-and-loop

19   fastener, like a Velcro fastener, or mounted to a padded cover

20   which is then -- either one is then in turn mounted to the

21   frame.  So we're either two or three steps removed from being

22   mounted on the frame.

23        With that context in mind, we think, Your Honor,

24   everyone knows what the term "mounted on" means.  For example,

25   the door on the side of your courtroom is mounted on a door

1   frame.  And just like it's described in the '245 patent,

2   there's connectors that mount that door to the door frame.

3   They can be hinges.  It could be a hinge at the top like the

4   door over here, Your Honor.  But I don't think any of us could

5   dispute that the door handle is mounted to the door itself.

6   It's not mounted to the frame.  So the difference that really

7   illustrates what the core of the dispute is over this term,

8   Wonderland essentially wants to argue that the door handles are

9   mounted to the door frame except for here we are talking about

10  a connection between a bassinet and the frame of a playard.

11          Now, as I mentioned, Wonderland asserts in its

12  briefing -- and I won't go into this too much -- but they

13  assert that the specification shows both indirect and direct

14  attachments between the bassinet and the frame body.  And

15  what's shown in the specification is you could have a hook or

16  another connector that you could use to connect the side panel

17  to the frame.  Well, this is no different from our door

18  analogy.  It's no different from the hinge.  But it's a bit of

19  a stretch to argue that the door is a connector that then

20  connects to a connector that then connects to the door frame.

21          So what's really happening here with this term is

22  honestly both parties are advocating infringement issues via

23  claim construction.  That's why we think we should just give

24  this term its plain meaning and let our experts fight over it

25  later.  However, if Your Honor decides to redefine this term or

1    if the Court decides to redefine this term, I think we've got

2    to put a limit on how many intermediate connections you can

3    have and still call something or describe something as being

4    mounted on.  And that's why in the alternative we have proposed

5    this directly attached to language.

6            And as one final point, I just want to caution the

7    Court we are not trying to suggest that the Court construe this

8    term with reference to the accused product.  That's exactly why

9    we believe that the correct construction is plain meaning.

10   Rather, I have only given you a glimpse because I want you to

11   have some context, Your Honor, as to why there's a dispute.

12   And the Federal Circuit in the Wilson Sporting Goods case has

13   said it's okay to take a glimpse of the accused product to

14   understand why there's a dispute.

15           So let's move on to the plurality of side panels

16   limitation.  As you've heard, we want to construe this as all

17   of the side walls of the bassinet while Wonderland would like

18   to construe this as at least two of the side walls of the

19   bassinet.

20           Now, I want to be clear up front about something.  We

21   don't dispute that the term -- the ordinary meaning of the term

22   plurality in a vacuum is two or more.  Nor do we dispute that

23   the bassinet can have two or four or six or any other number of

24   side panels so long as it has two or more.  But, rather, what

25   the issue here is is do the claims in the intrinsic record

1    demonstrate that when they refer back to the plurality of side

2    panels throughout the claim does it really mean all of the side

3    walls of the bassinet.  And we submit, Your Honor, that the

4    answer is yes.  And this is the case for the following reasons.

5            First, the Federal Circuit has recently basically

6    taken a similar approach in the Apple v. Samsung case.  And in

7    that case, we were dealing with a plurality of heuristic

8    modules.  And that's a big word, but heuristic modules

9    essentially just means a search function on a smart phone.  And

10   so the issue was when you refer to a plurality of heuristic

11   modules or a plurality of these search functions whether or not

12   they actually meant all of the plurality or did they mean just

13   a subset, two or more of the plurality.

14           And the Federal Circuit actually held that they meant

15   all of the plurality despite the use of this ordinary language

16   that Plaintiff's counsel has described to you.  They actually

17   meant all here for two reasons.  One, because the term "each"

18   followed the use of the term "plurality" and made it clear up

19   front that the inventors meant all of the plurality.  And then,

20   two, the intrinsic record supported that interpretation.

21           So with that in mind, let's look at the claim

22   language in the intrinsic record in the present case.  Now,

23   turning to the claim language, the first thing we should

24   consider is the claim language defines this as a bassinet

25   comprising a plurality of side panels each connecting to the

1   bottom panel with one end and to the frame body with the other

2   end.  So because we are talking about a bassinet, it has to be

3   an enclosure.  Otherwise, we don't have a bassinet.  And as I

4   mentioned earlier, the baby would fall out.  So when they refer

5   to a plurality of side panels each connecting to the bottom

6   panel with one end and to the frame body with the other end, we

7   have got to be talking about all of the side panels right up

8   front.  Otherwise, we don't have an enclosure.

9        Second, any other interpretation would ignore the

10  purpose of the invention and how it works.  And, for example,

11  this next bullet when they are describing the location of the

12  bottom panel -- or pardon me -- the opening in the bottom panel

13  as being positioned distally from said plurality of side

14  panels, they've got to be referring here.  Even though they are

15  referring back to the plurality, they have got to be referring

16  to all of the side panels because if they weren't this language

17  "positioned distally" would not make sense.  The term

18  "positioned distally" simply means the farthest distance.

19       A pencil has a proximal end or this pointer has a

20  proximal end and a distal end.  And if they weren't referring

21  to all of the side panels, we wouldn't know where the opening

22  was positioned.

23       And the third reason is in this third bullet the

24  claim language describes a height-adjustment device configured

25  on the plurality of side panels.  Now, we have heard some

1    claim-drafting principles.  But one principle is that when you

2    use the definite article "the" typically you are referring back

3    to the same claim term that you introduced earlier in the

4    claim.  So when they refer to "the" here, they are referring

5    back to the same plurality that make up our bassinet.  So, in

6    other words, we are talking about all of the plurality here

7    because we've got to have all of the plurality in order to have

8    a bassinet.  And, moreover, as I'll show you in one second,

9    this height-adjustment device would not work unless they were

10   configured on all of the plurality.

11         So, for example, as I mentioned earlier, the second

12   feature of the invention is an adjustable-height bassinet that

13   may be lowered from a shallow depth to a deeper depth.  And it

14   can -- if the repeated reference to the plurality of side

15   panels or plurality of side panels did not mean all of the side

16   panels, this simply would not work.

17         For example, this is Figure 5 from the specification.

18   And just using this as an example, if we were talking about

19   less than the plurality as Plaintiffs suggest, for example,

20   let's just take these two that are highlighted, how are we

21   going to raise and lower the bottom panel to different depths

22   between these two using states if we have only got our

23   height-adjustment device on less than the plurality.

24         And we submit, Your Honor, that there's Fed. Circuit

25   law on this that has stated that a construction that renders a

1    claimed invention -- we have already mentioned this --

2    inoperable should be viewed with extreme skepticism.  You

3    should view their construction as well with extreme skepticism

4    because they are advocating essentially that you construe this

5    in a manner that would not allow for one of the features in the

6    invention and would potentially render the invention

7    inoperable.

8            Now, Wonderland has countered this in their briefing

9    -- and I want to mention this just for a second before we move

10   on -- that, well, it's certainly feasible and that you could

11   certainly have a height-adjustment device on less than all of

12   the side panels.  Well, we submit, Your Honor, that's not going

13   to result in height adjustment.  What that would result in is

14   some type of strange incline where it would be inclined for in

15   this example from this corner down to this corner.  And there's

16   a difference between incline and height adjustment.

17           And it's also worth mentioning here that most

18   bassinets that are on the market today can't have an incline

19   because it's simply not safe under safety standards for the

20   bassinet to have an incline.  So when they were talking about

21   referring back to the plurality of side panels and they were

22   talking about this height-adjustment device, they were talking

23   about all.  Because you've got to keep in context going back to

24   this vacuum we can't just look at it in a vacuum.  We've got to

25   keep in context what the invention here is which really brings

1   us to the last reason why we believe we're correct.

2          And there's simply no support for this concept that

3   you can put the height-adjustment device on less than all of

4   the side panels.  So if we are talking about a plurality and we

5   are using our four-sided example on two of the four, there's no

6   support anywhere in the specification for that.  There's no

7   support anywhere in the file history.  And so while in a vacuum

8   you might be able to put a height-adjustment device on less

9   than the plurality and it certainly might be feasible, the

10  patent simply doesn't provide any support for it.

11         The next two terms we'll discuss together.  They are

12  located above the folding device versus located right above the

13  folding device.  And we believe that our construction, Your

14  Honor, contrary to Plaintiff's argument actually is the one

15  that's adopting the plain and ordinary meaning of this term

16  which simply means something went directly over or it refers to

17  a change in the vertical elevation over something.

18         Wonderland's proposal, on the other hand, if I

19  understand it correctly relies on this premise that the terms

20  "above" and "right above" refer to a change in horizontal

21  position of the opening in the bottom panel.  So, essentially,

22  they are saying it's either over, so it's still above it, or

23  it's directly over which just means it's positioned now

24  directly over it; and, thus, we are talking about a horizontal

25  change.  So the issue is do the terms "above" and "right above"

32

1   refer to a change in the vertical position, and we believe the

2   answer is yes.

3            And just to further explain this before I move on,

4   Your Honor, when we say that it's located above the folding

5   device we are talking about a higher position.  And when it's

6   located directly above, we are talking about that there's a

7   change in the vertical elevation of the opening.

8            Now, this is supported by the claims themselves.  And

9   here's why.  The claim language itself already defines the

10  horizontal positioning of the opening in the bottom panel, and

11  what the claims state is that wherein the bottom panel has an

12  opening positioned distally from said plurality of side panels

13  and located above the folding device of the frame body so that

14  the claims have already addressed our horizontal position of

15  the opening with the "positioned distally" language.  And so

16  the horizontal position because it's already fixed in this

17  bottom panel with this language would have to be talking about

18  a change in vertical position.

19           Otherwise, if you adopt Wonderland's construction,

20  you are going to render this "positioned distally" language

21  meaningless which is improper under Fed. Circuit law.  You've

22  got to give meaning to all of the terms.  And what they would

23  like to have the Court or what they are proposing that the

24  Court do is read out this "positioned distally" language.

25           And to illustrate this point just so you have an idea

1    of what this "positioned distally" language is, here we are.

2    And you can see the opening in the example in the specification

3    is positioned distally from all of the side panels.

4            We also believe the specification directly supports

5    our interpretation of this claim term.  As we discussed

6    earlier, the whole purpose of the first feature is to provide

7    one that can be folded up without removing the bassinet from

8    the playard.  And what the specification states is when you

9    need to fold up the playard or when the playard needs to be

10   folded up it can be set to the second using state so the

11   opening gets close to the folding device.

12           So contrary to Plaintiff's argument, there is direct

13   support in the specification that supports our interpretation

14   that these two terms refer to a change in the vertical

15   positioning of the opening.  And to once again give you an

16   example of what this looks like, in Figure 3 on the left we are

17   looking at the bassinet when it's set in the first using state

18   so it's at a higher position.  In Figure 5, on the right is the

19   bassinet set in the second using state.

20           So the opening can be switched from a higher position

21   to a lower position depending on the using state of the

22   bassinet.  And the specification teaches when it's time to fold

23   it up you put it in the position shown in Figure 5, and then

24   you simply fold up your playard.

25           So, once again, the only way you can really adopt

1    their proposal is if you construe the terms in a vacuum.  You

2    ignore not only the "positioned distally" language in the

3    claims themselves but also the teachings of the specification.

4          Let's move on to the cover limitation.  Now, we

5    propose that this be construed as a flap.  Wonderland wants to

6    propose that it be construed as an overlay that closes an

7    opening.  And I want to stop right here.  We'd be happy with

8    this construction, Your Honor, if they'll agree that that

9    construction is not so broad that it would encompass a mattress

10   or a cushion which is a separate and distinct structural and

11   functional component in the patent.  But the problem is we

12   believe they are going to try to use this construction to

13   broaden the scope of the term "cover" to include the mattress

14   or the cushion in Kids II's product.

15         Now, our construction is really supported by both the

16   claims in the specification.  Once again, we are looking to the

17   claims in the specification.  We are trying not to construe

18   these terms in a vacuum.  The claims state that you've got a

19   cover configured near the opening and capable of opening or

20   closing relative to the opening.  The specification also states

21   that a cover is further configured near the opening at the

22   bottom panel and can be operated to open or close relative to

23   the opening.

24         So in this case, the specification actually lines up

25   pretty closely to what we've got in the claims.  So we think

1    it's okay -- when the specification and the claims line up, we

2    think it's okay to maybe look a little bit to the specification

3    for guidance.

4              And so what do they show for the cover in the

5    specification?

6              Well, what's shown in 14 here, Your Honor, on the

7    left of Figure 4 is the cover.  And then 13 is the opening, and

8    then you can see the folding device sort of peeking through

9    there in 41.

10             So our construction is based not only on the claims

11   but on the specification.  And we think if something has to be

12   configured near the opening, the plain meaning of that means

13   it's probably similarly sized to the opening.  We're not

14   talking about something that can encompass the whole bottom

15   panel or floor of the bassinet.  If it's got to be capable of

16   being readily opened and closed, then it's got to be something

17   easy to use.  And in a nutshell, Your Honor, that's a flap.

18             Now, as I have already mentioned, we believe

19   Wonderland's construction is impermissibly broad and it's

20   designed to encompass a cushion or a mattress.  And the problem

21   with this as I mentioned earlier is the cushion or mattress in

22   the invention is separately defined as a distinct structural

23   and functional component.  Just referring to the specification,

24   the specification states that when the cover is in the closed

25   state as shown in Figure 3 the cover fully covers the opening.

1   Now we separately define the cushion.  A cushion can be further

2   placed on the bottom panel of the bassinet.

3          And then we have seen the language here before about

4   when the playard needs to be folded up the operator need only

5   remove the cushion, then pull up the cover and stick his or her

6   hand into the opening to operate the folding device and fold up

7   the playard.  And to further emphasize this point, once again,

8   we see Figure 6 again; and they are described and shown as

9   separate components.

10          Now, it's worthwhile just pausing here and looking at

11  the facts of Tessera which is the case I mentioned earlier

12  because this really illustrates why it's problematic to take

13  the approach that Wonderland is advocating here.  In Tessera

14  the issue turned on whether -- we are talking about a

15  semiconductor chip, and the issue turned on whether a top layer

16  of a semiconductor chip could include a solder mask layer.

17          And what the Fed. Circuit said was that where the

18  specification defines them as separate and distinct components

19  it would be improper.  And so they rejected Tessera's argument,

20  and in rejecting Tessera's argument they said it would be

21  flatly inconsistent with the preferred embodiments depicted in

22  the specification.  And, notably, Tessera made the same

23  argument that Wonderland is -- if I understand it correctly, is

24  trying to make here that we are importing limitations from the

25  specifications into the claim.  Well, the Federal Circuit

1    rejected that exact same argument in Tessera because of the

2    fact that the components were defined separately in the

3    specification.

4         And then the Fed. Circuit went on to say that it

5    would be disingenuous for Tessera to argue that the solder mask

6    layer on the accused products is part of the top layer when the

7    patent describes the solder mask as separate and distinct from

8    the top layer.  And we submit, Your Honor, it would be

9    disingenuous for Wonderland to make the same argument here.

10        So let's move on to the last two terms of the '245

11   patent.  This is the first using state and the second using

12   state.  I have already told you about the second feature of the

13   invention is this idea that you can set it into two different

14   depths, either the first using state or the second using state.

15   We believe the first using state has a shallow depth, and the

16   second using state has a deeper depth.  So the issue is do

17   these terms refer to the relative elevation of the bottom

18   panel, and we believe the answer is yes.  And here's why.

19        We think that the inventors have defined these terms

20   throughout the patent.  They first defined these terms in the

21   abstract, and in the abstract they stated a height-adjustment

22   device that's further configured on the side panels of the

23   bassinet for adjusting the height of the bassinet by

24   selectively setting the bassinet in a first using state that

25   has a shallow depth or in a second using state that has a deep

1    depth.

2          Second, when they were talking about why the

3    invention was advantageous over the prior art, they referred to

4    these two figures which are on the face of the patent, Figure 1

5    and Figure 2.  And what they essentially said was why the

6    invention was advantageous is we now can have what's considered

7    a more specific or a more general bassinet configuration on the

8    left in Figure 1 and then something similar to a traditional

9    playard in Figure 2.  We can now combine these in the same

10   invention because we've got a height-adjustment device, and we

11   can drop them between these two different depths.

12         And then in the specification the inventors once

13   again define these terms.  They state that the first using

14   state having a shallower depth, i.e., the bottom panel locates

15   at a higher position relative to the playard.  And then they

16   define the second using state is when the four side panels of

17   the bassinet extend to what is shown in Figure 5, and this

18   causes the bottom panel to locate in a lower position relative

19   to the playard.

20         And Kids II's language looks to not only the

21   specification but also the teachings of the summary of the

22   invention in the abstract.  But, also, the last point is when

23   this term is used in the claims all of the claims use these two

24   terms in connection with the height-adjustment device.  If

25   we're not talking to adjust -- talking about adjusting --

1  excuse me –– the height of the bottom panel, then I'm not sure

2  what we are talking about with these two terms.

3       Now, Wonderland would essentially have you construe

4  these as a first position in which the bassinet may hold a

5  sleeping baby and a second position in which the bassinet may

6  hold a sleeping baby.  And beside the fact that they don't

7  refer to height adjustment at all, the other problem with this

8  is if you remember the teachings of the specifications refer to

9  how the first position is a shallower depth that could be used

10  for a sleeping baby but the second position is this position

11  that's more akin to a playpen that would be used for an older

12  toddler to stand and play.  So we think that they are blurring

13  the issues with this "sleeping baby" language and it can cause

14  –– it would definitely cause problems later.

15       So unless you have questions on that patent, Your

16  Honor, I'm going to move on to the '949.  You have already

17  heard there's six terms.  We believe construction of one of

18  these terms is possible while the other five are indefinite.

19       Now, the '949, once again, we are talking about a

20  playard here.  It's essentially a playard with double columns

21  at each corner.  And when they were talking about the object of

22  the invention, they said that one object is the provision of a

23  playpen with columns which can provide a feeling of structure

24  abounding in a variety of materials.  So we're not exactly sure

25  what they were talking about there.  But then the other object

40

1    was that the present invention is the provision of a playpen

2    with columns which allow for the application of additional

3    artificial decorations.  I think what they were talking about

4    there if I understand it is you could put some type of

5    artificial decoration on one of the columns.

6         So you've seen the terms.  It's column, first corner

7    component, a second corner component and then a distance

8    between the two second columns and the two first columns.  And

9    there's three terms down here highlighted in red, but we have

10   just highlighted them all for your reference.

11        So the first term is the term "column".  And it's our

12   position, Your Honor, that both the intrinsic record and the

13   common meaning of this term demonstrate that they've got to

14   bear some type of vertical load here.  Wonderland apparently

15   believes that the columns of the playpen do not bear a vertical

16   load.  So the issue is simply do they bear a vertical load, and

17   we believe the answer is yes.

18        So looking to the specification, really common sense

19   dictates that they've got to bear a vertical load.  If you take

20   a look at Figure 2 on the right in this slide, you can see

21   we've got a corner component up here at the top, at the very

22   top next to the red arrow; and then you've got some rails.

23        Well, if the columns of the invention aren't bearing

24   a vertical load, what's going to hold up that corner component

25   and those rails?

1          And then in Figure 4 it's essentially just an

2     exploded view of what you see at the top of Figure 2, the top

3     of one of the corners.  Once again, if these two columns

4     labeled 16 and 15 that are inserted into the sleeves in these

5     top corner components don't bear a vertical load, well, what's

6     holding up that corner component?  What's holding up those rail

7     units that are shown coming apart from the corner component?

8          So the specification really supports our common-sense

9     interpretation.  And we submit, Your Honor, that our

10    interpretation is also just supported by the general meaning of

11    the term "column".  If you just look to a dictionary definition

12    as to what column means, it can mean either a vertical shaft

13    designed to bear axial loads in compression or a supporting

14    pillar.  Both of those definitions indicate some type of

15    support or some type of vertical load.

16         Now, the response to this if I understand it by

17    Wonderland is that one or more of these two columns would bear

18    a lateral load.  And while there's nothing in the specification

19    that we believe supports this concept or discusses this concept

20    of one or more of the columns bearing a lateral load, we don't

21    dispute that the columns could also bear a lateral load in

22    addition to a vertical load.  And there's nothing in our

23    construction that prohibits that.  Just because it's bearing a

24    vertical load doesn't mean it necessarily does not bear a

25    lateral load.  But based on the descriptions in the

1    specification, there can't really be a dispute that a column

2    has to bear some type of vertical load.

3         Now, before I move on to the next two terms, there's

4    one more issue that I should discuss here; and this is this

5    concept of Wonderland wanting to construe a column as

6    relatively slender.  The problem with this is that we believe

7    the jury is going to be left guessing what they meant or what

8    the Court has meant if we adopt this "relatively slender"

9    language when deciding the ultimate question of infringement.

10   In other words, how are we going to -- that's sort of a term of

11   degree, so how are we going to know whether a column is

12   relatively slender.  And this presents an even -- a bigger

13   problem, how is a competitor who's trying to design around this

14   limitation supposed to know whether a column is relatively

15   slender.  Once again, it's a term of degree.  So adopting

16   Wonderland's construction would add ambiguity to otherwise a

17   straightforward term.  We are talking about a column here.  And

18   we also think it potentially would defeat the notice function

19   of the patent which really brings us to the terms that we

20   believe are indefinite.

21        So it's our position that the remaining terms, Your

22   Honor, simply do not provide enough guidance to allow a person

23   of ordinary skill in the art or a competitor to determine the

24   scope of the invention.  And the Federal Circuit, the standard

25   for this is essentially they have got to be sufficiently

1    definite.  The claim terms or the scope of the terms -- excuse

2    me -- need to be sufficiently definite to inform the public of

3    the bounds of the protected invention.  In other words, Your

4    Honor, a competitor when they read a patent has to be able to

5    determine whether what they're designing falls within or

6    outside the scope of the invention.  And because these next

7    five terms don't provide us with sufficient guidance we believe

8    they're indefinite.

9            So the first three terms are a distance between the

10   two second columns and the two first columns.  And if we look

11   to the claim language, this is how these three terms are used.

12   The claim requires that a distance between the two second

13   columns is larger than between the first two columns.  So, in

14   other words, we are talking about a measurement here between

15   two second columns versus two first columns.

16           And in Honeywell which we'll discuss in a minute, the

17   Federal Circuit has held that where a measurement is claimed

18   the patent must provide sufficient guidance as to how to take

19   that claimed measurement.  Otherwise, the claims are

20   indefinite.  So the real issue is do we have sufficient

21   guidance as to how to take or how to measure the claimed

22   distance, and the answer is no.

23           So let's look at where these terms appear in the

24   claim.  They are first introduced as a plurality of first

25   columns and a plurality of second columns.  So you've got a

1    bucket of first columns, and you've got a bucket of second

2    columns.  And under their interpretation, we are talking about

3    at least two or more; and so you've got a bunch of first

4    columns and a bunch of second columns.

5          And then down here in the last limitation that we

6    have highlighted we refer back to them as a distance between

7    the two second columns as larger than that between the two

8    first columns.  And the problem is when you've got a whole

9    bucket of first columns and a whole bucket of second columns

10   and then you only refer to two of the second columns and two of

11   the first columns and you don't give us any indication which

12   two of the first columns and which two of the second columns we

13   should use to measure the claimed distance, that's where the

14   problem arises.  So based on this language, we believe it's

15   simply impossible to determine which two second columns and

16   which two first columns of the plurality should be used for

17   measuring the claimed distance.

18         So, for example, this is Figure 2 from the patent.

19   We have annotated it with some lines and some letters here for

20   reference, but this is the example in the specification.  And

21   in this figure, you could take the measurement between A and B.

22   So assuming there's two first -- there's a first and second

23   column at each of these corners, you could take the measurement

24   between A and B, you could take the measurement between A and

25   C, or you could take the measurement between A and D.  And this

1  is just showing a four-column playpen.  Things get more

2  complicated if we were talking about a six-column or six-corner

3  playpen.

4         And so if I understood Wonderland's argument

5  correctly, they say that, well, the measurement is on a

6  diagonal between A and C because those are the opposite

7  columns.  Well, there's nothing in the specification that tells

8  us that A and C are the opposite columns.  And depending on how

9  you look at this, opposite columns could be A and D.  If you

10  are looking down the length of the playpen, opposite columns

11  could be A and B if you are looking down the end of the playpen

12  or they could be A and C.  I mean, it really depends on where

13  you cut the playpen in half; and there's no indication of where

14  we should cut the playpen in half to take this measurement.

15         But the issue really doesn't end here.  What's more

16  problematic is not just the fact that we don't know how to take

17  the measurement.  It's that depending on how we take this

18  measurement a playpen may fall within or outside the scope of

19  the invention.  And this is better illustrated by the following

20  slide.

21         So in this slide, this is a demonstrative.  So if the

22  columns labeled S1, 2, 3 and 4 are second columns and the

23  columns labeled F1, 2, 3 and 4 are first columns, once again,

24  this would be sort of looking down from the top on Figure 2.

25  So you could once again take the measurement either on a

46

1    diagonal or down the end of the playpen.  And if we take it on

2    a diagonal between S1, F1 and F4 and S4, we fall within the

3    scope of the invention 'cause as you can see by our lines there

4    the distance between the second columns at S1 and S4 is greater

5    than the distance between the first columns at F1 and F4.

6         But if we measure it down the end -- we assume this

7    means opposite if that's what they are saying opposite means --

8    then we fall outside the scope of the invention because the

9    distance between S1 and S3 is less than the distance between

10   the first columns at F1 and F3.  And to make matters worse,

11   Your Honor, not only isn't there indication which way to

12   measure the distance, but going back to this slide we have no

13   indication whether to go between A and B, A and C or A and D.

14   There's no indication in the patent where to take the

15   measurement.

16        So do we assume that the patent -- under the patent

17   that we should take the measurement here across the middle?  Do

18   we assume we should take it across the top?  Do we assume could

19   we take it on a diagonal potentially?

20        There's no indication at all where we should take

21   this measurement.  So it's real difficult as a competitor when

22   you are looking at something like this and there's absolutely

23   no guidance as to not only how to take -- not only how to take

24   the measurement but which two first and two second columns that

25   should be used to take the measurement to determine what the

1    scope of the invention is.

2           So with these facts in mind, with the teachings of

3    the specification in mind, let's turn to Honeywell.  I

4    mentioned I would discuss this briefly.  So in Honeywell you

5    have already heard a little bit about the case.  It dealt with

6    a sample preparation method for this polyester yarn or product.

7    And in preparing the product, one of four sample preparation

8    methods could be used to measure the claimed melting point.

9    And because of the way that you measured this melting point

10   elevation was critical to whether a product fell within or

11   outside the scope of the invention, the Federal Circuit held

12   that the claims were insolubly ambiguous and indefinite.  And

13   in reaching the holding, the Federal Circuit held that there

14   was no indication in the intrinsic record or no guidance in the

15   intrinsic record as to which of the four measurements could be

16   used.

17          And what Honeywell did in response to this argument

18   was they said, well, let's just adopt the one method that

19   maintains the validity of the patent.  And what the Federal

20   Circuit said is, huh-uh, you can't do that.  You can't just

21   adopt the one method that will result -- the one method of

22   taking this measurement that will result in the validity of the

23   patent when there's nothing that eliminates the other methods

24   of taking the measurement.  So if you've got four measurements,

25   you can't just adopt the one of the four that results in either

1    infringement or maintaining the validity of the patent when

2    none of the other four are eliminated.

3           So like in the Honeywell case, we don't have any

4    indication here whether measuring -- or I should say like in

5    the Honeywell case here, the method of measuring the claimed

6    distance in the playpen is critical to determining whether we

7    fall within and outside the scope of the invention.  And

8    contrary to their assertions, Your Honor, Wonderland's

9    assertions, there is no indication in the spec.  There's some

10   language that talks about opposite columns, but they don't tell

11   us what opposite columns are in the specification.

12          Now, if I understand Wonderland's position in the

13   briefing correctly, they also want to take this any-one-method

14   approach.  Well, as I just mentioned, that any-one-method

15   approach was rejected by the Federal Circuit.

16          So let's turn to the last two claim terms of the '949

17   patent.  This is the first -- a first corner component and a

18   second corner component limitations.  Now, I'll tell you why

19   Wonderland's proposal or proposed instruction is improper in a

20   minute; but let's first talk about why we believe these are

21   indefinite.

22          So, first, to be clear, we're not contesting the

23   location of the first and second corner components.  If there's

24   one thing that's clear about these terms, we know the first

25   corner components are at the bottom and the second corner

49

components are at the top.  The specification tells us that.

Rather, here's the issue.  It's simply impossible when you are referring to a plurality of first corner components up here and then a plurality of second corner components and then down in this next limitation we once again refer to a first corner component and a second corner component in the fifth limitation so where the top arrows are pointing to there, Your Honor, up here.  We refer to a first corner component or the patent refers to a first corner component and then a second corner component.  And then, once again, it refers in the next limitation that's highlighted a first corner component and a second corner component.

And it's impossible to know whether we are talking about the same first corner components, whether the first columns are connected to the same first corner component as the second columns because these terms are introduced with the indefinite article A which usually means in the claim drafting that you are introducing a new component.  But it's unclear.

Were they really meaning to say that the first column is connected to a different first corner component at the bottom than the second column?

So here's what that results.  And this really gets us right back into the fact that we don't know the scope of the invention.  Any of these possible configurations are possible under that claim language.  We could have one or both the first

50

1   and second columns are both connected to the --

2         THE COURT:  Excuse me, Mr. Amy.

3         MR. AMY:  Yes, sir.

4         THE COURT:  You've got ten minutes of your time left.

5         MR. AMY:  Thank you, Your Honor.

6         So we could have this configuration where a first and

7   second column are both connected to the same corner components,

8   the same first and second corner components.  Or in B we might

9   have two first corner components down here and one up here.  Or

10  in C we could have two second corner components and simply one

11  down here connecting to the two columns.  Or in D we could have

12  two separate first and second corner components under this

13  language.

14        And this is just in the context of a four-column

15  playpen.  You can imagine when you take this out if you build a

16  bigger -- say we are building a six-sided playpen that this

17  problem becomes exponentially greater.  And that's why there's

18  a problem.  We don't know what they really intended by this

19  language.  The language is far from clear, and it's impossible

20  as a competitor to determine the scope of the invention.

21        Now, let's talk briefly about Wonderland's proposed

22  construction.  They want to construe -- going back to this

23  slide, they want to construe this term as a distinct part of an

24  assembly at a place at which two converging surfaces meet.

25  Now, even if you don't ultimately agree with us, don't

1   ultimately agree that these terms are indefinite, Wonderland's

2   proposed construction can't be right.  And here's why.

3        It's well settled that in the absence of evidence to

4   the contrary we got to presume that when inventors use two

5   different terms in a claim that they presume for them to have a

6   different meaning.  And Wonderland, however, wants to construe

7   these as the same exact thing.  So they want to ignore the fact

8   that we are talking about two separate terms, and they want to

9   assign two separate terms the same meaning which is improper

10  under Federal Circuit law.

11       So with that in mind, let's move on to the '919

12  patent.  Now, there's only one disputed term here.  The '919

13  patent yet again we are talking about another playpen or

14  another playard that's got a bed frame structure, that's got

15  some fabric mounted on the bed frame structure to define the

16  surrounding walls.  And then it's got what's called a plurality

17  of positioning post mounted on the fabric member.

18       And really the next slide gives you a better

19  indication of what they are talking about here.  Figure 5 would

20  be a top-down view of one of the corners.  What's shown in

21  green would be the upright tube of the frame.  What's shown in

22  red would be the positioning post.  And then what's shown in

23  yellow would be the fabric member.  So the positioning posts

24  are either inserted, lodged inside or clamped inside the

25  upright tube to hold the fabric in place.

52

1          Now, there's just one disputed term here.  It's the

2    term "attachment structure".  We believe that it should be a

3    device that makes a physical connection to the inside of the

4    support tubes while Wonderland wants to more broadly construe

5    this as a device that holds something in position.  And, once

6    again, I think they believe at least, Wonderland believes, that

7    we are trying to import limitations from the specification.

8    But that's simply not true, Your Honor.  So the issue here is

9    whether it makes a physical connection, and we believe the

10   answer is yes.  And let me show you why we don't think we are

11   importing limitations from the specification.

12          If you look to the language itself, we are talking

13   about an attachment structure.  And we believe a person of

14   ordinary skill in the art when they see the word "attachment"

15   they are going to understand what that term means.  And the

16   plain meaning of the term "attachment" is a physical connection

17   by which one thing is attached to another or an attaching by a

18   physical connection.  So when Wonderland's attorneys used the

19   term "attachment" to define a structure, they were limiting the

20   term to a device that makes a physical connection.  And any

21   other interpretation would ignore the language of the claimed

22   term itself.

23          Second, the claim defines -- if you look further down

24   that clause there, the claim defines the attachment structure

25   as configured to mount and secure the edge portions of the

53

1    enclosure member -- of course, we are talking about the fabric

2    there -- along the support tubes.

3           The use of the terms "mount and secure" also indicate

4    a physical connection.  And while what's ironic here is in the

5    context of the '245 patent if you go back, we talked about the

6    term "mounted on".  On the term "mounted on", they wanted to

7    argue that that term means attached.  Well, they'll run from

8    that term here because they don't want the term here to mean

9    attached.  They don't want it to indicate a physical

10   connection.

11          And then, finally, the last support for our

12   construction, we have this inside -- this language "in the

13   inside of the support tubes" in our proposed construction.

14   Well, we believe it has to be limited to the inside of the

15   support tubes because during --

16          THE COURT:  Five minutes, Mr. Amy.

17          MR. AMY:  Thank you.

18          During the prosecution history, Your Honor, they

19   disclaimed any structure in which it made contact with any

20   other place than the inside of the support tube.  So what

21   they've said was that you essentially had to have the only

22   contact that could be between the side panel or the enclosure

23   member could be to the inside.  You couldn't make any contact

24   with the outside surface of the support tubes.

25          And during the prosecution history, this is what

54

1    their attorneys wrote:  "It's simply not reasonable to construe

2    the limitations in the above table" -- and they are talking

3    generally about this limitation up here, the attachment

4    structure limitation -- "in the above table as contemplating

5    anything other than an outside surface of the tube that are

6    free from any substantial contact with the fabric or enclosure

7    member."

8         So based on that language, we believe we have got to

9    be -- our physical connection has to be to the inside of the

10   support tube.

11        Thank you, Your Honor.

12        THE COURT:  All right.  Let's take a ten-minute

13   break, and then we'll finish up.

14        Court's in recess for ten minutes.

15        (A short recess was taken.)

16        THE COURT:  I won't count this against anybody's

17   time, but I was trying to remember the last case where the

18   Federal Circuit reversed me.  And they had said in the patent,

19   I think, detect/analyze.  And I said, well, that could mean

20   just detect or it could mean just analyze -- or the intent

21   could be just detect or it could be just analyze, or it could

22   be detect and analyze or it could be detect or analyze.  And

23   since the inventor testified he had no idea what he meant, that

24   it was -- the patent was indefinite and invalid.  And the

25   Federal Circuit reversed me and said it was obvious what he

55

1    meant and that the patent was valid.

2            Anybody run across that case getting ready for this?

3            MR. AMY:  Not familiar.

4            THE COURT:  I can't remember the name of it.  Anyway,

5    never mind.

6            All right, Mr. Roche.

7            MR. ROCHE:  Your Honor, I'd like to address some of

8    the points that Mr. Amy made.

9            The idea that a cover is limited to the flap shown in

10   the patent, I think, is simply directly contrary to what the

11   Court said in Phillips.  The fact that a mattress could serve

12   as both a cover and a mattress, I think, doesn't take away from

13   the rule that applies here on claim construction; and that is

14   -- and this is a theme throughout -- that a term gets the full

15   scope of its ordinary meaning unless it's clearly from the

16   specification or the file history that there was an intent to

17   limit that term.

18           So what that means here is that cover and several of

19   the other terms like mounted on and others are -- what Kids II

20   is clearly trying to do is to -- when it comes to these terms,

21   they want to reach into the specification and get the specifics

22   and put that into the claim without any justification by way of

23   argument that was made by Wonderland during the prosecution and

24   without any clear lexicography which is what the term the cases

25   use but a definition of a term that's different from what

56

1    people understand the term to mean.  So the -- and the idea

2    that you get the full scope unless you have clearly intended to

3    limit it is something that the Federal Circuit has said as

4    recently as 2013 in 3M versus Tredegar, 725 F.3d 1325.

5            So I think that what's going on here when it comes to

6    the terms where we hear a definitions coming from Kids II they

7    are reaching right and left to the specification to get

8    examples, to get specifics and saying -- essentially, they seem

9    to be saying we are different from what they show in their

10   patent and so it would be unfair to find us to be an infringer.

11   That's essentially what they're saying.

12           But the claims, the purpose of claims is to cover

13   variants that you may not have put into your patent but are

14   clearly variants that should be within the scope of the claim

15   that you get given what the prior art is.  So that's -- you

16   know, it's interesting.  I mean, Mr. Amy did a great job; but

17   he flipped from getting very specific, quoting from the

18   abstract and quoting from the specification to justify, you

19   know, narrowing these terms; and yet when he talks about the

20   indefiniteness argument we are in a vacuum.  He sucked all the

21   air out of this room as far as I'm concerned.

22           I mean, he didn't talk about specification when he is

23   talking about indefiniteness.  He drew this diagram.  This

24   isn't the diagram of their product.  Their product the inner

25   columns are located here.  And so under virtually any analysis

1    unless you completely ignore the specification about what's

2    going on and what gaps and where there's a gap and how the

3    fabric is held generally speaking in the patent, we're not

4    talking about -- we're talking about a total vacuum here when

5    it comes to the indefiniteness argument.  And yet when we talk

6    about their specific definitions, you know, let's see what the

7    specification says on that.  Oh, that's what it means.  So, you

8    know, I think we have to be very careful here.

9            The other thing is, I mean, the idea that we're going

10   to quote the dictionary is something that I flagged in our

11   opening brief.  The Federal Circuit has -- I mean, one of the

12   other things that it did in Phillips besides make clear that

13   you can't limit the claims to the examples in the patent is

14   they also -- the other big thing they did in that case was

15   explain how dictionaries get used.  You don't use them to pick

16   the broadest possible meaning that you can find in a

17   dictionary.  It's something that you can use as a guide, but it

18   has to also be consistent with and it can't diverge from what

19   is in the specification.

20           So when he shows a column and one of the definitions

21   of column it talks about vertical support, sure, there are a

22   lot of columns that provide vertical support.  There's also a

23   lot of columns -- in fact, one of the ones that was flashed up

24   there; I don't have it -- but it was a decorative column like

25   in some of the ruins that you see in ancient Greece and stuff

1   where it's just a column.  It doesn't support anything except

2   its own weight.

3          So, and my point earlier was not that there's no

4   vertical load in the columns of these playpens but there's at

5   least as much horizontal load because of the fabric nature of

6   the walls and how those pull inward on these columns.  So my --

7   I guess my point is if you're going to, I mean, start inserting

8   things that are based on what's in the specification other than

9   the ordinary meaning of column, I mean, I don't think

10  ordinarily a column necessarily supports a vertical load.  It's

11  something that's vertical.  It may support vertical.  It may

12  support horizontal.  It may support both.  But it may also be

13  decorative.  So I don't think -- I mean, the minute you start

14  going off and start adding terms that aren't associated with

15  the ordinary meaning without any justification I think you're

16  on thin ice.

17         The other point -- and I noticed that Your Honor

18  flagged this problem in your 2013 decision in the Google case.

19  The courts have long recognized that arguments based on the

20  file history are a lot less reliable.  They're not as useful

21  because they are made in the context of a back-and-forth.  And

22  what we saw was the thinnest of snippets from Mr. Amy about one

23  of these terms here and how that justifies, you know, narrowing

24  these terms the way he requests.

25         My point is the Federal Circuit has recognized that

59

1    arguments based on the file history are -- have to be looked at

2    very closely and carefully, and they are not as useful as

3    looking to basic things like the specification.

4            THE COURT:  Is that the "Words, Words, Words" case?

5            MR. ROCHE:  Yes, that's the one.  And I noticed that

6    too.

7            THE COURT:  All right.

8            MR. ROCHE:  I have not seen an opinion starting like

9    that quoting Shakespeare, but I liked it.

10           The ordinary meaning, you know, of something like

11   mounted on, I mean, I think Mr. Amy pointed to the door and how

12   the door is mounted on the wall or the doorjamb.  But it's not

13   nailed directly to the doorjamb.  There's a hinge in between.

14   So even the door is not directly mounted to the doorjamb.  And

15   so I think when we hear that he wants to insert directly and

16   say that that's part of the ordinary meaning of mounted, I just

17   don't think that's the case, not at all.

18           Back to the indefiniteness point, though, I think

19   that the -- I have a little clip.  If we have time, I'd like to

20   show it because it shows, you know, Mr. Amy made the point and

21   I agree with him that terms -- I mean, it is absolutely proper

22   for this Court to consider what is giving rise to these

23   disputes.  Now, Mr. Amy shows a -- that diagram of the posts

24   where they are aligned in a way that doesn't match with their

25   product.  In fact, I have -- what we have is a clip of -- a

60

1    video of their product being assembled.  And this is their new

2    product on the left and another product of theirs on the right.

3            Now, this clip is only about a minute and a half or

4    two minutes long.  But I think I can jump to the point where I

5    want to show.  She's -- let me jump back a little bit.  She's

6    disassembling it.  This is the product with the columns.  Okay?

7            She is taking off this rail cover, and she is

8    flopping it down inside.  Then she is going to unzip the top

9    part of the wall from the bottom part of the wall, and she's

10   going to -- in a minute here she is going to tilt these columns

11   inward.  Okay?

12           Now, in this position, these four inner columns are

13   all very much closer to each other than the outer walls.  And

14   there's a principle in patent law that if you infringe part of

15   the time you're an infringer.  And so for Mr. Amy to display

16   this and say, well, this creates confusion as to how the claim

17   is going to read, this doesn't have anything to do with their

18   product.  Their product -- as I said, their inner columns are

19   right on the inside edge of their outer columns towards the

20   middle.

21           The cases where there's indefiniteness come up when

22   there is ambiguity about whether under one construction or

23   another it will be outcome determinative or not.  That's not

24   what's going on here.  They don't have a product like this.  He

25   made this up to create some basis for arguing that there's some

1    ambiguity in this language of the claim.

2            This is not a complicated piece of technology.  This

3    is about as simple a patent case as you're going to see.  I

4    mean, we're talking about some tubes and some fabric held in

5    place around an opening.  And I don't think any person of

6    ordinary skill who's been in this business for a couple of

7    years and knows how playards are made or constructed would read

8    that claim and understand it to mean anything other than the

9    inner columns are closer to each other than the outer columns.

10   That's what the claim says.

11           And for these guys to get up here and make this

12   argument up based on this dreamed-up design has nothing to do

13   with the case law because the case law talks about whether the

14   ambiguity is outcome determinative.  In fact, the case that

15   they cited in their reply, the Accentra case, Accentra versus

16   Staples, it said there was no indefiniteness because there was

17   no clear and convincing evidence that different methods of

18   measuring the handle travel made enough difference to render

19   the patent indefinite.  They are talking about making enough

20   difference in terms of whether there's an infringement or not.

21   And talking about whether there's ambiguity with respect to

22   this diagram means nothing because this is not what their

23   product looks like.

24           I think that's everything I have, Your Honor.  Unless

25   you've got any questions, I appreciate your letting us present

62

1    today.

2         THE COURT:  Mr. Amy, you've got about four minutes

3    left if you want to say anything else.

4         MR. AMY:  Thank you, Your Honor.  Just a couple final

5    points.

6         Let's talk about this indefiniteness issue.  So they

7    tried -- Wonderland tried to argue that we are sucking the life

8    or sucking -- taking this figure here out of a vacuum in order

9    to prove our point.  Well, first of all, this is clearly a

10   configuration based on the language of the patent that's

11   possible.  And what's more so is a patent can be indefinite

12   regardless of whether we are talking about the accused product.

13   And I submit, Your Honor, that you shouldn't be looking -- as I

14   mentioned very early in my presentation, you can take a glimpse

15   of the accused product to understand why there's a dispute; but

16   we shouldn't be using Kids II's product as extrinsic evidence

17   which it seems like that is what Wonderland is suggesting here,

18   and that is a problem.

19        Now --

20        THE COURT:  I think if the Federal Circuit was

21   considering a patent where the inventor said you glimpse

22   something that they would hold that that was void for

23   indefiniteness.

24        But go ahead.

25        MR. AMY:  Okay.  This is two final points.  We

1    understand on this indefiniteness issue we have a very heavy

2    burden, and we don't take that burden lightly.  But we feel

3    very strongly that the measurement, this measurement issue is

4    case determinative as to whether or not you fall within or

5    outside the scope of the claims of the '949 patent.

6          And then with respect to the other terms, they keep

7    trying to say that we are reaching into the specification or

8    reaching into the abstract to support our constructions.  But

9    as you -- I have mentioned very -- almost the first thing up

10   front in my presentation, the Federal Circuit in Phillips says

11   you look at the claims; but it also says that the specification

12   is usually dispositive of a claim construction.  So you can't

13   just wholly ignore the rest of the teachings of the

14   specification.  You can't ignore the file history.

15         The disclaimer issue, for example, that he mentioned

16   or he was referring to refers to the attachment structure.  The

17   disclaimer that's in the file issue is fully briefed in our

18   papers.  But if you look at the issue, I have not seen a

19   disclaimer that's more clear than that.  They specifically

20   state that the fabric cannot make any contact with the outside

21   surface of the tube.  And it's their attorney writing that to

22   argue for allowance to the Patent Office.  It's unmistakably

23   unclear that there is a disclaimer there of claim scope.

24         And then as one final point I just want to mention

25   this again that the only way you can really adopt their

64

1    constructions here is if you do take these terms outside of the

2    scope of the invention as a whole, you don't look to the spec,

3    you don't look to the file history and you construe the terms

4    in a vacuum.

5            So thank you, Your Honor.

6            THE COURT:  Mr. Roche, you want to say anything else?

7            MR. ROCHE:  I don't think I have anything -- let me

8    just check one more -- no, I think we're good.  Thanks.

9            THE COURT:  All right.  Obviously, we need to take a

10   close look at the briefs and try to issue a written order on

11   this.  And I'll get it out as quick as I can.  But, frankly,

12   y'all are in a pretty long line at this point in time.  So

13   we'll do the best we can.

14           Thank you very much, gentlemen.  Court's in recess

15   until further order.

16           (Proceedings adjourned at 3:58 p.m.)

17

18

19

20

21

22

23

24

25

65

1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7    64, are a true and correct copy of the proceedings in the case

8    aforesaid.

9              This the 20th day of July, 2014.

10

11

12

13              _____

14              Susan C. Baker, RMR, CRR
                Official Court Reporter
15              United States District Court

16

17

18

19

20

21

22

23

24

25