1

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF GEORGIA |
| 2 | ATLANTA DIVISION |

```
 3

    WONDERLAND NURSERYGOODS          )
 4  CO., LTD,                        )
                                     )
 5          Plaintiff,               )
                                     )
 6  -vs-                             )   Case No. 1:13-CV-1114-TWT
                                     )
 7  KIDS II, INC.,                   )   October 31, 2014
                                     )   Atlanta, Georgia
 8          Defendant.               )   2:00 p.m.
    _____   )
 9

10

11              TRANSCRIPT OF THE MOTIONS HEARING
          BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
12                 U.S. DISTRICT COURT JUDGE

13

14  APPEARANCES OF COUNSEL:

15  On behalf of the Plaintiff:      David Roche
                                     Shima Roy
16                                   Roger Taylor

17  On behalf of the Defendant:      Scott Amy
                                     Dan Gresham
18                                   Joseph Staley

19  On behalf of Graco & Strzelecki: John Amabile
                                     Joseph Krasovec
20

21          Proceedings recorded by mechanical stenography
22           and computer-aided transcript produced by

23                 SUSAN C. BAKER, RMR, CRR
                      2194 U.S. COURTHOUSE
24                   75 SPRING STREET, S.W.
                      ATLANTA, GA  30303
25                       (404) 215-1558
```

2

 1                    (Proceedings held in Atlanta, Georgia, October 31,

 2       2014, 2:00 p.m., in open court.)

 3                    THE COURT:  All right.  This is the case of

 4       Wonderland Nurserygoods versus Kids II, Inc., Case Number

 5       13-CV-1114.

 6                    First let me ask counsel for the parties to identify

 7       yourselves for the record and the parties you represent

 8       beginning with the Plaintiff.

 9                    MR. TAYLOR:  Good afternoon, Your Honor.  My name is

10       Roger Taylor.  I represent Plaintiff Wonderland Nurserygoods.

11       With me at the Plaintiff's table is Mr. David Roche and

12       Ms. Shima Roy, also counsel for the Plaintiff.

13                    MR. AMY:  Good afternoon, Your Honor.  My name is

14       Scott Amy.  I represent Kids II, Inc.  With me at the table is

15       Mr. Dan Gresham and Mr. Joe Staley, in-house counsel for Kids

16       II, Inc.

17                    MR. KRASOVEC:  And good afternoon, Your Honor.  My

18       name is Joe Krasovec.  I am here with John Amabile.  We

19       represent the deponent and subpoenaed parties Graco Children's

20       Products and Kerry Strzelecki.

21                    THE COURT:  All right.  This is a motions hearing on

22       the discovery-related motions that are pending in this case.

23       The first is the Defendant's motion to compel the production of

24       Plaintiff's financial information.

25                    Are you going to handle that, Mr. Amy?

1          MR. AMY:  Yes, Your Honor.  Thank you.

2          THE COURT:  All right.

3          MR. AMY:  You are correct.  We've got three separate

4    motions at issue this afternoon, Your Honor.  And I think

5    addressing them separately is the correct way to approach it,

6    and that's the way we'd like to do it.  But there is one common

7    underlying theme here, and the underlying theme on all three of

8    these motions is Wonderland and to a certain degree Graco who

9    is their exclusive distributor here in the United States for

10   the products at issue in this case are trying to determine what

11   we can consider and rely on during the discovery process.  And

12   as you can imagine, they don't have our best interest in mind.

13          So, for example, in some instances they put us in a

14   position where they are refusing to produce summary-level

15   financial information.  In other instances, we are not getting

16   witnesses on Rule 30(b)(6) topics that go to key issues in the

17   case such as invalidity and damages.  And the testimony and the

18   documents that we're seeking via all three of these motions are

19   relevant to the issues in the case.  Like I said, they go to

20   issues such as invalidity and damages.

21          And if they don't believe that something should be

22   afforded a certain weight at trial or if they want to try to

23   exclude something from trial, then they can do that at the

24   appropriate time in the case.  But discovery is very broad, and

25   what we're seeking is clearly relevant here, and they shouldn't

4

1   be able to unilaterally and arbitrarily dictate what we can

2   rely on via the discovery process.

3          So with that general context in mind, Your Honor,

4   let's talk about the first motion which is the motion to compel

5   the financial information.

6          There's two requests at issue in this motion, an

7   Interrogatory Number 7 and Request for Production 45.  The

8   numbers don't matter, but it's two requests.  They both go to

9   what I have already mentioned which is summary-level financial

10   information.  And all that is is information such as units

11   sold, gross and net sales, gross and net profits, margins,

12   costs of goods sold, that type of high-level information that's

13   typically produced in a patent case.  And we're seeking this

14   information for both playpens that not only practice the

15   patents in suit but also for playpens that do not practice the

16   patents in suit, and we are seeking it on a product-by-product

17   basis.

18          And the reason why this type of information is

19   routinely exchanged in patent cases is is it makes everyone's

20   life a lot easier.  It's much less burdensome on the parties.

21   It's much less burdensome on the experts.  It makes the

22   experts' jobs a lot easier to consider, rely on it, analyze it

23   and ultimately incorporate it into their expert report.

24          I haven't been doing this as long as the gentlemen at

25   this table, but over the last ten years I haven't been involved

5

1    in a patent case where the parties couldn't agree, come to some

2    agreement on the exchange of summary-level financials.  This is

3    the first one.

4             So here's what's really in dispute.  We want

5    summary-level financials on both products that practice the

6    patent, products that do not practice the patent on a

7    product-by-product basis.  Their financial production to date,

8    if I may, consists of two pages, Your Honor.  This is a complex

9    patent case, and we've gotten two pages of financial

10   information.

11            And the problem with this is what you see here is

12   it's series, what they call series-level data.  We don't have

13   data on a product-by-product basis.  We don't have any

14   indication whether this data is gross or net sales.  We don't

15   have any indication whether it's domestic or international or

16   both.  And even worse, it appears in some places the data may

17   be inaccurate.

18            If you turn to the page ending in the bates label

19   201, Your Honor, in the far upper-right-hand corner there's an

20   entry called Pack 'N Play On The Go Playard.  Well, if you go

21   to Graco's website for that series of product, you'll see that

22   there's many products in that series that couldn't possibly

23   practice the patent.  They couldn't possibly practice the

24   patent because there's no way they could have the patented

25   feature from looking at the product.

1        So I guess the point is we don't even know whether

2   this data is accurate based on at least that one series.  So

3   their primary objection here is relevance, and we need to keep

4   in mind up front that it's their burden to show that the

5   information is not relevant.  It's not our burden to show that

6   it's relevant.  It's their burden if they are objecting on

7   relevance to show that -- show lack of relevance or it's not

8   relevant.

9        So they have cited a bunch of cases in their briefing

10  that talk about how our financials are relevant to a reasonable

11  royalty analysis, and we don't dispute that.  We've complied

12  with our discovery obligations.  We've produced our

13  summary-level financials.  We produced far more than

14  summary-level financials in the case.  But regardless of whose

15  burden it is, let me give you a feel for why it is relevant.

16        Well, it's relevant to the reasonable royalty

17  analysis.  Now, they've stipulated that they are not seeking

18  lost profits in the case; so we're in the world of reasonable

19  royalty, so we are in the world of a hypothetical negotiation.

20  Well, under the Georgia-Pacific factors, we think this

21  information is relevant.  First, I think it's relevant to the

22  strength of Wonderland's bargaining position and their strength

23  in the market going into a hypothetical negotiation.

24        For example, if they make more money on their

25  products that practice the patent versus their products that

1   don't practice the patent, then they are more likely to ask for

2   a higher royalty rate.  It makes sense.  But if they don't make

3   any additional money on products that practice the patent

4   versus products that don't practice the patent, then they might

5   be willing to accept a lower royalty rate.  Any royalty could

6   be considered a windfall.

7          It's also relevant to the anticipated amount of

8   profit that Wonderland could lose if they end up licensing the

9   patents in suit.  And their expert -- we are already halfway

10  through expert discovery, Your Honor.  Their expert has stated

11  that they have a policy against licensing patents, that instead

12  they want people off the market.  Well, if they are not going

13  to lose a lot of profit, they might be more willing to actually

14  just enter into a license agreement than to stick with that

15  policy.  So we want to see this information for those reasons.

16         It's also relevant to the -- what we call the past

17  performance or the past success of the product, the commercial

18  success of the product.  And this is just common business

19  sense.  If you are a business person and you are going into a

20  negotiation that is focused on whether or not you are going to

21  license a patent and how much you want for the license as a

22  patentee, you are going to look at how much you are making on

23  your products.  You are going to look at how much you make on

24  products that practice the patent versus products that don't

25  practice the patent to get an idea as to where is my benchmark,

8

1    the products that don't versus -- that don't practice the

2    patent versus the products that do and is there a difference

3    and what can we -- what can we give up, how much do we want

4    based on that information in terms of a reasonable royalty.

5           And, finally, it's not the -- by far it's not the

6    final word on the issue, but I bring it up only because it's in

7    their briefing.  They bring up a cite to Chisum which is a

8    treatise on patent law, and what Chisum states is when the

9    patent owner also makes the patented article the profitability

10   of the owner's manufacture and sale also determines the royalty

11   that will be charged.  And, like I said, I only bring it up

12   because they brought up Chisum in their briefing.  But this is

13   the type of information that's commonly exchanged in a patent

14   case.  We are just asking for financials on covered and

15   not-covered products.

16          The other point that I'd like to emphasize is in

17   support of our briefing we submitted a declaration from our

18   expert, and our expert has told us he wants to see this

19   information.  He wants to consider it and potentially rely on

20   it.  Well, like I said earlier, we are already halfway through

21   expert discovery.  We have fully exchanged expert reports on

22   damages.  So he has been prejudiced or he has been hamstrung at

23   least by the fact that he hasn't been able to see this data,

24   and he can't respond with -- to what they have said is a

25   reasonable royalty with looking to any data based on

9

1    Wonderland's covered versus their non-covered products.

2            Now, that's how the information is relevant in our

3    mind to a reasonable royalty calculation; but there's another

4    piece to this as well.  We are obviously seeking -- we believe

5    the patents are invalid in this case, and one of our positions

6    is that we have an obviousness case against both patents.  And

7    in response they have introduced second -- what's called

8    secondary indicia of non-obviousness.  In part of that they are

9    trying to rely on the commercial success of their product and

10   argue, well, look how successful it's been; it wouldn't have

11   been this successful if the invention was obvious.

12           The problem with that is in order to show commercial

13   success you have to show a nexus between whatever evidence of

14   success you have and the patented feature.  You can't just rely

15   on sales alone.  You can't just throw a bunch of sales down on

16   the table and say, Look, we have sold 20 million dollars' worth

17   of this product; the commercial success must be attributable to

18   the patented feature.  Instead, you've got to once again have

19   some type of benchmark to see whether the success is

20   attributable to the patented feature.  And the way you do that

21   is you compare either sales of products that are covered versus

22   not covered which is what we are seeking here or you compare at

23   least products on -- pardon me -- financial data on a

24   product-by-product basis which we also don't have in Exhibit A.

25   Remember, we just have series data.

1          And the reason you'd want to compare on a

2    product-by-product basis is to rule out the idea that another

3    feature isn't potentially driving sales.  Our expert should be

4    allowed to look at that to determine, see whether, for example,

5    products that have a bassinet -- we're in the world of playpens

6    here -- so products that have a bassinet in those products that

7    the bassinet isn't what's actually driving sales versus the

8    patented feature.

9          So our position is we've produced our summary-level

10   financials.  We believe that they should comply with their

11   discovery obligations in this case.  It's just another example

12   of where they are trying to determine what we can rely on and

13   what our expert can rely on.

14         Thank you.

15         THE COURT:  Mr. Taylor, are you going to handle this

16   one?

17         MR. TAYLOR:  I am, Your Honor.  Thank you.

18   Appreciate your time this afternoon to address this with us.

19         And let me start with just a couple things, just a

20   couple of comments before I address the specifics.  As Mr. Amy

21   said, we now have three rounds of expert reports have been

22   served; and expert depositions are scheduled to start next

23   week.  And so, you know, the case is pretty much ready to go

24   into the expert deposition phase now.

25         If you take a look at the report that the expert for

1    the Defendants put in, he's put in a thorough report.  I've got

2    -- here it is here.  He doesn't really complain about not

3    having information he needs to have to do his work.  His report

4    and the analysis in his report is obviously a little different

5    from the one that our side the Plaintiff's expert put in but

6    really not that much different in terms of where they end up.

7    They went through the analysis using similar analytical

8    structures, and neither expert seemed to have any problem doing

9    the work they had with the information that they had available.

10           And, in fact, their expert in talking about

11   Georgia-Pacific Factors 5, 6, 8 and 13 which are the factors

12   that are addressed in the briefing on this issue by the

13   Defendant pointed out that those factors indicate the extent to

14   which the alleged infringer has economically benefited from the

15   use of the patents in suit as compared to the non-patented

16   features, whether or not there exists old or alternative ways

17   to produce the same economic benefits without uses of the

18   patent in suit and the nature of the patents in suit as

19   reflected by the character of the commercialization as produced

20   by the licensor.

21           So what he is talking about there, really these

22   factors that talk about profits and sales and that information,

23   that's to be measured over on the accused infringer's side in

24   this hypothetical negotiation.  And that's the structure that

25   the Defendant's own expert used in his report.

12

1          Now, moving more into some details, we did produce

2     summary financial information; and this is it.  And I know it

3     looks like there's not much here, but let me give you just a

4     little background to try to explain that.

5          Wonderland is a manufacturer of these products.  They

6     are manufactured, and the products are manufactured mainly in

7     mainland China.  Wonderland is a Taiwan-based company.  The

8     factory is in China.  Wonderland's primary and almost exclusive

9     customer for these products in the U.S. is Graco, and that's

10    why Graco is here today because they sought discovery from

11    Graco.

12         But Wonderland is not at a comparable space in the

13    market to Kids II.  Wonderland is not selling to a large number

14    of retailers.  In fact, it has three customers.  And of those

15    three, Graco is by far the largest and most important.  So it's

16    pretty easy to summarize the sales because you only have one

17    customer's data you have to deal with.

18         And in this information, they have for each year

19    patented products have been made the quantity sold and the

20    prices they have -- and it's broken out by product line.  And

21    then on the second page they have the profit information

22    indicated from those sales by product line.  So they have the

23    summary financial information that I heard being discussed.

24    What they are really seeking if you go back and take a close

25    look is very, very detailed, granular information on a monthly

13

1  basis for each product.

2          And let me just say there's over 330 products that

3  just one of these patents covers that are manufactured by

4  Wonderland.  So bearing in mind for 330 products on a monthly

5  basis they are asking that we produce quantities sold, our

6  gross sales, our net sales, anticipated profits, actual gross

7  profits, anticipated net profits, actual net profits, cost of

8  sales, profit margin, anticipated net profit, actual net

9  profit, anticipated and actual standard cost, anticipated and

10 actual dollar sales, anticipated and actual unit sales,

11 anticipated and actual manufacturing capacity, anticipated and

12 actual marketing capacity.

13         Now, many of those might be relevant if we had

14 maintained our claim for a lost profits accounting in this

15 case; but that claim was dropped.  And when that claim was

16 dropped, much of this information simply doesn't -- it becomes

17 irrelevant to a reasonable royalty calculation.  A reasonable

18 royalty calculation is basically hypothetical negotiation is

19 what you have to engage in where you look at the infringer's

20 sales, his cost of producing his product, the profit he makes

21 on the sales.  And he and the patent owner in this hypothetical

22 world try to understand what royalty rate would they arrive at

23 to compensate for the use of the invention.  And so that's why

24 what's important in the case now as we go forward is really the

25 financial information from the Defendant in terms of their

1   sales and their profits.

2        And we have -- as I said earlier, we have given them

3   the summary financial information which was largely when

4   Mr. Amy discussed what he wanted he largely described what he

5   has here.  What he didn't spend any time talking about is the

6   importance of all this detailed information on a monthly basis

7   on a product-by-product basis for over 300 products and why

8   that would be useful.  And his expert did not in the report

9   indicate any difficulties encountered by not having that

10  information.

11       So I guess I would make --

12       THE COURT:  Now, did your expert rely upon that type

13  of financial information from your client?

14       MR. TAYLOR:  No, sir.

15       THE COURT:  Will he be testifying to -- at trial to

16  any opinions based upon that sort of detailed financial

17  information from your client's products?

18       MR. TAYLOR:  No, sir.  He is going to rely only on

19  the information that's in the record from the Defendant and the

20  information that we have here.  Isn't that -- yeah.

21       In other words, I don't expect -- well, Mr. Amy can

22  address that because the reports have been prepared and served.

23  My memory is there's nothing in our expert's report relying on

24  the kind of data that I just described to you that has been

25  requested but has not been produced from our client.  He's --

15

1        THE COURT:  Well, your memory better be right about

2   that.

3        MR. TAYLOR:  I think I am.

4        THE COURT:  All right.  Go ahead, Mr. Taylor.

5        MR. TAYLOR:  Well, that's really -- just give me a

6   second.  I'm not sure I need to address much else.

7        I guess I will mention just for a moment the

8   commercial success argument.  There is going to be an issue of

9   commercial success in the case.  But the commercial success is

10  commercial success of products which contain the patented

11  features, you know, basically products that carry the patented

12  invention with them; and that's what this information is about.

13  And we have similar information from the Defendant showing

14  their sales of products that we believe infringed the patent,

15  and that's the kind of financial information that will be used

16  in the arguments about whether or not this invention has been

17  commercially successful.

18       And I think that's all I have to say, Your Honor.

19  Thank you very much.

20       THE COURT:  Mr. Amy, I'll give you the last word if

21  you want to say anything else.

22       MR. AMY:  Thank you, Your Honor.  Just a couple

23  points.

24       One, this is really just another example of where

25  they are trying to hem us in or dictate what we can rely on.

1   Regardless of whether their expert has relied on this data, our

2   expert wants to consider it and rely on it.  And because they

3   have presented one theory of a reasonable royalty damages

4   doesn't mean that we have to comply with that theory.

5          And the reason that our expert report somewhat

6   mirrors their expert report at this time is because we don't

7   have the data.  He can't rely on data that he doesn't have.  He

8   can't consider it.  He did put placeholders in his report that

9   said he understands additional data not only on these

10  financials but also on deposition testimony on license

11  agreements which we will get to in a few minutes is forthcoming

12  or he understands it may be forthcoming and would like to

13  consider and rely on that data.

14         So just because they've presented one theory of

15  reasonable royalty damages doesn't mean that our expert wants

16  to present the same theory, and his theory very likely will

17  change if this data is produced.

18         The other point I'd like to make is Exhibit A, there

19  were some discussion of the volume of data that would be

20  required to be produced, 300 products and thousands of pages

21  maybe.  Well, it's hard for me to sit here and listen to them

22  complain about the burden of producing that information when

23  they've asked for the same information from us in the case.

24  And we've incurred the burden and expense of producing the

25  information, and we have complied with our discovery

1    obligations.  So it's difficult for me to understand how they

2    can complain about the burden when we are just asking for the

3    same information that they asked for from us, Your Honor.

4           That's it.

5           THE COURT:  All right.  I'm going to grant in part

6    and deny in part the Defendant's motion to compel.  I'm going

7    to deny the motion with respect to requiring the Defendant to

8    make any additional response to the Defendant's Interrogatory

9    Number 7 and Request for Production Number 45.  But I will also

10   exclude any expert reports and any testimony at trial and any

11   expert declarations in support of or in opposition to the

12   motion for summary judgment that relies upon the type of

13   information requested in the Defendant's Interrogatory Number 7

14   and Request for Production Number 45 that is not contained in

15   the document that's been identified as Exhibit A, the two pages

16   of financial information that are produced and relied on by the

17   Plaintiff in this case.

18          I'm not persuaded that the Defendant's interrogatory

19   and request for production are narrowly tailored to get the

20   information that it needs for its expert to engage in an

21   analysis leading to an opinion as to what would be a reasonable

22   royalty in this case, and to require a manufacturer as opposed

23   to a wholesaler or a retailer to produce that information on a

24   monthly basis on a product-by-product basis with as many

25   products as are at issue here both as to products that practice

18

1    the patented feature and those that don't in my opinion is

2    overly broad and is not narrowly tailored to seek information

3    that is relevant to the case and that would be of significant

4    probative value in determining one or more issues in the case

5    in relation to the cost and difficulty of producing that

6    information.

7           So for those reasons, that motion is granted in part

8    and denied in part.

9           And, Mr. Taylor, if you and Mr. Amy will get together

10   and prepare a written order that summarizes that ruling on the

11   motion, present it to me, I'll be glad to sign it.

12          MR. TAYLOR:  Thank you, Your Honor.

13          MR. AMY:  Thank you, Your Honor.

14          THE COURT:  All right.  Next is the Defendant's

15   motion to compel full and complete deposition testimony.

16          Mr. Amy?

17          MR. AMY:  Thank you, Your Honor.

18          In terms of this motion, we are seeking a prepared

19   and knowledgeable witness on 19 Rule 30(b)(6) topics and then

20   two additional hours of testimony with the sole inventor of the

21   patents in suit here.  And there's a number of moving parts

22   here, so I'll discuss the Rule 30(b)(6) topics first.  We've

23   got a group of Rule 30(b)(6) topics where they've simply

24   failed -- Wonderland has failed to provide a prepared witness,

25   and that's topics 5, 14, 18 through 23, 25 and 51.  And then

19

1    we've got another group of Rule 30(b)(6) topics where through

2    the meet-and-confer process there was an agreement to provide a

3    witness, but then they sought to arbitrarily limit our time

4    with that witness to four hours.  And so for that second group

5    of topics, it's our position that we've already agreed through

6    the meet-and-confer process that additional testimony or

7    testimony in general is necessary and it's appropriate.  It's

8    mainly a dispute over how much time we should be afforded with

9    the corporate designee.

10            So let's start with the first grouping.  I'll address

11   the second grouping, and then I will address the 30(b)(1) piece

12   last.

13            Probably the best way to go through the first

14   grouping is just on a topic-by-topic basis.  I will do it very

15   quickly and just give you some high-level examples of the

16   problems that we encountered.  Topic 5, for example, is

17   directed to first public disclosure, first publication, first

18   public use and first public sale of the patents in suit.

19            Now, there are two patents at issue in the case, one

20   which I will refer to as the '919, one which I will refer to as

21   the '949.  This part of our motion doesn't deal with the '919

22   patent.  It just deals with the '949 patent.  And the issue

23   really here is just we want answers to two simple questions,

24   when did they first publicly disclose the '949 patent and when

25   did they first -- when was the first public use of the '949

20

1   patent.

2          And their corporate designee on this topic was a

3   gentleman by the name of Brad Bickley.  We took his deposition

4   up at Baker McKenzie's office in Chicago, and he was entirely

5   unprepared on the topic.  And I will just read from his

6   testimony, Your Honor.

7          The question I asked was:  "Do you know when

8   Wonderland first publicly disclosed the playard that's shown in

9   the '949 patent in Bickley 7?"

10         Answer:  "No."

11         Question:  "So you are not prepared to testify as to

12  that portion of the topic?"

13         Answer:  "No."

14         And then going on.

15         Question:  "Okay.  Do you know when Wonderland has

16  ever made a public use of the invention in the '949 patent?"

17         Answer:  "No."

18         We tried to resolve this, Your Honor, through the

19  meet-and-confer process; and Wonderland agreed to give us a

20  stipulation as to the first publication of the '949 patent.

21  But the problem here is first public use, first public

22  disclosure, first publication, those are all discrete,

23  statutory concepts.  So all we want is a witness that will

24  provide us an answer to these two questions.  That's the issue

25  on topic number 5.

1          On topic 14 we've got a bigger problem, though.

2     Topic 14 is directed to any license agreements or offers to

3     license by Wonderland related to any patented technology in the

4     field of children's products.  And as part of the

5     meet-and-confer process, we agreed to limit this to playards

6     and bassinets, swings and bouncers.  And the reason we did that

7     is because they all generally serve a similar purpose.  It's a

8     place where you can put a child either to play or to be

9     entertained or to rest.

10          And Mr. Bickley was once again unprepared on topic

11     14, but the problems here are sort of twofold in terms of how

12     he was unprepared.  First, he was unprepared to give testimony

13     on the sole license agreement that Wonderland is relying on as

14     part of their damages case here, Your Honor.  And this is what

15     I alluded to earlier.  And this is a license between Wonderland

16     and a company in the UK called Silver Cross.  And their expert,

17     this is the one license he relies on in the expert report.

18          And when we asked Mr. Bickley questions about this

19     license, he couldn't identify who negotiated the agreement, how

20     they reached the license fee or the royalty rate in the

21     agreement, why there was a provision in the agreement that the

22     license fee and the royalty rate go to a charity, how the

23     parties agree on the license fee and the royalty rate or the

24     number of units sold under the license.  But as soon as we got

25     in expert discovery, sure enough here's this one license that

22

1  they are relying on to support their reasonable royalty case.

2  And what makes matters worse is their expert, a gentleman by

3  the name of Michael Chase, he relies on discussions with a

4  Wonderland employee named Renee Wang as his basis for his

5  understanding of the facts and the circumstances and the

6  negotiation of this Silver Cross license.

7         Well, I asked Mr. Bickley at the deposition, you

8  know, who would have this knowledge that you don't have here

9  today; and he said Renee Wang would have it.  So we have been

10  put in this position where their damages expert's heavily

11  relied on a license agreement.  We don't have any fact

12  testimony on the license agreement.  And, once again, our

13  expert's been left in a position where he doesn't need all --

14  he doesn't have all the information that he needs to fairly

15  respond to their expert report.

16         Now, the problems don't end there, Your Honor, with

17  topic 14.  They've also failed to provide a witness as to

18  bassinets and swings and bouncers, and their position here once

19  again is it's not relevant.  Well, in our mind at least, this

20  is another instance where they are trying to dictate what we

21  can consider and rely on via the discovery process.  And

22  license agreements to these products are clear -- clearly meet

23  the relevance standard.  And it's up to our expert, not

24  Wonderland's counsel, to determine whether or not we think

25  these licenses meet the comparable license standard under a

23

1   reasonable royalty analysis.

2         Now, if they want to object as we get closer to trial

3   at the appropriate time and they don't think they are

4   comparable licenses, then they can do so at that time.  But he

5   should at least be afforded the opportunity to consider the

6   licenses.

7         Moving on to topic 37, this is the -- this topic is

8   directed to the business relationship between Wonderland and

9   Iron Mountains.  Iron Mountains is a design firm up in

10  Pennsylvania that Wonderland used as part of the design and

11  development of the inventions of the patents in suit.  And,

12  once again, Mr. Bickley wasn't prepared to give testimony on

13  this topic.  I asked him whether there were any formal

14  agreements that defined the relationship between Wonderland and

15  Iron Mountains, and he said he wasn't prepared to answer those

16  questions.

17        On topic 51, we're asking for pricing and pricing

18  information.  This is a little bit of a different beast because

19  their argument here -- pardon me -- Wonderland's argument here

20  was that we should have provided something to Mr. Bickley to

21  help him in answering the questions.  Well, we don't have

22  information on pricing.  We don't have the information that we

23  believe we should have received via our request for financials.

24  And so we couldn't put anything in front of him on license --

25  on the pricing issues.

1          I don't disagree with their counsel that a Rule

2    30(b)(6) isn't a memory contest.  But when you don't have the

3    information you need to put in front of a witness to help the

4    witness answer the questions, you can't put it in front of him.

5    It's as simple as that.

6          Now, topics 18 through 23 and 25, we didn't even get

7    to ask Mr. Bickley questions about these topics, Your Honor.

8    And let me give you a little background as to why.  As I

9    mentioned earlier, we took these depositions up at Baker

10   McKenzie in Chicago.  And we took a 30(b)(1) deposition and at

11   least a dozen or more 30(b)(6) topics on the same day.  We

12   tried to compress it all into one day.

13         And as part of that, Mr. Staley and I had split up

14   the 30(b)(6) topics.  So on a break, I told Mr. Roche that

15   Mr. Staley was going to take testimony on the remaining

16   30(b)(6) topics; and in response Mr. Roche asserted that it

17   would either be an ethical violation or an unauthorized

18   practice of law in Illinois if Mr. Staley were to participate

19   in the deposition.  He also asserted that he'd report

20   Mr. Staley if indeed it was an unauthorized practice of law or

21   an ethical violation.

22         Well, we, of course, were very skeptical of this.

23   Mr. Staley, counsel of record, indicates he is a member in good

24   standing of the bar here in Georgia; but we are also not

25   experts on Illinois law.  We are not -- neither of us are

1   members of the Illinois bar.  And so my initial reaction was

2   they are just trying to disrupt the discovery process; but out

3   of an abundance of caution we conferred on it, we decided to

4   suspend the deposition, agreed to designate some of his

5   testimony that had been given in a 30(b)(1) capacity but

6   repeatedly stated at the end of the deposition that we were

7   going to leave it open and we'd ask for another witness.  And

8   Mr. Roche confirmed that we'd be provided another witness

9   several weeks later during a 30(b)(6) deposition that was

10  already scheduled.

11        Well, now they are asserting we should have proceeded

12  with the deposition in the face of the ethical violation --

13  threatened ethical violation.  And they are also making an

14  after-the-fact argument that Mr. Staley wasn't admitted in the

15  case at the time which I think is quite a stretch.  He was

16  listed on our initial answer and counterclaims.  He had already

17  taken several depositions in the case, and there was no

18  objection provided at the deposition that day in Chicago.

19        Which bring us to the second group of topics that I

20  mentioned, topics 1, 9, 11, 29, 31, 37 and 49 through 50.  As I

21  mentioned earlier, we met and conferred on these.  And this is

22  a group of topics that the parties agreed additional testimony

23  was both necessary and appropriate; but there was a dispute

24  over how much time we should be afforded with the witness.

25  Wonderland said they would limit it to four hours at their

1    convenience or location at their convenience, and we said we

2    wanted sufficient time.  In our briefing, we stated that

3    sufficient time was probably approximately one day, one full,

4    seven-hour day.

5              Well, now they are arguing that because we have

6    sought clarification from Your Honor on this issue that we

7    waived our right to take the testimony altogether even though

8    we don't have any testimony on these topics which is an

9    interesting argument to make because as we'll discuss in a

10   second in the context of the inventor they argued that we

11   should have sought clarification up front with you as to the

12   amount of time.  But in this case, they are arguing that we

13   should have just went ahead and took the deposition subject to

14   their arbitrary time limit but then ask for the time after the

15   fact.

16             Well, they're sort of talking out of both sides of

17   their mouth here, Your Honor.  But the bottom line is we

18   haven't taken any testimony on these topics.  They have already

19   agreed that the testimony is appropriate, and they shouldn't be

20   able to backpedal on these issues at this point.

21             The final issue in dispute in this motion is whether

22   we should be afforded two additional hours with the sole

23   inventor of the patent in suit, a gentleman named Arden Chen.

24   As you may recall, Your Honor, back in February you entered an

25   order that all of these depositions take place via

1    videoconference.  Wonderland is a Taiwanese corporation.  Kids

2    II is based in Atlanta.

3           Well, I have to be up front.  It's been a very

4    difficult process to take these depositions via

5    videoconference.  It's been difficult, it's been inconvenient,

6    not to mention expensive and inefficient.  And in terms of

7    Mr. Chen's testimony, this is illustrated by the fact that we

8    were only able to get approximately 150 pages on the record in

9    a full seven-hour day when normally you'd get 250 or 300.  And

10   we weren't able to finish our questioning.  We were prepared to

11   go forward.

12          In fairness, it was late in the evening Taiwan time.

13   It was 2:00 a.m.  But we had started at 4:00 a.m., and we just

14   got cut off, and we weren't permitted to go any further after

15   seven hours.  So there's a provision under the Federal Rules

16   under the advisory notes that one basis for additional time is

17   use of an interpreter.  So I think that's appropriate here,

18   especially since we are dealing with an inventor of the patent

19   in suit.

20          Thank you.

21          THE COURT:  Mr. Taylor?

22          MR. TAYLOR:  Thank you, Your Honor.

23          One second.  I'm drowning in paper here.

24          I guess I'd like to start my comments on this point

25   again to try to just establish a few background facts.  I feel

1  that the Plaintiff has tried to work through these things.

2  We've had many meet-and-confers, and we have made offers to try

3  to resolve some of these issues, and I don't think that that

4  was portrayed quite the way I'd like to have it portrayed.

5        I mean, to give you an example, the Defendant admits

6  in their own paper that Mr. Roche was in Taiwan.  If they think

7  it's hard to take a deposition by videotape from here, flying

8  to Taiwan and having a 12-hour time shift is not easy either.

9  In spite of that, we offered while Mr. Roche was in Taiwan to

10  double-track to give them another day of deposition time while

11  he was there.  We were going to have another attorney who

12  resides in Taiwan handle that second double-track deposition.

13  They were unable to do that because of personnel issues as I

14  understand it or they couldn't get a videographer, I guess, was

15  the problem.

16        We offered to produce Ms. Renee Wang again during

17  that week to follow on a day after they had concluded the

18  notice depositions.  They turned that down because their

19  attorneys weren't available to take Mrs. Wang's testimony on

20  that date.  I'll just make a note.  That's the Mrs. Wang that

21  he mentioned that they haven't had access to because of this

22  licensing agreement dispute.  In fact, they took seven hours of

23  deposition from her earlier that year.  We offered to produce

24  her again, and they didn't take us up on the offer.

25        And we weren't trying to play games with them.  The

1   problem we had is Mr. Roche was in Taiwan.  He was only there

2   for a week, and he needed to return home.  So our time over

3   there was very limited.

4            Then in addition to all that, in the meet-and-confer

5   process that led up to these motions in working with them we

6   tried to -- as I say, tried to reach a compromise.  We offered

7   to produce by video deposition -- you know, to give them four

8   more hours of video deposition time; and they refused that.

9   That's on eight topics.  That's a half hour per topic.  Roughly

10  if you just do the math, their deposition notice had 64 topics.

11  A half hour per topic on 64 topics is 32 hours of deposition

12  time.  That's what it would work out to.  So it seemed

13  reasonable to us.

14           In fact, before I came over here this afternoon, I

15  took a quick look.  They have had 62 hours of deposition time

16  in this case.  So it's not as though they have been denied

17  their rights to take discovery.

18           Now, I'd like to try to address just a few of these

19  points in more detail.  The first was topic 5, the first public

20  use, disclosure and sale.  And this relates to the '949 patent.

21  And as Mr. Amy said, Wonderland does not use that patent.

22  That's a patent that was developed and patented in Wonderland

23  but not used, so there hasn't been a public sale except for the

24  infringers who sold it.  And we don't -- it perhaps is Kids II

25  who made the first public sale.  Perhaps it was some other

1  third party who was infringing the patent.  But it wasn't

2  Wonderland because we haven't sold any products that use the

3  patent.

4         The same with the public disclosures, to our

5  knowledge and I think the witness's knowledge there hasn't been

6  any public disclosure because they have never used it.  He said

7  Mr. Bickley was unprepared on this, but here is a question:

8         "Do you know whether Wonderland ever sold a playard

9  that practices invention of the '949 patent?"

10        Mr. Bickley said, "To my knowledge, no."

11        So that confirms what we were saying or what I am

12  saying now that they haven't made the product.

13        He said he wanted an answer to two questions:  What

14  time was the first public disclosure?

15        You know, to our knowledge -- and we can give this --

16  we can send him a letter.  We can send him a sworn statement.

17  I mean, if he wants an answer to the question, the first public

18  disclosure to my knowledge right now is when the patent was

19  published.  First public use -- the first public use was

20  whenever the first infringer used it.  It wasn't when -- it

21  wasn't by Wonderland.  So we really don't have access to that

22  information.

23        Moving on to topic 14, any license agreements.

24  First, it was for any childcare product, then it was narrowed

25  down to three or four different products.  In the -- in Exhibit

1   A which was put together, Your Honor, it's the comparison of

2   the topics and the testimony that has been taken on the various

3   topics, I believe Mr. Bickley testified there were no other

4   license agreements, you know, regarding U.S. patents or

5   products here in the U.S. at this -- and, in fact, the one

6   license agreement which has provoked this dispute is with an

7   English company involving a European patent.  It doesn't

8   involve a U.S. patent.

9        And I'll just make the point I made a moment ago with

10  regard to the fact that Ms. Wang is the individual most

11  knowledgeable about that agreement.  They had seven hours of

12  deposition time with Ms. Wang already.

13       Going to topic 37, and that topic 37 if I remind Your

14  Honor was the relationship between Wonderland and a design

15  company called Iron Mountain.  What you haven't been told, I

16  think, is that Kids II took over ten hours of testimony from

17  two Iron Mountain officials, including about six or seven hours

18  of 30(b)(6) testimony from one of the high-level executives at

19  which time he was questioned thoroughly regarding Iron

20  Mountain's relationship with Wonderland and the relationship

21  and documents that formed their business arrangement.

22       So, once again, perhaps Mr. Bickley didn't know all

23  the ins and outs of that relationship; but it's not fair to say

24  that Kids II has not been given discovery on that point.  And,

25  in fact, the one individual -- I guess I said this.  The one

32

1    individual for Iron Mountain was a 30(b)(6) witness who is

2    speaking for the company.

3            Turning to the next topic which had to do with the

4    topic of pricing and their questioning of Mr. Bickley on

5    pricing and the fact that he couldn't recite the prices from

6    memory during the deposition, Mr. Amy said they didn't have any

7    information.  Well, that's not completely right.  They had the

8    exhibit that we talked about in our earlier argument.  That was

9    not introduced in his deposition.  He wasn't questioned about

10   it.  I suspect if he had had it, you know, he could have

11   provided information about the sales and pricing because it's

12   all right there.

13           And next I want to talk about this dispute that

14   occurred during the deposition in Chicago.  I was there, Your

15   Honor, for that as we all were actually or many of us.  And to

16   set the context, Mr. Amy began the deposition at about 9:00 in

17   the morning; and these events occurred about 5:15 in the

18   afternoon.  So there had already been a full day of deposition

19   taken, both 30(b)(6) and personal deposition, of a man who had

20   flown from Taiwan two days before and who was becoming tired.

21   And then during a break we learned that Mr. Staley wanted to

22   complete the deposition.

23           And, you know, two or three comments about that.

24   That's an irregular practice in my view to begin with to

25   tag-team a witness with a fresh attorney at the end of the day.

1    Whether we would have agreed to that or not I don't know

2    because the issue that came up is the one that we are talking

3    about here today, and that is that Mr. Roche had mentioned one

4    of his partners had said that in Illinois an Illinois corporate

5    attorney who isn't a member of the bar there is disqualified

6    from participating in court proceedings.  And so Mr. Roche just

7    raised that as a concern.

8         And I'm sure you have read the transcript, Your

9    Honor; but I just want to make a few points.  Mr. Roche never

10   said it was an ethical violation.  He said it might be, I don't

11   know if it is or not is how he phrased it.  And then in terms

12   of talking about having to report it, he simply said that under

13   the Illinois rules he has an obligation to report violations.

14   He did not say I am going to go report this.  He said if it's a

15   violation I'm under duty to report it.  That's how that

16   conversation happened.

17        He said:  It may or may not be a violation.  It may

18   be an unauthorized practice of law problem and not an ethics

19   violation per se.  I don't even know that there's a bright-line

20   distinction.

21        And then he went on to say -- and this is the

22   important part that hasn't been discussed with you:  But I

23   believe that the topics are so similar to many of the ones that

24   you have already covered that you should be willing to go

25   forward with the deposition.  In addition, we are willing to

1    designate any of his earlier testimony as being responsive to

2    the 30(b)(6) topics.

3            Again, he had been deposed on a personal and a

4    30(b)(6) capacity from 9:00 in the morning until 5:00 in the

5    afternoon.  It's unlikely if the same questions had been asked

6    again if he would have given different answers to those.  And

7    so we were willing to go back and re-designate any testimony

8    that had been gotten.

9            And we also encouraged -- Mr. Staley made the point

10   he hadn't prepared to cover those six or seven topics and that

11   -- I'm sorry.  Mr. Amy made that point that Mr. Staley had.  We

12   encouraged them to share notes.  They could talk with each

13   other to try to just work their way through it.  At no time did

14   we close the deposition off or stop the deposition.  They just

15   felt they couldn't continue because this issue had been raised.

16   So that's the factual background on what happened.

17           And then in our responsive brief on this motion we

18   attached an Exhibit A, Your Honor, which breaks down the topics

19   and it shows the testimony that's been taken.  And if you look

20   at this, we think it shows that it's not fair to say no

21   testimony was received on this topic.  There's quite a bit of

22   testimony here responsive to those topics, and all this

23   testimony we are willing to designate as 30(b)(6) testimony on

24   behalf of the company.

25           Turning to the next -- the group of eight topics, I

1   think, that he talked about, Exhibit A, once again, the

2   document I just referred to that shows that there is a lot of

3   testimony in the record already on these various topics.  In

4   addition, as I say, we tried to work out a compromise on that

5   and give them a little more time.  They were not willing to

6   accept that compromise.  I think it's odd that they want to

7   hold us to our side of the compromise, but they are not willing

8   to take the whole deal that we proposed.

9        One of the reasons we wanted to impose a time limit

10  was because their insistence that the deposition begin at 6:00

11  in the morning Atlanta time, 6:00 in the evening Taiwan time.

12  That caused the witnesses to work until late the next morning.

13  Arden Chen, for example, it was after 2:00 a.m. to his -- in

14  Taiwan to him at the time his deposition was completed.

15       So it's -- I think it's unreasonable to expect that

16  he would have spent the whole night there.  And, again, we

17  offered to let him come back.  They refused that offer because

18  they didn't think four hours was enough.

19       And I guess the final point is this.  A lot of this

20  happened back in a month, six weeks, seven weeks, eight weeks

21  before discovery ended.  And, you know, discovery has ended.

22  We have now got the expert reports in.  Expert depositions are

23  supposed to start next week.  I wish they had raised this early

24  on, we had dealt with it earlier on if we are going to deal

25  with it I guess is what I would say about that.

1          Thank you, Your Honor, unless you have questions.

2          THE COURT:  Mr. Amy, I will give you the last word.

3          MR. AMY:  Thank you, Your Honor.

4          Just to address that last point first, we did raise

5   it early on.  We raised it the same week that all of this

6   occurred, and then we raised it by letter the week following

7   that.  The meet-and-confer process started within days, maybe

8   weeks after that, and then the motion was filed.  This all

9   occurred at the beginning of July before the 4th of July, and

10  then the motion was on file by the end of July.  So it's not

11  like we have waited until the end of October here to raise

12  these issues.  As Your Honor knows, the motions were filed in

13  July and they have been pending for sometime.

14          In terms -- I just want to briefly touch on a couple

15  of issues with respect to the topics.  With respect to topic 5,

16  he talked a lot about public sale.  But as I mentioned, public

17  sale, public use and public disclosure are all discrete

18  statutory concepts under 102, Section 102.  And so the fact

19  that they haven't sold it doesn't mean that they haven't made a

20  public disclosure or potentially made a public use.  And they

21  were working with several third parties throughout this

22  process.  We just want an answer.  If they want to do it by

23  stipulation, we'd be happy to do that if that's an option.

24          Topic 14 is a -- the issue here is Mr. Bickley, when

25  he mentioned that Mr. Bickley testified that he wasn't aware of

1   any other license agreements in the U.S., that testimony was

2   with respect to only playards.  Well, as you recall, we are

3   asking for license agreements that go to bassinets and swings

4   and entertainers as well.  So the fact that there may not be

5   other license to playards in the U.S. is one thing, but we'd

6   just like an answer as to whether there is license as to these

7   related products.

8          On topic 37 -- well, let me back up on topic 14, one

9   last point on that.  I also mentioned that we had taken

10  Ms. Wang's deposition back in April, and that is true.

11  However, to my knowledge, I don't think they had produced the

12  Silver Cross license at the time of Ms. Wang's deposition in

13  April.  So we couldn't ask questions on something that hadn't

14  been produced.  If my memory is correct, I believe we produced

15  that license, that that license agreement was produced by

16  Wonderland shortly before Mr. Bickley's deposition because he

17  was the designee on that topic.

18         With respect to topic 37, the 30(b)(6) testimony that

19  Mr. Taylor refers to as 30(b)(6) testimony of a third party,

20  not Wonderland, while we received some testimony from Iron

21  Mountain we should be entitled to 30(b)(6) testimony on behalf

22  of Wonderland since they are the Plaintiff here in the case.

23  Iron Mountain isn't a party to the case.

24         And with respect to topic 51 which is the pricing

25  topic, he referred to Exhibit A and how we should have used

1    Exhibit A to discuss pricing.  Well, if you look at Exhibit A,

2    Your Honor, there's -- I don't see pricing data on here.  I see

3    quantity, and I see amount.  And I see quantity, amount, cost

4    and gross profit.  I don't see pricing data.  Part of the

5    reason we need additional financials -- I know we have already

6    addressed that -- is, for example, if we don't have pricing

7    data we can't use a document in front of a witness to help them

8    through a topic relating to pricing when the document doesn't

9    have pricing data on it.

10           With respect to the ethical violation, there was a

11   lot more said off the record.  There's no need to get into the

12   weeds on this, Your Honor.  But there was an assertion made

13   that it would be an ethical violation or an unauthorized

14   practice of law.  I don't know why you would make such an

15   assertion unless you had a basis for it.  If it turns out there

16   wasn't any basis for it, I mean, if -- there's no need to make

17   that type of assertion if we can just proceed and take the

18   topics.  Unfortunately, it was made; and now here we are.  So I

19   don't know.  I just haven't ever seen anything like that

20   before.

21           But the other issue, they mentioned this Exhibit A

22   that they put in their briefing and how they designated

23   testimony.  Well, it's another instance where they want to

24   unilaterally designate testimony on a 30(b)(6) or unilaterally

25   decide what we can rely on.  Well, we will just go back and

39

1    pick and choose what we want to designate as 30(b)(6)

2    testimony.

3              Well, the first thing that you should keep in mind if

4    you take a look at Exhibit A it's six pages total.  It's not

5    like we've got 80 pages of 30(b)(1) testimony on these topics.

6    I believe it's six pages total.  And when we were taking a lot

7    of the testimony that they referred to in Exhibit A, Mr. Roche

8    even clarified that that was testimony in an individual

9    capacity and not in a 30(b)(6) capacity.

10             So that's all I have, Your Honor.

11             THE COURT:  Just stay there at the podium, Mr. Amy.

12             All right.  I'm going to grant in part and deny in

13   part the Defendant's motion to compel full and complete

14   deposition testimony.  With respect to topic number 5, I'm

15   going to grant the motion to compel; and I'll order the

16   Defendant to produce a witness prepared to testify -- a witness

17   or witnesses who are prepared to testify to the first public

18   disclosure, first publication, first public use and first sale

19   of the inventions claimed in the patents in suit.

20             I'm going to grant the motion to compel with respect

21   to topic 14 and order the Defendant -- I mean order the

22   Plaintiff to produce a witness or witnesses who can testify to

23   the subjects contained in the topic with respect to the license

24   of the -- what was the name of the product, Mr. Amy?

25             MR. AMY:  The Silver Cross license.

1          THE COURT:  -- the Silver Cross license.

2          I'm going to grant the motion to compel with respect

3     to topics 18 through 26 and will order the Plaintiff to produce

4     a witness or witnesses to testify to those topics or to produce

5     a written designation of prior deposition testimony that

6     relates to those topics that is satisfactory to counsel for the

7     Defendants in lieu of another deposition or depositions.

8          I'm going to grant the motion to compel with respect

9     to topics 9, 11 and 49 through 50 and order the Plaintiff to

10    produce a witness or witnesses prepared to testify as to those

11    topics or to provide a written designation as to existing

12    testimony directed to those topics that's satisfactory to

13    counsel for the Defendant.

14         If you have to have another deposition on those

15    topics, how much time do you think you need, Mr. Amy?

16         MR. AMY:  On just those topics alone?

17         THE COURT:  Yes.

18         MR. AMY:  I think we can accomplish that in two

19    hours, Your Honor.

20         THE COURT:  All right.  Two hours if it's an

21    English-speaking individual, four hours if it's a

22    non-English-speaking witness.

23         MR. AMY:  Just for clarification, when we are

24    referring to those topics, you were just referring to 9, 11 and

25    49 through 50 --

1              THE COURT:  Correct.

2              MR. AMY:  -- or all of them?

3              Okay.  Thank you.

4              THE COURT:  Now, I'm not sure what it is you're

5    asking for with respect to Mr. Arden Chen, Mr. Amy, what the

6    dispute is over him.

7              MR. AMY:  Well, the dispute is whether we should be

8    afforded additional time with the witness.  I mean, I will be

9    the first to admit we hit our seven-hour limit under the

10   Federal Rules.  But because of the difficulties associated with

11   taking these depositions via videoconference, the delays that

12   you incur through an interpreter where you necessarily -- every

13   question gets asked and answered twice, once to the interpreter

14   and once to the witness and then back through that same chain,

15   it takes much longer than it would normally take.  We also had

16   problems with videoconferencing issues during these

17   depositions.  So what I'm asking for is just two additional

18   hours with the witness.

19             THE COURT:  Well, what's the dispute where you were

20   wanting additional time and they were trying to limit you to

21   four hours?

22             MR. AMY:  That's a different set of topics on which

23   they were -- they never agreed to put Mr. Chen up for

24   additional time.  From my understanding --

25             THE COURT:  All right.  You are asking two more hours

42

1    with Mr. Chen?

2           MR. AMY:  Yes, Your Honor, in his 30(b)(1) capacity.

3    That's correct.

4           THE COURT:  All right.  I will grant the motion to

5    compel with respect to additional testimony from Mr. Chen in

6    his individual capacity no more than two hours.

7           MR. AMY:  Thank you, Your Honor.

8           THE COURT:  Now, was it 18 through 26 where there was

9    the dispute over the number of hours?

10          MR. AMY:  No, Your Honor.  The dispute over the hours

11   was topics 9, 11, 37, 49 through 50 which was addressed.  Give

12   me one second, and I will confirm those.

13          It was topics 1, 9, 11, 29, 31, 37 and 49 through 50

14   where the parties -- the proposal was made for four additional

15   hours, and we had a dispute over how many additional hours was

16   appropriate.

17          THE COURT:  All right.  Well, I'll grant the motion

18   to compel as to that and give you a total of seven hours.

19          MR. AMY:  Thank you, Your Honor.

20          THE COURT:  And then I will deny the motion to compel

21   with respect to topic 37 and topic 51.  I don't believe the

22   additional information sought outweighs the putative value of

23   the information sought and the additional cost it would take to

24   provide the discovery requested.

25          Mr. Amy, you prepare a written order summarizing

43

1    those rulings on the motion, get Mr. Taylor's approval as to

2    form, and I'll be glad to sign it.

3              MR. AMY:  Okay.  Thank you, Your Honor.  Will do.

4              THE COURT:  All right.  Let's take a ten-minute

5    break.  Court's in recess for ten minutes.

6              (A short recess was taken.)

7              MR. TAYLOR:  Your Honor, can I have 30 seconds to

8    consult with opposing counsel on something?

9              THE COURT:  Fine.

10             (Pause.)

11             THE COURT:  All right.  Next is the Defendant's

12   motion to compel production of documents by Graco and testimony

13   by Ms. Strzelecki.

14             Mr. Amy?

15             MR. AMY:  It will be Mr. Gresham, Your Honor.

16             MR. GRESHAM:  Your Honor, if it please the Court.

17   Dan Gresham.  I will address this motion.

18             This motion involves a subpoena served on behalf on

19   Kids II on third-party Graco Children's Products -- well,

20   actually, two subpoenas, a document subpoena to Graco

21   Children's Products and a deposition subpoena to a person,

22   Kerry Strzelecki of Graco Children's Products.  And as

23   Mr. Taylor pointed out in the argument regarding Wonderland's

24   financial information, Wonderland and Kids II are not in the

25   same space.  Wonderland is a manufacturer that manufactures

1    these playards.  Kids II is a seller who sells playards in the

2    United States.  The competitor, direct competitor of Kids II

3    that sells the playards in the United States is Graco

4    Children's Products; and that is who Wonderland sells the

5    product to to be sold in the United States.

6          So in initial disclosures, Wonderland identified

7    Ms. Strzelecki of Graco as a witness that they may use to

8    present information on their behalf.  With regard, Kerry

9    Strzelecki of Graco is a person likely to have discoverable

10   information that Wonderland may use to support its claims.  And

11   they identified that knowledge as commercial marketing and

12   competitive aspects of the party's business as they bear upon

13   Wonderland's claim for damages and the competitive environment

14   in the playard area.

15         Well, our motion to compel deals -- directly to Graco

16   deals with two items in the documents subpoena, and that is

17   request 17 and 18.  And those requests go to the type of

18   financial information regarding profits, retail sales, margins

19   that was discussed earlier with respect to Wonderland.

20         And we understood the Court as saying that in denying

21   that motion in part that you were not persuaded that the

22   requests were tailored, that they were overbroad against a

23   manufacturer versus the cost and difficulty of obtaining that

24   type of information.  Well, Wonderland has identified 112

25   different Graco products as allegedly being covered by the

1   patents in suit.  As far as the burdensomeness, in

2   Ms. Strzelecki's deposition she testified that obtaining this

3   information was not burdensome, that Graco kept this

4   information in the ordinary course of business.

5          The objections that the third-party Graco has raised

6   here essentially are twofold.  One is that the information is

7   competition sensitive, that they are competitors with Kids II

8   and so it's competition sensitive.  But that ignores the fact

9   that after the subpoena was issued the parties -- the non-party

10  Graco and Kids II negotiated a special protective order.  Along

11  with the original subpoena, we sent them a copy of the

12  protective order that you had already entered in the case to

13  cover information disclosed.  And I believe it did cover third

14  parties, but we went above and beyond and negotiated a special

15  supplemental protective order that you entered about three

16  months after the subpoena was issued.  Nevertheless, they still

17  argued that this is commercially sensitive and they shouldn't

18  supply it.

19         Now, in their opposition, Graco did identify some

20  other litigation that is involved between Graco and Kids II

21  directly.  And, interestingly, in that case, they did produce

22  the same type financial information that they are objecting to

23  producing in this case.  So I think that takes care of whether

24  the protective order is sufficient to protect it.

25         Our firm is also representing Kids II in the other

1   case, so the risk of disclosure or whatever that's identified

2   in the opposition brief here is just a complete red herring.

3   They've got -- they can designate anything attorney's eyes only

4   and that type thing.  So the fact that they have already

5   produced similar information in the other case regarding the

6   accused products in that case pretty much moots their

7   confidentiality argument.  Then they come back and start

8   arguing relevance.

9          Well, again, as has been talked about before, what is

10  or is not relevant as far as being discoverable, Rule 26 is

11  really broad as to what's discoverable.  As Your Honor knows,

12  the Georgia-Pacific factors in determining a reasonable royalty

13  it's a very holistic-type view.  There's 15 factors.  We

14  identified specifically three factors that we think are

15  directly -- that make this information relevant.

16         And, remember, Graco and Kids II are direct

17  competitors in this phase.  So determining what Kids II would

18  try to negotiate for a reasonable royalty it seems to me that

19  information what their competitor is willing to pay or is

20  realizing for licensing or selling product covered by one of

21  these patents in suit is directly relevant to what Kids II

22  would expect to deal with.

23         And the Georgia-Pacific factors we identified were 8,

24  13 and 15; and one of the factors is factor 8 which is the

25  established profitability of the product made under the patent.

1   Wonderland has identified 112 different Graco products.  Now,

2   these aren't like completely separate products.  These are

3   variations of products.  So it's not like burdensome to pull

4   information regarding the 112.  They have these broken down by

5   model numbers and that type thing.  There may be a model A and

6   a model B, but they are all similar numbers.

7          Now, in the deposition, we tried to get into some

8   information regarding this same type information that we asked

9   the documents for.  And in the deposition, objections were made

10  and the witness was instructed not to answer the questions on

11  the basis of relevance, not on the basis of privilege.  They

12  didn't follow what the proper procedure is.  If you're

13  instructing a witness not to answer due to burden or

14  oppressiveness or whatever, you should terminate the deposition

15  and seek a protective order.  They didn't do that.  They just

16  instructed the witness don't answer.

17         We cite in our brief that's improper.  The only time

18  you can just instruct a witness not to answer is to protect the

19  privilege.  But here we did lay the foundation in the

20  deposition that this type of financial information was readily

21  available.  Ms. Strzelecki testified that Graco keeps this

22  information.  She could access the computer drive and get the

23  information and produce it very easily.  We tried to ask

24  substantive questions.  Counsel shut her down, instructed her

25  not to answer them.  She followed counsel's instruction, did

1    not provide the answer.

2         So we are here today filing this motion to get the

3    type information.  And, again, this is information that our

4    expert would have considered in making the determination.  Our

5    expert did the best he could with the information he had.  But

6    as we noted with regard to the Silver Cross license and with

7    regard to other information regarding how these -- the

8    profitability of the products allegedly covered by the patents

9    in the marketplace, that information was not available to him.

10   And Graco has the information.  Their argument as to

11   competitiveness is fully protected by the protective order that

12   they negotiated, spent time negotiating --

13        THE COURT:  You are starting to repeat yourself,

14   Mr. Gresham.

15        MR. GRESHAM:  Yes, sir.  Okay.

16        And, essentially, we believe the motion should be

17   granted on that basis, that we are entitled to this

18   information.  It's highly relevant under Georgia-Pacific.  We'd

19   ask the motion be granted.

20        THE COURT:  Mr. --

21        MR. KRASOVEC:  Mr. Krasovec.

22        THE COURT:  -- Krasovec.

23        MR. KRASOVEC:  Yes.

24        THE COURT:  Krasovec.

25        MR. KRASOVEC:  Yes.  Thank you, Your Honor.  May it

49

1   please the Court.  Joe Krasovec on behalf of Graco Children's

2   Products and Ms. Kerry Strzelecki.

3           As I sat and heard the arguments made this morning,

4   it's very clear to me that this case is about a reasonable

5   royalty and a hypothetical negotiation that would take place

6   between Wonderland and Kids II over what royalty Kids II should

7   pay Wonderland for infringing on these patents assuming that

8   infringement is established.  There is nothing in the

9   Georgia-Pacific factors.  The Georgia-Pacific case specifically

10  talks about looking at what the hypothetical negotiation would

11  entail.  And no case, nothing in Georgia-Pacific, nothing

12  anywhere says that that hypothetical negotiation includes the

13  direct competitor's profit data.

14          In other words, what we are really talking about here

15  is if they are going to negotiate what they are asking for is,

16  yeah, and we would know what Graco's competitive profitability,

17  what their cost of sales are, what their profits margins are,

18  what their net margins are.  They would never know that.  We

19  don't know that with respect to Kids II.  Graco doesn't know

20  that.  Kids II would never know that.

21          The question under Georgia-Pacific is the infringer's

22  profit margins.  And I've looked at the expert report that

23  Kids II prepared for this case.  That expert does not say that

24  he can't complete his analysis without Graco's data.  In fact,

25  he completes that analysis based upon the profit margins that

50

1    Kids II experienced with respect to the products that are

2    allegedly infringing on the Wonderland patent.

3            That's what's important.  That is what's relevant to

4    the inquiry here is what a reasonable royalty would be based

5    upon those profit margins and that profit data, not the

6    competitor's profit data.  Because then, frankly, there are

7    other companies that make products that are licensed by

8    Wonderland; and you would open the flood gates to subpoena and

9    discovery to every one of those competitors as well as to what

10   their confidential profit and margins and sales data are.

11           Graco is not Wonderland.  They are not owned by them.

12   They are not a subsidiary.  They are not an affiliate.  They

13   are separate entities.  Wonderland supplies finished goods to

14   Graco, and Graco sells them to retailers.

15           This is not -- to the extent that there is a royalty

16   question as to what royalty Graco pays to Wonderland for these

17   playards, we have answered that.  We produced the document that

18   governs that relationship.  And it's a royalty-free license

19   because that's not the way that that business works.  That's

20   not the way that Graco does business with Wonderland.  Again,

21   Graco buys the finished good from Wonderland and turns around

22   and sells it to the retailer.

23           Graco could sell it for whatever it wants to.  Graco

24   could have whatever profit it decides.  But it has nothing to

25   do with what reasonable royalty Graco -- or I'm sorry --

1    Kids II would negotiate with Wonderland.

2            Let me say this just with respect to the issue of the

3    objections and our objections for the record.  We objected on a

4    timely basis.  And, again, we are a third party.  We weren't

5    involved in this litigation.  We were served with a subpoena in

6    March of 2014.  We responded by objecting to these two

7    particular requests as being overly broad, as being unduly

8    burdensome and beyond the scope of Rule 14 -- or I'm sorry --

9    Rule 45, the rule that governs subpoenas.

10           When we then learned more about what was at issue and

11   we learned that, for instance, Wonderland is not seeking lost

12   profits, when we looked at these two requests there was no

13   reasonable basis for Kids II to ask Graco for this information.

14   And, yes, Graco is involved in litigation directly with Kids II

15   on a whole different product.  And where they are a party, yes,

16   they provided certain financial information that informs that

17   case.  But that case isn't before the Court; those products

18   aren't before this Court.  So just because they produced it as

19   a party in another case doesn't mean that we have to or Graco

20   has to produce this information as a third party.

21           But once we identified what the issues were in this

22   case and understood them, we clarified our objection.  We did

23   that on June 24th.  We made it very clear that we objected to

24   producing this information.  We made that clear the day before

25   the deposition.  The Plaintiff -- or Kids II went through with

1    the deposition.

2            We thought that it wasn't going to be an issue, and

3    yet they asked the questions.  I indicated that the witness is

4    not going to answer those questions pursuant to our previous

5    objections that Kids II had never asked for a ruling on.  We

6    were going to terminate the deposition if those were the only

7    questions left to ask.  They asked a few more questions.

8            We sat -- Ms. Strzelecki sat for her deposition for

9    almost eight hours that day, answered questions on the

10   disclosure that was made with respect to her which was what is

11   the competitive environment for playards, what are the factors,

12   what are the issues with respect to sales.  But there's no need

13   under the damages analysis that's at issue in this case for her

14   to talk about profit margins, sales margins or anything of that

15   nature.

16           In fact, Your Honor, we did produce documents that

17   talk about or that show what the market share of the different

18   retailers and manufacturers are.  We produced documents that

19   show how many units have been sold.  So we did all of that

20   pursuant to the protective order that was entered.  But the

21   sales data and the net profit data and the net margin data are

22   not at issue in this case because there's no issue under

23   Georgia-Pacific that would be informed by that data.

24   Therefore, Your Honor, we request that the Kids II motion to

25   compel be denied as to the request 17 and 18.

1           And, Your Honor, let me just also point out again

2    that Kids II's expert, Mr. Mark Gallagher, when he talked about

3    the Georgia-Pacific factors that Kids II has pointed to with

4    respect to this motion, factors 5, 6, 8 and 13, he identifies

5    those factors in the context of the alleged infringer.  Graco

6    is not the alleged infringer in this action.  Graco is not a

7    party to this action.  And it would be unduly burdensome and

8    oppressive for Graco to have to produce this financial

9    information when it has no bearing on the damages claims at

10   issue in this case.

11          Wonderland hasn't asked for that information.

12   Wonderland does not need that information.  And Graco would

13   object to producing that information to Wonderland as well for

14   it to pursue its damages claims in this case.

15          So for all those reasons, Your Honor, we request that

16   Kids II -- Kids II's motion to compel as to Graco and

17   Ms. Strzelecki be denied.

18          Thank you, Your Honor.

19          THE COURT:  Mr. Gresham, I will give you the last

20   word.

21          MR. GRESHAM:  Thank you, Your Honor.

22          Mr. Krasovec's argument is more of a jury-type

23   argument as to what weight should go to different factors in

24   the context of a damages report.  Our damages expert did

25   indicate in his report that he understood that there were

1    pending motions before the Court, that there was information

2    requested that he couldn't consider in his report.  He did the

3    best job he could with the information he had.

4            This is not -- let me just emphasize this is not an

5    arm's length situation.  Graco, as Mr. Taylor acknowledged

6    earlier, is the exclusive U.S. distributor for Wonderland.

7    These are tightly integrated entities that are involved here.

8    So this is not like a case where there are three or four

9    competitors and you are requesting financial information from

10   those competitors.  This is the entity that markets the

11   products that are allegedly covered by this patent in the

12   United States.

13           We did identify this dispute up front that we

14   expected this information to be produced, that we would move to

15   compel if required.  We asked the questions in the deposition.

16   We got the instruction.  Since these were subpoenas, if this

17   had been an issue they could have filed a motion to quash.

18   They didn't do that.  And now they are trying to argue that we

19   shouldn't have gone ahead with the deposition as far as

20   excusing improper objection.

21           As far as burden, we did lay the foundation for that.

22   It is not burdensome for them to do so.  Their own witness

23   testified that this information is readily available and is not

24   a burden to be produced.  It is relevant under the

25   Georgia-Pacific factors, and whatever weight is given to it

1    would have to be determined at the time the expert report

2    addresses it and is introduced to the Court or to the jury.

3    That's a matter for attorney argument, not as a threshold

4    matter of whether it's discoverable or not.

5              Thank you, Your Honor.

6              THE COURT:  All right.  I'm going to grant the

7    Defendant's motion to compel with respect to Request for

8    Production Number 17 and will order Graco to produce documents

9    responsive to the request that it maintains within the ordinary

10   course of business and that it can produce without undergoing

11   significant burden and expense.  I'll deny the motion with

12   respect to any additional testimony with respect to

13   Ms. Strzelecki.

14             And, Mr. Gresham, if you'll prepare a written order

15   granting in part and denying in part the motion as I have

16   directed, get Mr. Krasovec's approval as to form and present it

17   to me, I'll be glad to sign it.

18             MR. GRESHAM:  Your Honor, just a point of

19   clarification just to make sure I got this down correctly.  It

20   was granted as to 17.  You didn't mention 18.

21             THE COURT:  That's correct.  I'm denying it as to 18.

22             MR. GRESHAM:  Okay.  Just wanted that clarified.

23   Thank you.

24             MR. KRASOVEC:  And, Your Honor, with regard to 17, 17

25   does ask for all sales by date of transaction, by retailer, by

56

1   number of products.  The questions that were posed to

2   Ms. Strzelecki she indicated that there could be without a

3   great deal of burden something that was produced would only be

4   with respect to broad sales data and margin data.  To produce

5   every transaction with every retailer is unduly burdensome.

6           THE COURT:  Well, that's why I said you are required

7   to produce what you already have and maintain in the course --

8   ordinary course of business.

9           MR. KRASOVEC:  And I assume also that this would be

10  produced under the attorney's eyes only confidentiality

11  provision?

12          THE COURT:  That's my understanding of what the

13  Defendant is asking for.

14          MR. KRASOVEC:  Okay.  And appropriate protections

15  will be taken with regard to the public disclosure of that

16  information should this case go to trial I am assuming?

17          THE COURT:  We will cross that bridge when we get to

18  it.

19          MR. KRASOVEC:  I guess we will be involved then.

20          THE COURT:  Yes, sir.

21          MR. KRASOVEC:  All right.  Thank you.

22          THE COURT:  All right.  Thank you very much,

23  gentlemen.  Court's in recess until further order.

24          MR. TAYLOR:  I'm sorry, Your Honor.  Can I just

25  clarify one thing?

57

1          I think probably the Defendant's attorneys will

2   agree.  In view of the rulings and the discovery we are going

3   to be taking, we have a deadline of November 14th for all

4   expert discovery to be completed.  It seems like it would be

5   most efficient if we mutually agreed to move that deadline

6   back, wrap up the fact discovery and then to the extent we have

7   to have any amendments to the expert reports do that and then

8   do the expert depositions as opposed to having to do

9   supplemental expert depositions later.

10          THE COURT:  Y'all talk about it and see if you can't

11  work something out.

12          MR. AMY:  That's agreeable to me.  We can talk about

13  it and work it out.

14          MR. TAYLOR:  Okay.  Thank you, Your Honor.

15          MR. AMY:  Thank you, Your Honor.

16          THE COURT:  Okay.  Court's in recess.

17          (Proceedings adjourned at 3:39 p.m.)

18

19

20

21

22

23

24

25

58

1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7    57, are a true and correct copy of the proceedings in the case

8    aforesaid.

9              This the 7th day of November, 2014.

10

11

12

13              _____

14              Susan C. Baker, RMR, CRR
                Official Court Reporter
15              United States District Court

16

17

18

19

20

21

22

23

24

25