Exhibit 8



# Response Report - Validity of Selected Asserted Claims of U.S. Patent Numbers 6,954,949 & RE 43,919

Wonderland Nursery Goods, Co. Ltd. v.  Kids II Incorporated
Civil Action No. 1:13-CV-1114-TWT

**GLOBAL DEVELOPMENT AND SOURCING, INC.**
**TUCSON, ARIZONA 85739**

October 6, 2014
Authored by: Jerry Drobinski

Signed electronically:  *Jerry Drobinski*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   MATERIALS REVIEWED ........................................................................ 1

III.   BACKGROUND ....................................................................................... 2

   *A.  The '949 Patent* ............................................................................... 2

   *B.  The '919 Patent* ............................................................................... 3

IV.   ASSUMPTIONS AS TO LEGAL STANDARDS ........................................ 5

   *A.  PRESUMPTION OF VALIDITY & BURDEN OF PROOF* .................... 5

   *B.  ANTICIPATION* ................................................................................ 5

   *C.  OBVIOUSNESS* ............................................................................... 6

   *D.  INDEFINITENESS* ........................................................................... 8

   *E.  LEVEL OF ORDINARY SKILL* .......................................................... 9

   *F.  PRIOR ART CONSIDERED OR NOT CONSIDERED BY THE USPTO* ............ 10

V.   FINDINGS ............................................................................................. 10

VI.   NOTES ON HISTORY ............................................................................ 17

   *A.  PRIOR TO THE MID 1980'S* ............................................................ 17

   *B.  MID- LATE 1980's* ......................................................................... 20

   *C.  DESIGN HISTORY* ......................................................................... 22

VII.  OBJECTIVE EVIDENCE OF NON-OBVIOUSNESS ............................... 23

VIII.  DETAILED RESPONSE TO CONTENTIONS OF INVALIDITY ............................ 24

   *A.  Paragraphs 1-68 Introduction and miscellaneous comments.* ............................. 24

     1.  Section I thru III – para 1 – 15 .............................................. 24

     2.  Section IV – para 16 - 27 - Summary of Opinions -- ............................. 25

     3.  Section V – para 29 – 52 - Legal Standards -- ................................ 26

     4.  Section VI – para 53 – 57 – The '949 patent  -- ............................. 26

5.    Section VII – para 58 – 61 -  the '919 patent --...................................................27

6.    Section VII – para 62 – 66 – Claim Construction -- ..........................................27

7.    Section IX – para 67 & 68 – The level of skill in the art --................................27

B.    *Paragraphs 69-115 – Patent '949 - Indefiniteness*............................................28

C.    *Paragraphs 116 - 204 – Patent '949 Anticipation* ...........................................29

1.    Claim 1 of the '949 Patent - U.S. 914,309 to Ross – para 116 – 159 –...........30

2.    Claim 1 of the '949 Patent - U.S. 5,722,477 to Richter (Par. 160-184)............34

3.    Claim 1 of the '949 Patent Anticipation - U.S. 7,055,192 to Waters, et. al. – para 185 – 214....................................................................................................................38

D.    *Paragraphs 215 - 356 – '949 Patent - Obviousness*.........................................44

1.    US 5,615,427 to Huang in view of Marks' Handbook ......................................45

2.    US 5,615,427 to Huang in view of US 7,055,192 to Waters............................48

3.    US 5,615,427 to Huang in view of US 914,309 to Ross...................................49

4.    US 5,615,427 to Huang in view of in view of US 6,317,907 to Wang..............49

5.    US 6,317,907 to Wang in view US 5,615,427 to Huang...................................50

6.    US 4,376,318 to Cirillo in view of US 5,615,427 to Huang .............................50

E.    *Paragraphs  357 - 423 – '919 Patent - Anticipation* ..........................................51

1.    US Patent 6,098, 217 to Hammil......................................................................51

2.    Australian patent 715,883 to Bidwell ...............................................................53

F.    *Paragraphs  424 - 497 – '919 Patent - Troutman* ..............................................55

G.    *Paragraphs  498 - 856 – '919 Patent - Obviousness*.........................................57

# I.    INTRODUCTION

Global Development and Sourcing, Inc. (GDS), its principal and President, Jerome Drobinski were retained by Baker and McKenzie, LLP in January of 2013 through Thomson Reuters Expert Witness Services to render technical opinions relating to the infringement of the Kids II play yard product "Ingenuity" on U.S. Patents 6,954,949 and RE 43,919 (the "'949 and '919" patents respectively hereinafter), assigned to Wonderland Nursery Good, Ltd. (WL), and to render technical opinions on the validity of these patents. Specifically, after rendering an infringement opinion, we have been asked to respond to the Expert Witness Report of Professor William Singhose dated August 26, 2014 relating to claim 1 of the 949 patent and claims 15, 19, 20, 21, 27, 28 and 29 of the '919 patent.

Our charges for this service through Thompson Reuters are calculated by the time expended and expenses disbursed for this analysis.  The hourly rate for study and preparation of this report are included in Exhibit A. The author's detailed qualifications are presented in Exhibit A as are recent writings and deposition and trial testimony in the last four years.

In general, the author has been in the Juvenile Products industry for almost 30 years. In that time he has had responsibility for the full range of business and technical activities in the industry including, sales and general management. However, his primary focus has been the research, product development and manufacturing functions. He is a named inventor on a number of patents in the field, including patents on swings, sleep products, including play yards, strollers and amusement items. As Vice President of Product Development, he directed the activities of more than 30 individuals in research, design and startup of a wide variety of successful, patented, new and improved products. As an independent consultant he has been engaged by a number of companies, primarily in the Juvenile Products industry (as well as others), both domestic and foreign, in the full range of design, engineering and manufacturing disciplines. He remains active in the safety and standards area, chairing or participating in various ASTM committees on Juvenile Products.

# II.    MATERIALS REVIEWED

A list of materials reviewed and relied on for this analysis is included as Exhibit B

## III.    BACKGROUND

Folding Baby Cribs, hereinafter called "play yards" except where quoted from other documents, have long been in production and use. They provide a safe, portable and convenient area for infants up to toddler age to not only play but sleep. They are often provided with additional child care features and accessories which further enhance their usefulness and desirability. It should be noted that these products are generally understood to be use-interchangeable and are sold in that way. It is common knowledge, in my opinion, that in American commerce, the vast majority of consumers who purchase these products use them as both safe play areas and safe sleep areas. This was noted and recognized many years ago by the industry, the standards writing groups and in fact by the government.  The current ASTM Standard for these products is an amalgam of two standards which, prior to 2002, were historically separate, a standard for play yards and a standard for non-full sized cribs. That combined standard is now Federal law under the Consumer Products Safety Improvement Act. (16 CFR 1509).

Over the last more or less 30 years since they were first introduced, foldable play yard structures and, for the most part, aesthetic design have been quite similar from manufacturer to manufacturer.  Play yards generally consist of a rectangular structural assembly and a fabric enclosure, the vertical structural members, generally, tubes of varying shapes and cross sections.

### A.    The '949 Patent

The '949 patent entitled "Playpen with Double Columns at Each Corner, issued on October 18, 2005 presents in its Abstract a novel deviation from the normally single column (tube) construction. It is intended to deliver to the consumer a perception of increased strength and durability by exposing the outer tube it can be seen by the user. Its Abstract describes,  "A playpen with columns comprises a plurality of first corners each having a first bulge and a second bulge, a plurality of second corners each having a first sleeve and a second sleeve, a first rod unit connecting the first corners, a second rod unit connecting the second corners, a plurality of first columns whose one end bushes around the first bulge and another end thereof is inserted into the first sleeve, a plurality of second columns whose one end bushes around the second bulge and another end thereof is inserted into the second sleeve, and a boundary shelter unit covering the first columns. The distance between two opposite second columns is larger than that of two opposite first columns so that the second columns are revealed."

Claim 1 clearly describes the dual column invention of Mr. Chen. It was unique when designed and patented, and the dual column feature is clearly present in the infringing Kids II products.

Regardless of their number and design, the columns of products on the market before the '949 and '919 patents were often covered in fabric, most often the same fabric as the fabric used to construct the child-enclosing body of the play yard. These columns or upright members, in combination with the rest of the components of the play yard, form the safe play and sleeping environment for the child.

### B.    The '919 Patent

The '919 patent describes a novel structural design which allows for exposure of the outer upright members. These components, generally made of metal, are included in the design for both aesthetic and functional reasons.  It can reasonably be said that the exposure of these metal parts enhances the appearance and perception of strength and security.  The structure of the '919 patent also avoids excessive wear and tear that can occur when stretched fabric is on exposed on the corners of a play yard.  Thus, the invention of the '919 patent improves the strength and durability of a play yard, and those improvements can be readily seen, which is an additional and important improvement.

The '919 patent, is entitled "Baby Crib".  In general, the '919 patent describes construction and design features of a folding "Baby Crib", also often also called a play yard (also historically a "playpen").  An example of a play yard that uses the invention of the '919 patent is described in  the Abstract of the patent as follows: "A baby crib includes a bed frame structure to define a surrounding wall around the bed frame structure and a plurality of positioning posts mounted on the fabric member. The bed frame structure includes a plurality of upright tubes each of which has a tube wall defining a receiving hole and having a slit that runs along the length of the tube wall and that is in spatial communication with the receiving hole. The positioning posts are inserted respectively into the receiving holes of the upright tubes. The fabric member is clamped between each upright tube and a corresponding positioning post, and extends outward through the slit in each upright tube."

In his Expert Witness Report, which will be addresses specifically below, Professor Singhose opines that certain prior art references (alone or in combination) and alleged indefiniteness of the claim language render the patents in suit invalid for a variety of reasons. His report of 856 numbered paragraphs has been addressed in detail in the

Exhibits to this report  - paragraph by paragraph - and those responses are summarized below. The contentions and my analysis and refutation are broken down into the following sections, each addressed in detail in an Exhibit.[1]

Exhibit C – Paragraphs 1-68        Introduction and miscellaneous
Exhibit D – Paragraphs 69-115     Patent '949 Indefiniteness
Exhibit E – Paragraphs 116-214   Patent '949 Anticipation
Exhibit F – Paragraphs 215-356   Patent '949 Obviousness
Exhibit G – Paragraphs 357-423   Patent '919 Anticipation (patents)
Exhibit H -  Paragraphs 424-497   Patent '919 Anticipation (Damon Troutman)
Exhibit I –  Paragraphs 498-856   Patent '919 Obviousness
Exhibit J - Summary of similarities Singhose Art to Cited Art
Exhibit K- Photographs of competing products which Wonderland believes to infringe the '949 or '919 patents or both.
Exhibit L- Sales data (Wonderland to Greco) for exposed tube play yards


There has been no communication with Wonderland (assignee) or the design/ engineering individuals responsible for any of the patents.

It is my understanding that I may be required to provide opinion and additional testimony relating to both validity and infringement in the future. This may include further analysis, reports, models and graphics. These have not been worked on or determined at this point.

I understand that the terms of a patent claim are generally given the meaning as understood by a person of ordinary skill in the art at the time the invention was made. We also understand that a patent is to be analyzed based on the claims of the patent and the specification (scope of invention, prior art, preferred embodiments, advantages provided.) It is also acknowledged that claim terms are given their ordinary meaning when viewed in the context of the patent, except where claim language is agreed upon by both parties or the court provides guidance by way of a court order stipulating claim construction. In the case of this dispute, both agreed upon terms and court ordered construction exist.

---

[1] Note: The fact that a particular paragraph of Prof. Singhose's report is not specifically addressed with a direct refutation, does not mean that I agree with what is said in such paragraphs. It may simply mean that the point is addressed elsewhere, e.g., in another paragraph or the narrative portion of my report.

## IV.   ASSUMPTIONS AS TO LEGAL STANDARDS

In conducting my analysis and rendering my opinions and conclusions, I have attempted to avoid offering opinions on the state of the law. In certain instances identified below, counsel for Wonderland has advised me and/or reinforced my understanding of certain legal standards that apply to the overall subject matter of my report. For the preparation of this report, I have assumed that the statements regarding legal standards and principals provided to me by counsel are accurate statements of the law. The citations to legal authority below have all been provided to me by counsel as part of the underlying basis for my assumptions.

### A.   PRESUMPTION OF VALIDITY & BURDEN OF PROOF

A patent enjoys a presumption of validity, which can be overcome only through clear and convincing evidence. 35 B.SC. § 282. At all times, the burden is on the defendant (Kids II here) to establish by clear and convincing evidence that the patent is invalid. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Lite.*, 676 F.3d 1063, 1077-78 (Fed. Cir. 2012).

To overcome the presumption of validity, the challenging party must present *clear and convincing* evidence of invalidity. Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315 (Fed. Cir. 2002). Clear and convincing evidence is that "which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are highly probable" *Builder, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988).

[The Defendant, Kids II in this case, must prove invalidity by clear and convincing evidence. This is a higher standard than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. Clear and convincing evidence is evidence that shows it is highly probable that the claims are invalid. (Excerpted from Apia's Model Patent Jury Instructions.)

### B.   ANTICIPATION

Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." Advanced Display Sys. Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). "There must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of

ordinary skill in the field of the invention." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir. 1991).

In determining whether a patented invention is anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted "[i]f needed to impart clarity or avoid ambiguity" in ascertaining whether the invention is novel or was previously known in the art. Id.

"A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). Additionally, the reference must "enable one of ordinary skill in the art to make the invention without undue experimentation." *In re Gleave*, 560 F.3d at 1334 (citing Impax Labs., Inc. v. Aventis Pharms. Inc., 545 F.3d 1312, 1314 (Fed. Cir. 2008)).

## C.    OBVIOUSNESS

A patent is obvious, and, therefore, invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter, <u>as a whole</u>, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1360 (Fed. Cir. 2012).

Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of non-obviousness. Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966).

A party seeking to invalidate a patent on the basis of obviousness must "demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" Procter & Gamble Co. v. Teva Pharm. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009). While an analysis of any teaching, suggestion, or motivation to combine elements from different prior art references is useful in an obviousness analysis, the overall inquiry must be expansive and flexible. KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 415, 419, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007).

In appropriate cases, the ultimate inference as to the existence of a motivation to combine references may boil down to a question of "common sense," See Perfect Web, 587 F.3d at 1330.

While "the common sense of those skilled in the art demonstrates why some combinations would have been obvious where others would not," Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1161 (Fed. Cir. 2007) (citing KSR, 550 U.S. at 416), the determination is made not after observing what the inventor actually did, but in light of the state of the art before the invention was made. Outside the Box Innovations, LLC v. Travel Caddy, Inc., 695 F.3d 1285, 1298 (Fed. Cir. 2012).

"[E]vidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983). Objective evidence of nonobviousness is an important component of the obviousness inquiry because "evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not." Id. This objective evidence must be "considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art." Id. at 1538-39. Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling United States, Inc., 699 F.3d 1340, 1349 (Fed. Cir. 2012).

Factors Indicating Nonobviousness

Certain factors, which, if established, may indicate that an invention would not have been obvious.  No factor alone is dispositive, and the question is whether the invention as a whole obviousness or not.

- Were products covered by the claim commercially successful due to the merits of the claimed invention rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claim?

- Did others copy the claimed invention?

- Did others in the field, or [the Defendant] praise the claimed invention?

- Did others accept licenses because of the merits of the claimed invention?

Answering any, or all, of these questions "yes" may suggest that the claim was not obvious.  These factors are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims.  These factors should be considered along with all the other evidence in the case in determining

whether Kids II has proven that the claimed invention would have been obvious as of late 2003.

Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); United States v. Adams, 383 U.S. 39, 52 (1966); Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 894-95 (Fed. Cir. 1984); Envtl. Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 697 (Fed. Cir. 1983); WL Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1555-56 (Fed. Cir. 1983); Stratoflex, Inc., v. Aeroquip Corp., 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

"[S]uccess of an infringing product is considered to be evidence of the commercial success of the claimed invention." Brown & Williamson Tobacco Corp. v. Philip Morris, Inc., 229 F3d 1120, 1130 (Fed. Cir. 2000).

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997), see also Brown & Williamson, 229 F.3d at 1130 (stating the presumption that commercial success is due to the patented invention applies "if the marketed product embodies the claimed features, and is coextensive with them.").

### D.   INDEFINITENESS

I understand that in 2014, in Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120 (2014), the Supreme Court overruled the formulation used to evaluate whether a patent claim is sufficiently definite, i.e., "so long as the claim is 'amenable to construction' and the claim, as construed, is not 'insolubly ambiguous.'"   The Court instructed that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."   The Court emphasized three important principles of the indefiniteness inquiry: (1) that definiteness is to be determined by someone skilled in the relevant art; (2) that definiteness should be assessed in light of the patent's specification and prosecution history; and (3) that definiteness is measured at the time the patent was filed.

I also understand that in this case Judge Thrash has fully considered the indefiniteness issue under the revised formulation, and has ruled a follows on the indefiniteness issue raised by Kids II with respect to the '949 patent:

The "distance between" the two second columns and the two first columns forms a gap and "a boundary sheet extends through each said gap and covers the first columns."[footnote to '949 Patent; 4:29-34]  Thus, the claim language merely describes a set of inner columns and a set of outer columns allowing for a boundary sheet to be inserted between the two sets of columns. A person of ordinary skill in the art would, with reasonable certainty, discern from the claim language and the specification that Claim 1, including the terms "distance between," "the two first columns," and "the two second columns" describes a playpen with a set of outer columns, a set of inner columns, and a boundary sheet surrounding the inner columns. In any event, even under the new standard for indefiniteness articulated in Nautilus, Kids II cannot demonstrate by clear and convincing evidence that the terms "a distance between," "the two first columns," and "the two second columns" are indefinite.

Opinion and Order dated August 18, 2014 (Docket # 108).

My understanding is that this resolves the issue of indefiniteness.  However, if the Court does not consider the issue to be resolved, I reserve the right to amend this report to provide opinions on that issue.

## E.    LEVEL OF ORDINARY SKILL

The determination of whether a claimed invention is obvious is based on the perspective of a person of ordinary skill _in the field of play yard design_.  The person of ordinary skill is presumed to know all prior art that you have determined to be reasonably relevant.  The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.

Evidence to consider when determining the level of ordinary skill in the art includes:

- the level of education and experience of persons actively working in the field at the time of the invention, including the inventor;

- the types of problems encountered in the art at the time of the invention; and

- the sophistication of the technology in the art at the time of the invention, including the rapidity with which innovations were made in the art at the time of the invention.

KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. 1727, 1742-43 (2007); Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966); Ruiz v. A.B. Chance Co., 234 F.3d 654, 666-67 (Fed. Cir. 2000); Envtl Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 696-97 (Fed. Cir. 1983).

This will be discussed in more detail below.

### F.    PRIOR ART CONSIDERED OR NOT CONSIDERED BY THE USPTO

When a party challenging the validity of a patent relies on prior art that was considered by the Examiner during the prosecution of the application which resulted in the issued patent, that party's ability to satisfy its highly probable evidence burden may be more difficult. When a party challenging the validity of a patent presents evidence that was not considered by the Examiner during the prosecution of the application which resulted in the issued patent, such new evidence may be given more weight and may make it easier to satisfy that party's highly probable evidence burden.

*Microsoft Corp. v. i4i Ltd. P'ship.*, 564 U.S. __, 131 S. Ct. 2238, 2251 (2011); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005).

Source:  Federal Circuit Bar Association

Some courts have said that the burden is "enhanced" when the challenger is relying on cited art:

> Under 35 U.S.C. § 282, each claim of a patent shall be presumed valid; an accused infringer must prove invalidity by clear and convincing evidence. Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1365 (Fed. Cir. 2004). Easton is correct in noting that, although the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an enhanced burden if the invalidity argument relies on the same prior art considered during examination by the U.S. Patent and Trademark Office ("PTO").

Tokai Corp. v. Easton Enters., 632 F.3d 1358, 1366 (Fed. Cir. 2011)

This will be discussed in more detail below.

## V.    FINDINGS

Kids II has contended that the aforementioned claims of the '949 and '919 patents are invalid and the report produced by Professor Singhose is intended to support their contentions. His report is an analysis of the disputed claims enumerated above with his opinions of anticipation, indefiniteness and obviousness leading to his conclusion of

invalidity. I have carefully reviewed his report and applied my knowledge and understanding of the definitions of anticipation and obviousness discussed above. The analysis has been done with the specific knowledge of and understanding of the mindset of a person of *"ordinary skill in the art at the time the invention was made"* without the benefit of hindsight. That is, someone *in the discipline of the design of juvenile products*, specifically play yards, prior to the time of filing with an understanding of the needs of both the child and the caregiver. This would include the practical issues of the size of the product, the ability to function in all modes safely, the ability to be produced and meet the reasonable cost expectations of the marketplace. These issues are "sine qua non" of the design art of Juvenile Products.

Moreover, it is important to note that:

a. A number of the prior art references set forth in Kids II's contentions and the Invalidity report would probably not have been looked to or considered by an inventor in the design process, since they have little relevance or practical application to the field of play yard design and do not have any substantial application to the design of such products.  A person of ordinary skill in the art of play yard design in 2003 would not have considered many of the references relied upon in the Invalidity Report (especially the prior art references that have nothing to do with infant products or enclosures) as part of an effort to improve a play yard.

b. A number of the prior art references relied on by Professor Singhose were cited in the prosecution of the '919 patent, which is a reissue of an earlier approved patent, 6,859,957, filed April 20, 2004 and issued March 1, 2005. The reissue '919 patent was filed October 26, 2006 and reissued on January 15, 2013. In all there were in excess of 80 prior art citations considered in the original and reissue patent filings, some of which were discussed in detail and applied by the USPTO examiner(s) as part of the back-and-forth leading to the allowance of the '919 patent. In addition, some of the prior art relied upon by Professor Singhose which was not cited in the patent filings or by the examiner, in most cases, bears significant similarity to, and/or are equivalent to art that was cited.  Because Professor Singhose relies on cited art or art that is equivalent to cited art, Kids II and Professor Singhose are faced with the "enhanced" burden applicable to a party challenging the validity of a patent based on prior art that was considered by the Examiner, as noted above. This will be treated in more detail in the obviousness sections on the '919 patent later in this report.

c.  An inter *partes* request for reexamination of claims 1-7 of the original '957 patent was filed with the PTO on August 7, 2012 by another party, Thorley Industries LLC. At the time of filing, Thorley cited seven US patents in their inter *partes* Reexamination Request. This request was denied on or about October 15, 2012 (just prior to the issue date of the reissued patent, the '919 patent) with a thorough (38 pages) explanation by the examiner of the reasons for rejection of the request and the cited art.  The Primary Examiner from the Central Reexamination Unit appears to have conferred with two other Examiners.  While the claims of the '957 patent that were the target of the inter *partes* request are somewhat different from the claims of the '919 reissue patent, the two sets of claims are quite similar in scope. Thus, the denial of this request does bear significantly and positively on the validity of the claims of the '919 patent.  In addition, Wonderland's counsel submitted to the Examiner in the reissue, all of the references submitted by the filing party in its request for reexamination of the '957 patent, and the Examiner in the reissue application allowed the claims of the '919 patent after considering all of that prior art.

Professor Singhose essentially ignores the fact that much of the prior art upon which he relies was previously considered by the USPTO, either directly, or in the form of substantially similar prior art references. For all practical purposes, this claims of the '919 patent and/or the similar claims of its parent (the '957 patent) have been examined by the USPTO three times and have been found to be patentable. I believe their evaluation is more credible that that which might come from Professor Singhose, who appears to have limited experience in the juvenile products area, and none with play yards. This will be discussed in more detail in the obviousness sections on the '919 patent later in this report.

d.  In addition to the USPTO reviews and approvals, the non-obvious nature of the invention of the '919 patent is supported by the following.

  o  Wonderland has produced and sold hundreds of thousands of units of variants based on the novel technology of the '919 patent.  The very favorable reaction of Graco's management to the initial presentation (mentioned below), it is apparent that the success represented by these sales is due to the new exposed tube design of the '919 patent.

  o  I understand that Kids II has also made significant sales of products that use the invention of the asserted claims of the '919 patent.

○ There are in excess of 50 companies which have manufactured or sold products which are variants based on the patents which Wonderland deems to be infringements. A number of these offenders are currently being pursued in legal action for infringement.  It is my view that these products are evidence of non-obviousness, because they incorporate the invention of the '919 patent, in that they are play yards, the uprights are undoubtedly tubular, the uprights support the fabric enclosure, and the uprights are substantially exposed. See Exhibit J for photographs of products which have been in the marketplace with exposed outer tubes. While not having investigated each and every one, it is likely that many will have incorporated many or all of the design elements of the patents in suit.

○ There was significant enthusiasm for the products produced using the technology demonstrated by the invention. In addition to the acceptance in the marketplace demonstrated by the sales of product and the replication by competitors, there is commentary by individuals who have been in the field of juvenile products for years and decades and their enthusiasm for this inventive design. Mr. Brad Bickley has explained that the then Newell-Rubbermaid (Graco Children's Products) Vice President of Marketing, Rich Matthews, when first shown the prototype made utilizing the technology of the '919 patent. His reaction was simply "ship it". The obvious meaning of this spontaneous reaction was enthusiastic approval of the product's appeal and he was confident it would be a success. As someone who has been in the industry for nearly 30 years, and who was at Graco when the original Pack N Play product was invented (Dillner et al patent) and has several patents in the field, my opinion is that the novelty, marketability, and non-obviousness of the invention and the products produced using that technology is apparent.

○ A UK competitor of Wonderland's (Silver Cross (UK) Ltd.) agreed to pay a 7% royalty to Wonderland for a limited right to sell play yards under the European counterpart of the '919 patent.  Silver Cross sought the license after Wonderland confronted Silver Cross and accused its product of infringement.

Response Report on Validity
Wonderland v. Kids II
October 6,2014

e.  As mentioned above, there are factors pertinent to a determination of the level of ordinary skill in the art at the time of the invention. They include:

(1) Educational level of the inventor

(2) Experience level in the field of invention(juvenile products.)

(3) Type of problems encountered in the art:

(4) Prior art solutions(or lack thereof) to those problems

(5) Rapidity with which innovations are made;

(6) Sophistication of the technology

(7) Educational level of other workers active in the field.

Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. I generally do not agree with his view of the level of skill of a person of ordinary skill in the art as presented paragraph 67 on page 29 of Professor Singhose's report:

> 67.    I understand that a person of ordinary skill in the art to which the '949 patent and '919 patent applies would have at least: (i) no college degree, but at least four (4) years of experience in product design and development; or (ii) a bachelor's degree in mechanical engineering, industrial design, or another related technical field and at least two (2) years of experience in product design and development; or (iii) a master's degree (or higher) in mechanical engineering, industrial design, or another related technical field.

It appears that Professor Singhose does not believe that individuals "of ordinary skill in the art" would need to have experience or training in the design of products for the infant and toddler market, and would not need to have knowledge of the standards of the industry and an understanding of the anthropometric data and its use for the occupants of the products, and would not need to have an understanding of the expectations of caregivers, and at least some level of understanding of the costs involved in production and the level of cost acceptance in the market. To the extent that this is the Professor Singhose's position, I disagree.  Familiarity with and understanding of children's anthropometric data, activity levels, accident/incident data provided by CPSC and others is also useful/mandatory so that safety issues, not readily avoided by

strict application of the standard, might be foreseen. Sleep Products for use by children who are consumers unable to protect themselves from harm are not the same as ordinary consumer goods such as those used by adults. As someone who executed and managed the design process in the juvenile products area of art for many years before, during and after the time of this invention, I find it imperative to have the types of experience and training to properly and effectively design for the industry.

Based on the factors for determining the level of ordinary skill in the art at the time of the invention, it is my view that a person of ordinary skill in the art in this case would meet at least one of the following criteria:

> (i) no college degree, but at least four (4) years of experience in product design and development in the field of play yard design; or

> (ii) a bachelor's degree in mechanical engineering, industrial design, or another related technical field and at least two (2) years of experience in product design and development n the field of play yard design.

I have a Bachelor's Degree in Chemical Engineering and have knowledge of materials, mechanical assembly and other experience which accompanies 25-30 years designing and managing the design of chemical manufacturing facilities coupled with a Master's Degree in Mechanical Engineering, I joined Graco Children's Products in 1985. My first assignment was to help design, build and manage a production facility including the production lines which manufactured and assembled high chairs, walkers, _play yards_ and other juvenile products. After two years in that assignment, after learning the industry, its requirements and standards, I was assigned to direct, as Vice President, the Product Development Department of Graco Children's Products, Inc. which was then one of the largest and fastest growing juvenile products companies. As I assumed the direction of the department, the initial development work was being completed by the Graco design team on the "Pack N Play", the most innovative product of its kind in the industry and the genesis of essentially all of the portable folding cribs and play yards now in existence. I managed and executed the process of patenting that product, and several later variants, both in the design and mechanical patent areas. I directed all of Graco's design activities for five years thereafter. The point of this digression is that:

- Despite having significant experiential and academic credentials, it was necessary for me to acquire and understanding of the use (and miss-use), construction and design characteristics of these products before being involved in their design. This was necessary for me to be able to participate in the process and results of the design activity, and evaluate and direct it to fruition. This is only acquired with time, experience, exposure and tutelage.
- With responsibility for supervising over 30 and hiring and evaluating well over 20 design personnel at Graco and thereafter, I believe I understand the "ordinary skills" which were both desirable and necessary in someone trained in the art.
- My nearly 30 years of experience in the industry, both in the U.S. and overseas, provides a considerable breadth of experience in the design and manufacture of products for this understandably safety-use focused product area and the ability to understand the qualities required in the people that do these tasks.

By his CV, Professor Singhose possesses exemplary academic training and credentials in mechanical engineering and a wealth of experience in designing cranes, heavy equipment and the control devices for such equipment. In addition, he has directed research and student activities in a number of diverse and impressive areas. In paragraph 13 of his report he says:

> 13.    As a result of my work in rehabilitation engineering, I have approximately 10 years of experience designing and developing children's products for the medical field. For example, I recently lead (sic.)a team of graduate students and undergraduate students that conceptualized, designed, engineered, prototyped, and tested a baby swing that was designed for use by underweight babies in neonatal intensive-care units. I have also lead teams that have conceptualized, designed, engineered, prototyped, and tested a moving seat for a children's wheelchair and a pediatric transporter that allows handicapped children to more actively play with their friends.

I find it curious that none of this experience was important enough to find its way to his 36 page CV. In addition, none of the topics of his extensive publications or those of his supervised graduate students remotely touched on the mechanical

design of products for the juvenile products (play yards and folding cribs in particular) or for that matter, any consumer products industry.  There is also no mention of patents, mechanical or design, for the consumer products industry either in general or specifically.

On page 3, paragraph 6, of his report, he mentions three cases in which he was a named expert witness. Some research has revealed that these cases all seem to involve heavy equipment of some kind:

1. The first case is a personal injury/liability case involving heavy equipment. A motion to exclude Professor Singhose as an expert has been filed.
2. The second is a patent infringement case involving heavy cranes.
3. The third seems to also be a personal injury/liability case.

None of these cases remotely involves juvenile products or folding cribs/play yards.


## VI.   NOTES ON HISTORY

Before I get into the balance of Professor Singhose's report, _particularly those areas he considers "obvious"_ I think some description of the history of these products would be useful. First and foremost, we are dealing with play yards(also called by some play pens) and foldable, (generally portable) cribs. We are NOT dealing with full sized cribs, which are not generally designed to fold nor  are we dealing with bassinets or cradles or the like, and are generally designed for smaller children.

In my opinion, it important to go back in history and consider the development of products in the play yard category, i.e., the non-full sized (or portable) crib category.


### A.     PRIOR TO THE MID 1980'S

For many years products that resembled the product illustrated below from the Schettler Patent which Professor Singhose lists as a reviewed patent.

Generally made of wood and later metal tubing, these products were called "non-full sized cribs", primarily due to their out of standard dimensions when compared to "full sized cribs," which have dimensions narrowly defined by the Federal Regulation and the mattress size standard. They were cumbersome, did not fold

easily, or did not fold at all, and generally were not considered portable, or convenient, but were the only type of product available.



**NON-FULL SIZED CRIB FROM 1943 PATENT**

For the most part, in current production, they exist only in drastically strengthened form (metal or wooden framed) as "commercial cribs" used in hospitality (hotel) and day care applications, because of their inherent strength. In the daycare applications, they are sometimes used only as emergency evacuation cribs. In the hotel and hospitality environments they are favored because their large wheels, and strength allow them to take the abuse of elevator thresholds and storage/movement of supplies, dishes, etc. The conclusion, as we will see below, is that most if not all home applications have been taken over by the compact, light weigh, foldable products. No current sales data is available for the sale of this type of product for home use but a number of major retailer's websites do not have these pictured at all. An anomaly was one retailer who had three of these units pictured among 33 of the newer mesh framed play yard/non full sized crib.

A second type of product that was strong up to the 1980's was the "drop sided play yard, pictured below.



These products came in several sizes and geometries, and were primarily of metal tubing, multiple metal stampings and vinyl with sewn in nylon mesh. They were basically the only other option available to the wooden products described above. They suffered from many of the same problems as the wooden non-full sized cribs. They were not very portable, fairly clumsy to move and last, but unfortunately not least, were generally fraught with safety issues. They had pinch-point issues with the latch mechanisms, side rail collapse problems and, worst of all, could cause suffocation of a child if the side rail was left down while the child was in the product and the child rolled into the pocket formed by the loosened vinyl/mesh sidewall. These products were involved in multiple recalls and, because of these issues, have all but disappeared from the industry.

Of note is that at the time of their "popularity," these two product categories were covered by two different ASTM and Federal Standards clearly delineating between their characteristics and use and test requirements.

Clearly, caregivers and the industry were sorely in need of solutions to these issues.

### B.    MID- LATE 1980's

In the early to mid 1980's a "new form" of play yard/ non-full size crib was introduced into the market, the Fischer – Price Travel Tender, pictured below. In many ways this was a dramatic break-through. A portable, collapsible, light weight, safe and cost effective solution for the shortcomings of the previous technology seemingly had been found. Moreover, it defined a new marketing category for the industry by lowering the product to the ground while maintaining the dimensions and "look" of a non-full sized crib, including the raised end panels, all of this in a product which, when disassembled, fit into the carry bag pictured below. The product was a significant, albeit short lived, success.



FULLY ERECTED TRAVEL TENDER



TRAVEL TENDER IN CARRY BAG

The significant success of this product started the demise of the earlier products as viable items for the consumer of juvenile products since it married the size requirements of both products with lower, but adequate, off-the-floor height, and it met almost all of the parameters considered important for a portable, sleep/play product, shape, perceived and actual safety, look, weight, portability, etc. However, it fell short in one major area – ease of assembly. The product was complex, consisting of approximately 24 parts including 5 plastic and three fabric assemblies (including the carry bag.), the balance being various metal tubing elements. The tubing and plastic parts were assembled into a skeleton, over which the nylon body with mesh panels was fitted. A mattress pad was added and the product was ready to go. Unfortunately, the assembly was complex, was

confusing to a consumer and, if one part was lost, led to failure, an unsafe situation or both. For a video demonstration of the assembly process go to: https://www.youtube.com/watch?v=ufes9Jfm4kI

Despite the shortfalls of the product, it not only had its own measure of success, but also it sparked significant consumer interest and excitement in the industry.

At this point Graco Children's Products, the third largest manufacturer in the juvenile products business (at that time) enters and essentially turns the market upside down with an innovative leapfrog in design over all of the product in the marketplace.

Graco Children's Products, an innovative manufacturer, recognized the significance of the concept of the Fisher-Price Travel Tender unit but also was well aware of its shortcomings. Their goal was to take the concept, size, etc. of the FP product, minimize the parts and simplify the assembly. The 1989 Dillner et al patent (US 4,811,437) was the result of these innovative design efforts. Introduced at the 1989 JPMA show, it immediately received acclaim from consumers and the industry. The ultimate acclaim came from competitors who immediately set out to design around the patent and a plethora of designs and "copies" was generated.

Of significance to note is that at the time of the introduction, the product was made both in Graco's plant AND by Wonderland, then Graco's primary (only) Asian supplier. At and before the time of development of the Graco Pack 'n Play product, Wonderland was also beginning design efforts in several juvenile products categories including portable cribs and play yards. That effort grew substantially over the years with Wonderland employees and sub-contractors developing perhaps hundreds of new products, many of which are patented in the US and globally, many of which are in the play yard, portable crib category as is the patent in suit.

The Pack 'n Play name has become almost generic for this type of product with millions of units sold by both Graco/Wonderland and its competitors. It is interesting to note as it has been earlier that the overwhelming dominance of these combination products and the uniformity of the design and safety issues of these combined products led ASTM to combine the two separate standards into one which is now the mandated standard.

All of the above history serves to reinforce the reality that:

- this is a significant product category.
- design activity has been a continuum on the part of all manufacturers and suppliers involved.
- the significant advances in the design continuum have been "game breakers", that is they have resulted in major innovations in both mechanical and aesthetic design as well as very significant increases in product acceptance and popularity.
- in my opinion, these important, innovative advances were the result of very sophisticated and intense design efforts by exceptional individuals with broad design experience in the juvenile products industry. They were not just a combination of concepts from a casual review of patent history and agglomeration of "known" art from obscure and other sources.

## C.    DESIGN HISTORY

When the innovative Pack 'n Play was introduced, it is safe to say that most or all of the competition scrambled to "invent" and produce product in competition with Graco while Graco and Wonderland continued their work and developed and produced variants of the product. Throughout the 1990's almost all of the innovation in this field for the competitors was concentrated on by-passing the mechanical features of the Dillner '437 patent and its companion design patent, changing corner designs and "looks", changing shapes (Graco also introduced a larger square version of the Pack 'n Play shortly after it was apparent that the product concept and invention was a "winner." ) and adding a variety of accessories such as bassinets, changing tables, etc. The basic "look" which consisted of the raised end panels, the rectangular, close to the floor, foldable frame surrounded by a fabric enclosure element changed little. The structural frames (and all with single vertical corner or upright tubes) of the product were always hidden by the enclosure fabric member. This led to a certain sameness among the products, regardless of manufacturer, and it was obvious that, in use, the fabric stretched over the frame was vulnerable to damage and increased likelihood of soiling. In addition, the single tube corner design could be perceived to be weak.

Wonderland, by then fully active in product design, and Mr. Chen conceptualized the exposed metal structural frame and filed the '949 and '957 patents on the priority dates of April 19, 2004 and April 20, 2004. These two methods allow the exposure of the "outer tube".  Wonderland subsequently filed and received approval of the patent in suit the '919 patent which was a revision of the original '957 patent. It is important to note that Mr. Chen is an experienced designer in the juvenile products industry. He has been granted approximately 100 US patents for a variety of products in the industry, many in the play yard/portable crib category. It is without doubt that Mr. Chen is much more than the "person of ordinary skill in the art at the time of the invention."

## VII.   OBJECTIVE EVIDENCE OF NON-OBVIOUSNESS

The introduction of play yards with exposed tubes led to significant commercial success. Based on testimony and evidence,  there is considerable objective evidence of non-obviousness, including:

1.   Substantial commercial success, by both Wonderland and Graco, as shown by Wonderland's sales of exposed tube product covered by the '919 patent (taken from EXHIBIT L):

| Year | Units Sold |
|------|-----------|
| 2005 | 242,809 |
| 2006 | 262,519 |
| 2007 | 255,643 |
| 2008 | 210,527 |
| 2009 | 122,892 |
| 2010 | 82,182 |
| 2011 | 60,357 |
| 2012 | 31,182 |
| 2013 | 57,040 |

Note: To the extent that Kid II's sales are found to embody the invention of the '949 and '919 patents, those sales also show the commercial success of the inventions in those patents.

2. Substantial copying of the exposed tube invention by many participants in the play yard market.  See EXHIBIT H for examples of extensive adoption by others of the exposed tube concept;

3. Praise of the invention by Graco upon first seeing a play yard that was made in accordance with the invention; and

4. The taking of a license by a competitor under the European counterpart of the '919 patent; this shows recognition of the value of the invention.

Thus, the significant objective evidence of non-obviousness is strong, and generally outweighs Professor Singhose's subjective evidence (i.e., opinions) of obviousness.

In addition, the subjective evidence of non-obviousness is weak at best, because he is essentially opinion that does little more than disagree with the decision of the USPTO to allow the '919 patent.  Professor Singhose relies on prior art that was either already considered by the USPTO, or is essentially not meaningfully different from, prior art that was already considered by the USPTO, either in the original prosecution of the '957 patent, the reissue prosecution or in connection with Thorley's Request for *Inter Partes* Reexamination, which was denied with a very thorough opinion from three Examiners at the USPTO.

## VIII.   DETAILED RESPONSE TO CONTENTIONS OF INVALIDITY

As mentioned above, the Professor Singhose's report presents a categorized list of invalidity accusations in some 856 paragraphs. These have been broken down into sections and responded to in detail in exhibits relating to each section. This narrative will address each of the areas as presented. The Exhibit charts are detailed point by point analyses and therefore may be redundant or repetitive, since my comments and opinions are reactive to statements in a variety of the Sections, which are, themselves, somewhat repetitive.

### A.   Paragraphs 1-68 Introduction and miscellaneous comments.

1. Section I thru III – para 1 – 15

These paragraphs are merely introductory outlining Professor Singhose's experience, compensation and also references to documents and research he claims to have reviewed.

Professor Singhose has extensive academic training and experience. However, he does not appear to have any experience relative to consumer products and juvenile products for consumers, specifically play yards.

Of significance also is the fact that he has not considered key documents, possibly because they were not provided to him by counsel:

- The Court's ruling on indefiniteness (Document 108 Filed 8/18/14) is part of the Court's ruling on Construction.  My understanding is that the Court's Ruling completely resolves the issues raised in Section X, para 69 – 115 which will be addressed below. If not, I reserve the right to supplement this report.

- The denial of Thorley's Inter Partes Re-examination of the '957 patent, claims of which are similar to the '919 patent.  The '919 patent and its precursor underwent three USPTO reviews, the reissue and reexamination request being especially intensive.

- Professor Singhose disregards much of the prior art cited by Wonderland in the prosecution of the '919, the original '957 patent upon which it is based, and the art in the inter *partes* request for reexamination of the '957 patent. Though he cites the file history of the '957 and '919 patents in his list of materials reviewed, he does not acknowledge it nor does he recognize the significant similarities of the cited art and the art upon which he relies. A large majority of the prior art cited and relied upon by the USPTO in the reissue and presented in Thorley's request for reexamination is not listed in Exhibit 2 of Professor Singhose's report, and that list appears to be all of the prior art that he considered.

2.    Section IV – para 16 - 27 - Summary of Opinions --

This **is** a summary of his opinions. I disagree with the opinions as they pertain to invalidity of the claims of the patents in suit. Professor Singhose misinterprets,  or misunderstands structure of several pieces of prior art, ignores the rulings of the court and agreed constructions, and does not apply common sense in arriving at

conclusions which, in my view, are incorrect or at best misleading. All of his conclusions and interpretations will be dealt with in this response report.

3.      Section V – para 29 – 52 - Legal Standards --

Professor Singhose recites the legal standards given to him by Kids II counsel. In paragraph 27 he states that, "In forming my opinions, I have applied the legal standards for indefiniteness, anticipation, and obviousness, as provided and explained to me by counsel and discussed below in Section V." However, some areas seem to have been ignored or forgotten. Concerns about Professor Singhose's discussion of the legal principles are raised and discussed in Exhibit C.  Specific major issues are:

a.  Professor Singhose either did not have or has ignored the Court's ruling on indefiniteness.

b.  He avoids all mention of the enhanced burden of proof mentioned in Section 6 of " Assumptions as to Legal Standards" referred to above and the requirement for clear and convincing evidence and argument to prove invalidity.

c.  He appears not to have been aware of the agreed construction of the term "rod unit".

d.  Professor Singhose completely disregards a large number of pieces of prior art cited by Wonderland in the prosecution of the '919, the original '957 patent and the denied request for reexamination of the '957 patent. Though he cites some of it in his list of materials reviewed, he does not acknowledge it or discuss the significant similarities that exist between art he uses and that which was considered by the USPTO as part of the process by which the '919 patent was granted.

e.  Portions of findings in significant Legal Cases (such as KSR) are not included in his statement on his application of those findings and he seems to misunderstand the concept of inherency.

4.      Section VI – para 53 – 57 – The '949 patent  --

This section is merely Professor Singhose's  interpretation of the scope of the patent coupled with a recitation of the disputed Claim 1 of that patent and the inclusion of Figure 2 of the patent.

5.      Section VII – para 58 – 61 - the '919 patent --

This also is his interpretation of the scope of that patent. Unfortunately he mischaracterizes the patent in that he indicates that both the positioning posts and the fabric are <u>inside</u> the upright tube. This is contradictory to Claim 20 of the patent reproduced below. In this claim the operative word or phrase is the first three lines of the claim as shown on the patent, column 6. "an attachment structure configured to mount and secure the edge portions of the enclosure member ALONG the support tubes."

> 20. A baby crib comprising:
> a frame structure including a plurality of support tubes,
>     wherein each of the support tubes has an outer wall that
>     defines an outer contour shape of the upright tube;
> an enclosure member including a plurality of side panels
>     having edge portions; and
>
> an attachment structure configured to mount and secure
>     the edge portions of the enclosure member along the
>     support tubes,
> whereby the side panels surround an enclosed space, and
>     each of the side panels extends generally between two of
>     the support tubes substantially out of contact with out-
>     wardly facing surfaces of the outer walls thereof, such
>     that the outwardly facing surface of each of the upright
>     tubes is exposed on an outside of the enclosure member.

6.      Section VII – para 62 – 66 – Claim Construction --

Professor Singhose in this section describes his consideration of both the patent in suit claims and the court ordered and agreed on constructions. However, his understanding of what his invalidity analysis must entail is incorrect. He mentions "a limitation-by-limitation, feature-by-feature, or element-by-element basis".  While this is correct for anticipation, he does not appear to acknowledge the requirement that the invention "as a whole" must be considered in an obviousness analysis.

7.      Section IX – para 67 & 68 – The level of skill in the art --

This topic is dealt with by me extensively in both the Legal Assumptions and General Findings Section above. In addition, Exhibit C provides additional commentary and reference. In short, I disagree with Professor Singhose's interpretation of the level of skill required for this field of invention.

 See Exhibit C for additional detail with respect to the above.

Response Report on Validity
Wonderland v. Kids II
October 6,2014

B.      Paragraphs 69-115 – Patent '949 - Indefiniteness

In this section of Professor Singhose's report he details multiple ways in which the measurements in question could, would or should be taken. It is obvious that he was not in possession of the Court's ruling – Document 108 Filed 8/18/14 which I believe resolves the issue of indefiniteness. This section of Professor Singhose's report is covered by Exhibit D to this report.

Also, I have been informed that this year, in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the Supreme Court overruled the Federal Circuit's formulation that a patent claim is sufficiently definite "so long as the claim is 'amenable to construction' and the claim, as construed, is not 'insolubly ambiguous.'"   Instead, the Court instructed that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."   The Court emphasized three important principles of the indefiniteness inquiry: (1) that definiteness is to be determined by someone skilled in the relevant art; (2) that definiteness should be assessed in light of the patent's specification and prosecution history; and (3) that definiteness is measured at the time the patent was filed.

I also understand that Judge Thrash has fully considered the indefiniteness issue under the revised formulation, and has ruled a follows on the indefiniteness issue raised by Kids II with respect to the '949 patent:

"The "distance between" the two second columns and the two first columns forms a gap and "a boundary sheet extends through each said gap and covers the first columns."[footnote to '949 Patent; 4:29-34]  Thus, the claim language merely describes a set of inner columns and a set of outer columns allowing for a boundary sheet to be inserted between the two sets of columns. A person of ordinary skill in the art would, with reasonable certainty, discern from the claim language and the specification that Claim 1, including the terms "distance between," "the two first columns," and "the two second columns" describes a playpen with a set of outer columns, a set of inner columns, and a boundary sheet surrounding the inner columns. In any event, even under the new standard for indefiniteness articulated in Nautilus, Kids II cannot demonstrate by clear and convincing evidence that the terms "a distance between," "the two first columns," and "the two second columns" are indefinite."

Opinion and Order dated August 18, 2014 (Docket # 108).

As someone who is "a person of skill" in the art, I feel that there is no difficulty at all interpreting this claim and the understanding of the method of measurement is defined well enough for those in the art of designing play yards and foldable cribs would be unlikely to misunderstand or misinterpret its meaning.  In short, I agree fully with Judge Thrash's ruling on indefiniteness.

More detail on these and other contentions in response to Professor Singhose's arguments is provided in Exhibit D.

*In summary, my understanding is that this ruling by Judge Thrash resolves the issue of indefiniteness in regards to the '949 patent. I agree with Judge Thrash's views on the indefiniteness issue.  However, if the Court does not consider the issue to be resolved, I reserve the right to amend this report to provide opinions on that issue.*

### C.      Paragraphs 116 - 204 – Patent '949 Anticipation

Professor Singhose in this section contends that the '949 patent is anticipated by three patents. Specifically:

- **U.S. Patent No. 914,309 to Ross**

- **U.S. Patent No. 5,722,477 to Richter and**

- **U.S. Patent No. 7,055,192 to Waters et al.**

My opinion is that these contentions and opinions are unfounded and are based on misinterpretations of the art and claim language and, most egregiously, the court ordered claims construction language. From the Legal Standards Section earlier in this report "Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation."  The details of my objections to his claims of invalidity are contained in Exhibit E.

**General – para 116** – While the use of dual structural members to improve strength may be said to be well known, it is not the concept that drove Mr. Chen to develop either the invention of '919 patent or the '949 patent. In general, as will be addressed below, each of the products cited as anticipatory in this section is not a playpen or play yard. The details of this objection are included in Exhibit E - XI A. 116

1.      **Claim 1 of the '949 Patent - U.S. 914,309 to Ross – para 116 –
        159 –**

In this contention of invalidity, Professor Singhose in para 121 opines (correctly) that a
crib is generally a high walled sleeping device. The definitions of baby sleep products
from a variety of sources is as follows:

> **ASTM F406-13** defines a "play yard" as a framed enclosure that includes a
> floor and has mesh or fabric sided panels primarily intended to provide a play
> or sleeping environment for children.

> **CPSC Regulatory definition in place in 2004 from 16CFR 1508** - Full-size
> baby crib means a bed (1) that is designed to provide sleeping
> accommodations for an infant, (2) that is intended for use in the home, and
> (3) that is within a range of ±5.1 centimeters (±2 inches) of the interior length
> or width dimensions specified for full-size baby cribs in § 1508.3.

> **ASTM F**-1169 Standard for cribs - 3.4 *full-size crib*, *n*—a bed that is designed
> to provide sleeping accommodations for an infant having interior dimensions
> of 28 6 5⁄8 in. (710 6 16 mm) wide and 523⁄8 6 5⁄8 in.(1330 6 16 mm) long.
> (This generally matches up with 16CFR 1508 above.)

> **Merriam Webster on line dictionary**

> **Crib** *noun* \ˈkrib\ : a small bed with high sides for a baby

Thus a play yard can be a crib but cribs are not generally understood to be play yards.

The exception to this rule is the relationship of a non-full sized crib and the play yard.

As mentioned earlier, the voluntary ASTM standards for Non-Full Sized Cribs F- 1822-
97 was merged into the F-406 Play Yards standard which was in place because of the
similarity of both the uses and the characteristics of the products.

> **CPSC Regulatory definition in place in 2004 - 16 CFR1509:**
> **(a)** Crib or baby crib means a bed designed to provide sleeping
> accommodations for an infant.
> **(b) (1)** Non-full-size baby crib means a crib that (i) is intended for use in or
> around the home, for travel and other purposes and (ii) has an interior
> length dimension either greater than 139.7 centimeters (55 inches) or
> smaller than 126.3 centimeters (493/4 inches), or, an interior width
> dimension either greater than 77.7 centimeters (305/8 inches) or smaller
> than 64.3 centimeters (253/8 inches), or both.

This standard is both referenced in the F-406 standard AND required by it.

The F-406-13 also defines the following.
Non-full-size crib, n—crib that (1) is intended for use in or around the home, for travel and other purposes; and

(2) has an interior length dimension either greater than 55 in. (139.7 cm) or smaller than 49 3⁄4 in. (126.3 cm), or an interior width dimension greater than 30 5⁄8 in. (77.7 cm) or smaller than 25 3⁄8 in. (64.3 cm), or both.

Portable crib, n—non-full-size crib designed so that it may be folded or collapsed, without disassembly, to occupy a volume substantially less than the volume it occupies when it is used.
play yard (aka playpen), n—framed enclosure that includes a floor and has mesh or fabric sided panels primarily intended to provide a play or sleeping environment for children. It may fold for storage or travel.

I know of no fabric or mesh sided non-full-size baby cribs/play yards that do not fold.

When looking at both of the patents in suit it is clear that they are folding, portable cribs or play yards.

The fact that the '919 patent may use the terms crib and playpen without making a clear distinction between them does not change the ordinary meaning of "playpen" as that term would be understood by a person of ordinary skill in the art.  The language of the '919 patent is not relevant to proper meaning of the terms in the '949 patent.

My objections to the specific contentions of Professor Singhose regarding invalidity based on alleged anticipation are as follows:

1. Para 121 & 122 - Using the ordinary meaning as terms would be understood by a person of skill in the relevant art, the device shown in the Ross patent is a crib, not a play yard or playpen. It is not close to the ground as someone who is a person skilled in the art would expect for both a play yard and a portable folding crib.

2. Paragraphs 123-124 and others – Professor Singhose opines that: Element 11 of the Ross patent is a column – since the "box" of the crib is suspended from the upper frame of the crib, it is obvious to me that this element is in tension not compression as is commonly understood for columns (or to withstand lateral forces from supporting a fabric enclosure,

as shown in the '949 patent). *Thus the Ross patent fails to disclose this element of the claim.*

In paragraph 147, he leaps to the conclusion that the connection for element 11, the corner hanger which he calls a post, would *necessarily* be connected by a mortise and tendon *sic.* This is not true since this connection in wood could also be made with a metal fastener which also could be part of the finial shown on the illustration in the Ross patent.

He further opines that the element 20, which in the Ross patent is defined as a roller, not a column. A roller could not be in compression since, if it were, it would not rotate. Nor could the roller provide structural rigidity or strength to the product. In addition, the "roller" is not positioned at the corner as the '949 requires. *Thus the Ross patent fails to disclose this element(Singhose Element 1) of the claim.*

3. Throughout his analysis Professor Singhose has misinterpreted the court construction ruling on the meaning of "corner component." The court ruled that a "first corner component" and "second corner component" are defined as "a *distinct* part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components," and "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" In all cases where Professor Singhose refers to "corner components" he draws a circle or oval around a general area ("Region" as he calls it in paragraph 139) of the product shown in the Ross patent and calls it a corner component. The construction ruling calls for a DISTINCT part, not an assembly, not a group of parts, not a region. *Thus the Ross patent fails to disclose these elements (Singhose Elements 2 & 4) of the claim.*

4. Professor Singhose further opines regarding the presence of first and second rod units of the Ross product. The agreed upon definition of "rod unit", i.e., "an assembly capable of being put into a generally straight or bar-like configuration." This has been misapplied in the case of both rod units which Professor Singhose has tried to identify.

   i. The First rod units he identifies are elements 13 and 14 connecting regions of the Ross device that he has circled. Since these regions

are not corner components, the elements 13 and 14 cannot form a rod unit. Singhose Figure 21 is below inserted to identify these elements.



**Singhose Fig. 21:** First (Lower) Rod Units Shown in the Cross Sectional View of Figure 2 of the '309 Patent

**ii.** The second rod units are named in paragraphs 141 and 142 as the combination of elements upper parts of the cross legs 5 and 6 of the patent (See Fig. 1 of Ross). Clearly from Singhose Figure 25 reproduced below, this cannot met the construction definition of rod units ., "an assembly capable of being put into a generally straight or bar-like configuration." There is no way for these elements to generally straight.

Thus the Ross patent fails to disclose these elements (Singhose Elements 3 & 5) of the claim.



**Singhose Fig. 25:** Second Rod Units Shown in the Cross Sectional View of the Playpen in Figure 2 of the '309 Patent

More detail on these and other contentions, including with regard to the element describing the boundary sheet and Professor Singhose's arguments regarding covering of the tubes, and my counter arguments to them, is provided in Exhibit E.

***In summary, it is my opinion that Ross '309 does not anticipate claim 1 of the '949 patent, since Ross does not describe every element of the claimed invention, either expressly or inherently.***

### 2.     Claim 1 of the '949 Patent - U.S. 5,722,477 to Richter (Par. 160-184)

The Richter '477 patent describes an assembly/connector system for joining sections of fencing or panels. The '477 patent (Col. 1, lines 24-25) indicates the panels can be used "in a daycare or a classroom setting as dividers." Later in Col. 1, line 36, the patent suggests to not have sharp edges when the panels are used around children. Professor Singhose refers to Figure 1C of the patent as illustrative of a play yard. This is not so in reality or in the patent description of that Figure 1C found in the '477 patent document In Column 3, Lines 17-19.

Section C para 162 – Professor Singhose has served up a buffet of terms alluding to child care and imagines a play yard from the '477 patent. None of these statements mentions a play yard or foldable portable crib.  The Richter patent mentions: a rectangular enclosure (but not for a child), day care room dividers or walls, "play

structures", classroom dividers but no mention of a portable crib or play yard. The patent mentions the need for tamper proof locking mechanisms that avoid the potential for pinching of small children, of course a necessity in a day care environment. It must be noted that the Richter product does not comply with the definition or the requirements for play yards or portable foldable cribs as described in the standard or that which someone skilled in the art of design of such products would anticipate.

**ASTM F406-13** defines a "play yard" as a framed enclosure that *includes a floor* and has mesh or fabric sided panels primarily intended to provide a play or sleeping environment for children.

In fact, the product produced with the invention of the Richter patent, ***if it were to be used for a child,*** would be more likely classified as a gate or an enclosure and be viewed as needing to comply with **ASTM F-1004** that covers Expansion Gates and Enclosures.  By definition in that standard, *expandable enclosures*, *n*—a self-supporting barrier intended to completely surround an area or play-space within which a young child (see 1.2) may be confined. Enclosures may be marketed for indoor or outdoor use, or both.

Professor Singhose in his Discussion of the Claim elements of Claim 1 of the '949 patent, has identified elements in Richter, as he has in Ross, which he opines are all of the elements of the patent in suit. In Exhibit E, I have outlined paragraph by paragraph my objections to his findings. Specifically:

Claim 1 Element 1 - "A playpen with double columns at each corner of said playpen, comprising:" paragraph 164 and following – As mentioned above, the Richter patent describes a fence not an play yard or a portable crib. ASTM F406-13 defines a "play yard" as a framed enclosure that includes a floor and has mesh or fabric sided panels primarily intended to provide a play or sleeping environment for children. Richter has no floor, and is not play yards or a play pen; it is a portable fence. The fact that Richter says his portable fence may be used to define a play area does not make it a playpen or play yard. In Singhose Figures 34 and 35, reproduced below, he opines that the two columns of separate panels are the first and second columns of the '949 patent. They cannot be, since they are on separate panels which can be removed from each other at will.

Claim 1 Elements 2 and 4 - "a plurality of first corner components" and "a plurality of second corner components" respectively as he has interpreted and opined are circled areas containing a multiplicity of parts.(paragraph 168)  As

pointed out in the discussion of Ross above, "corner component" means "a *distinct* part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components" There is nothing "distinct" about the area or region that is circled in Singhose Fig. 35, and for this reason the area or region is not a component or a corner component, as that term has been construed by the Court.

By the same logic in paragraph 171, Prof. Singhose has identified the second corner components incorrectly. In the Richter design, first and second corner components do not exist because there are no DISTINCT parts at which two surfaces meet. Without corner components as properly defined in the court construction ruling, his argument for use of Richter as prior art for anticipation of all of the elements of the '949 patent disintegrates.



**Singhose Fig. 34:** Magnified View of the Center Corners in Figure 1A of the '477 Patent

**Singhose Fig. 35:** First Corner Components in Figure 1A of the '477 Patent

Claim 1, elements 3 and 5, deal with the rod components which connect the corner components in the '919 patent. I have already dealt with he term "second corner component" meaning "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" above, and in my view there is nothing "distinct" about the area or region that is circled in Singhose Fig. 36 below, and for this reason the area or region is not a corner component, as that term has been construed by the Court. Therefore, the rod identified by Prof. Singhose as a "second rod unit" is not a second rod unit, because it does not connect distinct parts that meet the

requirements to be second corner components. This refutation also deals in a like manner with the first rod component as described in paragraph 173 of the report by Professor Singhose. (Singhose Figure 37)



**Singhose Fig. 36:** First (Lower) Rod Unit in Figure 1A of the '447 Patent

**Singhose Fig. 37:** Second Corner Components in Figure 1A of the '447 Patent

Claim 1, elements 6 & 7, call for "a plurality of first columns, each said first column having two opposite ends, one end being connected to a first corner component, another end of said column being connected to a second corner component" and "a plurality of second columns, each said second column having two opposite ends, one end being connected to first corner components, another end of said second column being connected to a second corner component each said second corner component comprising a first sleeve and a second sleeve connecting respectively with the first column and the second column" respectively, and covered in paragraphs 173 and 174, respectively. Again we are dealing with the mistaken interpretation of the Court's ruling. The Court ruled that the term "first corner component" means "a distinct part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components" The Court also ruled that the term "second corner component" means "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" There is nothing "distinct" about the areas or regions that are circled in Singhose

Fig. 37 and others, and for this reason the areas or regions are not distinct components or a corner components, as construed by the Court.

Also, the claim requires the "second" (or upper) corner components to have sleeves for the first and second columns (i.e., the inner and outer columns).What Prof. Singhose shows is what Richter calls a " connector assembly" and does not correspond to what Prof. Singhose has identified as the "corner component".

Claim 1 Element 8 – This has been dealt with by the court's ruling on indefiniteness DKT 108 Filed 8/18/14 which clearly defined what the relevant measurement was to be. This was also described earlier in the section of this report on indefiniteness.

Claim 1 Element 9 – this is discussed in detail in the relevant paragraph responses in Exhibit E.

More detail on these and other contentions in response to Professor Singhose's arguments is provided in Exhibit E.

***In summary, it is my opinion that the Richter '477 patent does not anticipate claim 1 of the '949 patent, since Richter does not describe every element of the claimed invention, either expressly or inherently.***

### 3.   Claim 1 of the '949 Patent Anticipation - U.S. 7,055,192 to Waters, et. al. – para 185 – 214

Paragraph 186 – Professor Singhose opines that there is no difference between a crib and a play yard. This statement exposes his lack of experience in the industry with its stringent safety and use requirements. In my extensive discussion of the definitions of these products in the above Section A – "Ross – Anticipation" I have clearly defined what the differences, similarities, and uses of the several products are. What we are dealing with in these two patents but specifically with the '949 patent is the play yard/portable, foldable crib product category which are used for both play and sleep and not full sized cribs which are designed for and used for overnight sleep.

The Waters patent does not show a playpen. It is a full sized crib. Playpens are generally understood by persons of ordinary skill in the art (and most parents and caregivers) to be low to the ground.  Waters is a crib not a playpen or folding portable crib. The fact that the '919 patent may use crib and playpen without making a clear distinction between them does not change the ordinary meaning of "playpen" as that term would be understood by a person of ordinary skill in the art.

What should be recognized is that Waters does not claim a crib or play yard or portable crib design. It is for a crib accessory, a crib shield system which could only be used in this type of product because of its inherent geometry and the standardization of full sized cribs by regulation. It can be considered also that the Waters product would likely be considered hazardous since it could compromise the design integrity of the full size crib and provide dangerous foot holds and strangulation hazards. Despite the significant lack of commonality between the products, I have in Exhibit E once again paralleled my contra opinions to his opinions. As will be seen, because of the significant disparity of these devices and their elements it is obvious that the Waters patent does not provide sufficient evidence to warrant a ruling of invalidity because of anticipation. As in the previous anticipation suppositions by Professor Singhose, I will comment in this narrative about some of the specific claim elements of the '949 Claim 1 with the full area covered in Exhibit E.

Claim 1 Element 1 - "A playpen with double columns at each corner of said playpen, comprising:" paragraph 191 and following – As above, the Waters patent describes a full sized crib and an accessory for that crib, not an play yard or a portable crib. In Singhose Figure 47 (Waters Figure 1), reproduced below, he offers an opinion of what the two columns in the Claim element are. He encircles and describes the two outside columns correctly as columns in blue. However, then he also calls the first slats on the headboard out as columns which is grossly incorrect. These cribs in general are made up of five components.

> Two pre-assembled headboards which are panels with a frame made up of parts 36, 38, 43 and 32. The slats 35, 37, and so on are captured in the frame and form the outer boundary of the crib on either end.

> Two side rails made up in a similar fashion, though not as structurally substantial due to the differential in their load requirements.

> One bottom "mattress support"

When one analyzes the mechanical function of the elements we find:

> The Four columns of the two headboards numbered 31,33,36 and 38 carry essentially all of the weight load of the product

> The cross members which will be discussed later, 16, 32, 43 and its unnumbered duplicate on the other side of Figure 1 of the patent simply serve to join the two vertical columns.

The slats numbered 37 & 35 and their counterparts between and on the opposite side are the containment elements for the child in the crib. They are not in compression. They are simply held in the "frame" formed by 32, 36, 38 and 43. They are just NOT in compression as would be postulated by Professor Singhose.

The mattress base is always suspended from what are the blue corner posts.

Thus virtually all of the weight of the crib and its contents are borne by ONLY the four "blue" corner posts.

The contention that Claim 1 Element 1 is met by this construction is incorrect. This is further substantiated by the fact that the slats Prof. Singhose is calling the second corner posts are not in the corners at all.



**Singhose Fig. 47:** Double-Column Corners on the Left
Side of Figure 4 in the '192 Patent

Claim 1 Elements 2 and 4 - "a plurality of first corner components" and "a plurality of second corner components" respectively.  Singhose as he has interpreted and opined are circled areas containing undefined parts .(paragraph 168) As in Ross and Richter, corner post means "a distinct part of the assembly at which two converging surfaces meet, at a lower(or upper) end of the playpen." There is nothing "distinct" about the area

or region that is circled in Singhose Fig. 49, and for this reason the area or region is not a component or a corner component, as that term has been construed by the Court.



**Singhose Fig. 48:** First Corner Components on the Lower Left of the Playpen Disclosed in the '192 Patent

By the same logic in paragraph 197 he has identified the second corner components incorrectly. In the Waters design, second corner components do not exist because there are no DISTINCT parts at which two surfaces meet. Without corner components as properly designated in the court construction ruling, his argument for use of Waters as prior art for anticipation of all of the elements of the '949 patent disintegrates.



**Singhose Fig. 51:** Second Rod Unit in Figure 4 of the '192 Patent

Claim 1 Elements 3 and 5 deal with the rod components which connect the corner components in the '949 patent. I have already dealt with he term "corner component" meaning "a distinct part of the assembly at which two converging surfaces meet, at a higher(or lower) end of the playpen from the first corner components" above and said that there is nothing "distinct" about the areas or regions that are circled in Singhose Figures 48 and 5 above. For this reason the area or region is not a corner component, as that term has been construed by the Court. Therefore, the rod identified by Prof. Singhose as a "second rod unit" is not a second rod unit, because it does not connect distinct parts that meet the requirements to be second corner components. This refutation also deals in a like manner with the first rod component as described in paragraph 200 of the report by Professor Singhose. (Singhose Figure 51) I find it curious also that he opines that the second corner elements AND the second rod units are one and the same part. As could be expected, this rigidity precludes folding and reinforces the fact that this device is outside the realm of the products clearly shown in both of the patents in suit.

Claim 1 Elements 6 & 7 - "a plurality of first columns, each said first column having two opposite ends, one end being connected to a first corner component, another end of said column being connected to a second corner component" and "a plurality of second columns, each said second column having two opposite ends, one end being connected to first corner components, another end of said second column being connected to a

second corner component each said second corner component comprising a first sleeve and a second sleeve connecting respectively with the first column and the second column" respectively - paragraphs 204-208. Again we are dealing with the mistaken interpretation of the Court's ruling. The Court ruled that the term "first corner component" means  "a distinct part of the assembly at which two converging surfaces meet, at a lower end of the playpen from the second corner components"  The Court also ruled that the term "second corner component" means "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" There is nothing "distinct" about the areas or regions that are circled in Singhose Fig. 51, 52 and others, and for this reason the areas or regions are not distinct components or a corner components, as construed by the Court.

In addition, I must remind the reader that I have denied the existence of a first or inner column since what Professor Singhose has identified as the first column is merely one of the many slats in the headboard of the crib, is not in compression and is not in the corner of the crib.

Also, the claim requires the "second" (or upper) corner components to have sleeves for the first and second columns (i.e., the inner and outer columns).What Prof. Singhose describes in paragraph 206 and shows in his Figure 54 is a close up of what he is opining is the upper or "second corner past" into which he claims in paragraph 207 it is obvious that the corner posts are inserted . Prof. Singhose's statement that the connection of the corner post and the slat which he is calling the first column in his Figure 54 "would probably" be accomplished with sleeves is admission that the claim is not anticipated, because the requirements for anticipation demand more than probabilities and possibilities. He further as he has in the past suggests that: "although the sleeve connections are not explicitly shown, Singhose Fig. 57 shows the bar-like first column and the circular post-like second column both attaching to the upper cross bar 32. "Columns are often connected to cross bars using what are commonly called mortise-and-tendon (sic.) joints." My reaction and comment to this is that the methodology of connection is speculative on his part and is surely not taught by the Waters patent. As stated above, merely speculating that a mortise and tenon joint will be used to create the sleeves he perceives to be needed is not sufficient to make it a fact. This joint or joints could be made using metal fasteners or even brackets. While the mortise and tenon approach may well work, it is not the sine qua non. Again, he is opining that the slat in the headboard is a column which it is not. It is interesting that in paragraph 207 he calls what was formerly identified by him as the second rod unit combined with the second corner components an upper crossbar. In crib manufacturing, that is exactly what it is.



**Singhose Fig. 54:** Second Corner Component Shown in Figure 4 of the '192 Patent

Claim 1 Element 8 – Dealt with by the court's ruling on indefiniteness (Document 108 Filed 8/18/14) clearly defined what the relevant measurement was to be. This was dealt with earlier in the section of this report on indefiniteness.

Claim 1 Element 9 – It is ironic that the enclosure element of the Claim is most relevant to the Waters patent in that this is what the Waters patent is about - not about a play yard or folding portable crib. It is interesting and curious that, when one looks at the Waters patent Figure 1, two of the outside or columns 2 are covered and two are not. I do not believe this is what the patent teaches but it does fly in the face of one of the main reasons for the two patents in suit, the exposure of the outside tubes. Of course, the Waters crib is not foldable and, because of weight, is not portable. As before, I have addressed all of Professor Singhose's theories of invalidity in Exhibit E.

More information on these and other contentions in Professor Singhose's report and my counter arguments to them, is provided in Exhibit E.

***In summary, it is my opinion that the Waters '192 patent does not anticipate claim 1 of the '949 patent, since Waters does not describe every element of the claimed invention, either expressly or inherently.***

D.  **Paragraphs 215 - 356 – '949 Patent - Obviousness**

1.  Professor Singhose has postulated six combinations of either previous patents or technology which he opines would render Claim 1 obvious: US 5,615,427 to Huang in view of Marks' Handbook,

2.  US 5,615,427 to Huang in view of US 7,055,192 to Waters,

3.  US 5,615,427 to Huang in view of US 914,309 to Ross,

4. US 5,615,427 to Huang in view of in view of US 6,317,907 to Wang,

5. US 6,317,907 to Wang in view US 5,615,427 to Huang, and

6. US 4,376,318 to Cirillo in view of US 5,615,427 to Huang

In each case, the comments below summarize the more detailed comments in the chart of EXHIBIT F.

Having reviewed the six obviousness argument, I disagree with them and the following summary analyzes and responds to Prof. Singhose's opinions.

Prof. Singhose starts this section in paragraph 215 by presenting a compendium of prior art which he believes in various combinations will prove his contentions of obviousness. Some of these references have been dealt with before. For the most part they are either:

- Not play yards – either a crib or something else
- Do not have second columns
- Are portable fences, not play yards
- Do not have a boundary sheet

Professor Singhose alleges that various combinations of prior art items render claim 1 of the '949 patent obvious.

## 1.   US 5,615,427 to Huang in view of Marks' Handbook

The device shown in the Huang patent '427 is a conventional folding portable crib or play yard. What Huang has done is add parts to the corner posts (outer or second columns) to support a frame structure which provides what is normally called a bassinet to the product.

In paragraph 219 of Professor Singhose's report, he contends that all but one of the nine Claim elements are taught by the Huang patent. This is not correct for the following reasons:

Claim element 1: "A playpen with double columns at each corner of said playpen, comprising…"   While there are two tubular members shown in Huang's embodiments, the entire design is based on the need for a removable structure to allow for removal of the bassinet feature and so that the unit can be folded. This is fundamental to play yards and folding portable cribs. Later in his discussion on this patent, Prof. Singhose opines that according to his Mark's Handbook calculations, extending the inner structural element of the Huang product to the first corner components on the bottom of the product provides additional strength. Several factors mitigate this.

There is no need for additional strength in the Huang play yard.  The load requirement on the outside(second) columns which are the only compression load bearing members in the corners does not change when a child is moved between the shorter bassinet version and the play yard version. While it is true the child in the bassinet is smaller, the design of the product is such that it must take loads far greater than a smaller child in the bassinet.

The loads on the product without the bassinet are taken by both the floor cross members and the columns and again are far greater than those for the "cantilevered" inner support members. It should be noted that the perceived load that is thought to be cantilevered from being "pulled in to the center of the product by the weigh of the baby is relieved by the insertion of the bottom board of the product which is rigid and covers the bottom of the bassinet or the bottom of the play yard. Also many manufacturers of these products insert structural members into the bottom of the bassinet "liner" to stiffen it to better support the bottom board, and thus remove the cantilevered load on which Professor Singhose focuses. Thus these short members inside the play yard are in tension, for the most part, with very little if any cantilevered or lateral load transmitted to the short rail components.

If, as Professor Singhose suggests, the inner tensional structural member which he incorrectly identifies as a column were to be extended and linked to the bottom or first corner component, the folding of the unit would be complicated and the principal design feature, the removable bassinet would be nullified.

Claim element 3: "a first rod unit connecting the first corner components - Huang does not have a first rod unit, under the agreed meaning of "rod unit", because no connection of two lower corner components is "an assembly capable of being put into a generally straight or bar-like configuration". The illustration adjacent to Singhose Figure 66 copied from the patent in suit illustrates the definition agreed on for first rod unit. It is definitely not the Huang lower elements.

Claim element 4: "a plurality of second corner components"  -  Huang does not have a second (or upper) corner component with two sleeves, because the inner short rail, incorrectly defined by Professor Singhose as the inner column, is in one part and the outer column is in another part. Thus, Court's construction of "second corner component", i.e., "a distinct part of the assembly at which two converging surfaces meet, at a higher end of the playpen from the first corner components" is not met, in that the construction says "part" -- singular not plural. It is obvious that the two parts shown on the illustrations of the Huang patent are separate elements, designed to allow the separation of the inner bassinet feature from the play yard body.

Response Report on Validity
Wonderland v. Kids II
October 6, 2014

Claim element 5: "a second rod unit connecting the second corner components"
Because the second rod unit must connect second corner components, and since
Huang does not meet the limitation calling for second corner components, Huang does
not have a second rod unit.

In addition, the item that Prof. Singhose says is a second rod unit does not connect the
inner brackets 53 of the inner play yard of Huang. For this additional reason, the Huang
device does not have a second rod unit.

Claim element 6: "a plurality of first columns, each said first column having two opposite
ends, one end being connected to a first corner component, another end of said column
being connected to a second corner component."  As discussed above, extending the
inner short rail to connect it to the first (lower) corner component would make no sense:

    1. Huang is not in need of addition strength, rigidity or redundancy, and
    2.  Making the proposed change would take away the primary function of Huang,
       which is to have two nested devices of different heights.

Claim element 7: "a plurality of second columns, each said second column having two
opposite ends, one end being connected to a first corner component, another end of
said second column being connected to a second corner component each said second
corner component comprising a first sleeve and a second sleeve connecting
respectively with the first column and the second column"  Reiterating what has
previously been said, Huang does not have a second (or upper) corner component with
two sleeves, because the inner short rail is in one part and the outer column is in
another part. Thus, Court's construction of "second corner component", i.e., "a distinct
part of the assembly at which two converging surfaces meet, at a higher end of the
playpen from the first corner components" is not met, in that the construction says "part"
-- singular not plural.

Claim element 8: "wherein a distance between the two second columns is larger than
that between the two first columns, whereby a gap is formed between an adjacent fist
column and a second column" This issue has been dealt with earlier in the section on
indefiniteness. Prof. Singhose's failure to consider Court's ruling on indefiniteness -
Document 108, Filed 08/18/14 -  is a serious error, because this ruling is part of the
Court's claim construction, which the Court reconsidered at Kids II's request, and which
sets forth the way in which "distance" is to be determined.  I understand that the Court's
ruling resolves the issue of indefinites in Wonderland's favor.


Claim element 9: "a boundary sheet extends through each said gap and covers the first
columns – Exhibit D clearly deals with the issues involved in this claim element.

Response Report on Validity
Wonderland v. Kids II
October 6, 2014

Prof. Singhose says that it would be "common sense" to "improve the structural strength, rigidity and redundancy" of Huang, based on the Marks' Handbook.  However, Prof. Singhose offers no explanation as to why Huang's structure would be in need of "improved structural strength, rigidity, and redundancy".

In addition, it would defy common sense and would defeat the purpose of Huang's provision of different height play yards to extend the inner short rail to the bottom of the floor of the outer play yard.

Thus, common sense would point away from the modification that Prof. Singhose suggests as his basis for obviousness.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

***In summary, it is my opinion that the combination of Huang and the Marks' Handbook would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.***

## 2.    US 5,615,427 to Huang in view of US 7,055,192 to Waters

As discussed above, Huang does not have a first rod unit, and does not have second corner components.

Prof. Singhose contends that the "only" missing element of Huang is a full length inner column, and says that "the '192 patent renders this missing element obvious."  My understanding is that this is an incorrect analysis, because to show obviousness requires that the invention, as a whole, must be rendered obvious to a person of ordinary skill in the art at the time the invention was made (here in the fall of 2003).

As discussed above, extending the inner short rail to connect it to the first (lower) corner component would make no sense, and would defy common sense, and the Waters patent provides no incentive or motivation to modify Huang in a way that would render Huang useless for its intended purpose, i.e., a play yard with a nested bassinet.

Prof. Singhose suggests that a person of ordinary skill in the art would have been inspired by Waters be to create from Huang a "a much stronger, rigid, and redundant structure" by extending Huang's inner rail, and connecting it to the same lower corner component to which the full length corner post is connected.  However, as note above, this would defeat the purpose of Huang's nested and removable bassinet feature, and thus would be contrary to common sense.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

*In summary, it is my opinion that the combination of Huang and the Waters patent would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.*

### 3.    US 5,615,427 to Huang in view of US 914,309 to Ross

Ross would also not provide any inspiration or motivation to a person of ordinary skill in the art to make the proposed modifications of Huang, because, as noted above:

1. Huang is not in need of addition strength, rigidity or redundancy, and
2. Making the proposed change would take away the primary function of Huang, which is to have two nested devices (a bassinet and a full sized play yard) of different heights.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

*In summary, it is my opinion that the combination of Huang and the Ross patent would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.*

### 4.    US 5,615,427 to Huang in view of in view of US 6,317,907 to Wang

Prof. Singhose distorts and mischaracterizes the structure of the Wang play yard. He says that Wang has a "double-post structure" shown in Figure 3. Wang does not have dual columns or posts; only horizontal elements are "dual".

The purpose of Wang's design is to prevent inadvertent folding of the play yard, not for improved "structural strength". This is clear from the first paragraph of Wang:

BACKGROUND OF THE INVENTION

The present invention relates to nursery apparatus and [5] more particularly to a safety device for a collapsible playpen which can prevent the playpen from unintentional-collapse by a user.

Thus, not only does Prof. Singhose distort Wang, he is using Wang to, again, modify Huang in a way that makes no sense, given Huang's goal of providing a nested and removable bassinet inside a larger play yard.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

Response Report on Validity
Wonderland v. Kids II
October 6, 2014

*In summary, it is my opinion that the combination of Huang and the Wang patent would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.*

### 5.      US 6,317,907 to Wang in view US 5,615,427 to Huang

In the section of his report starting at Par. 294, Prof. Singhose reverses Wang and Huang, saying that "the '907 [Wang] patent discloses nearly all of those elements, with the only omission being second columns that connect to both the first and second corner components, and second corner components that contain two sleeves." Wang is missing much more of claim 1 than Prof. Singhose is willing to acknowledge. Wang does **not** have element 1 (dual columns at each corner), element 6 (first or inner columns), element 7 (second corner component with sleeves), element 8 (a distance between…) or element 9 (a gap between corner columns.

Switching the order of considering Wang and Huang does not fix the problem associate with the combination of these two references.

Huang does not suggest two full-length corner columns, and notion of first "modifying" Huang, and then adding that modification to Wang, can only be seen as hindsight in action.  Neither Wang nor Huang contemplate or show a play yard with exposed columns, which is the goal of the '949 patent.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

*In summary, it is my opinion that the combination of Wang and the Huang patent would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.*

### 6.      US 4,376,318 to Cirillo in view of US 5,615,427 to Huang

As mentioned repeatedly above, including a second set of corner supports as suggested by Huang, but doing so by extending them the full height of a play yard (such as Cirillo's) would be contrary to the teachings of Huang, because Huang's purpose for having two vertical members at each corner is to have devices of differing height, not two full-sized nested play yards.

Doing so in the context of Cirillo is particularly problematic, because the vertical collapsing arrangement of Cirillo. Using Huang's nested construction Cirillo would not improve the " structural strength, rigidity, and redundancy" of Cirillo, and would very much complicate or possibly prevent the folding of Cirillo.  This is particularly true if, as

Prof. Singhose suggests the inner column is enclosed inside a tunnel of fabric to support the enclosure.  This would make Cirillo very difficult to fold.

Even if the additional corner tube were left exposed, it would severely complicate the vertical scissors action of Cirillo's folding mechanism.

In any event, Huang simply does not provide any motivation for or logic associated with adding a full-length second column to Cirillo.

More detail on these and other contentions in response to Professor Singhose's report is provided in Exhibit F.

***In summary, it is my opinion that the combination of Cirillo in view of the Huang patent would not have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003.***

***Thus, it is my opinion that none of combinations of prior art as listed above and explained by Prof. Singhose in Section XII of his Report would have rendered claim 1 of the '949 patent obvious to a person of ordinary skill in late 2003. (See also Exhibit F to this report.)***

### E.      Paragraphs  357 - 423 – '919 Patent - Anticipation

#### 1.      US Patent 6,098, 217 to Hammil

In his report, Prof. Singhose has cited US Patent 6,098,217 to Hamill as anticipating the asserted claims of the '919 patent.

First, it should be noted that Hammil is a cited reference that was considered by the USPTO during the reissue prosecution of the '919 patent.  This means that the "enhanced" version of the "clear and convincing" burden applies.

A thorough review of the Hammil patent indicates that Hammil does not contain or specify key elements of the '919 patent. Claims 15 and 20 of the '919 patent claim:

> 15.      A baby crib comprising: a plurality of ***upright tubes defining corners of the baby crib***, wherein each of the upright tubes has ***an outer wall*** that defines an outer contour shape of the upright tube;

> 20. A baby crib comprising: ***a frame structure including a plurality of support tubes***, wherein each of the support tubes has ***an outer wall*** that defines an outer contour shape of the upright tube;

The emphasized terms above require:

- tubes to be the structural corner supports of the crib, and

- the tubes to have walls.

Prof. Singhose avoids the requirements of claims by calling the solid posts of the Hammil patent "tubes" which they surely are not. The '919 patent is very specific in its inclusion of tubes. [2] The meaning of the word "tube" was not raised by Kids II as a term that required construction. Hammil's posts are not tubes. The plain and ordinary meaning of the term "tube" makes this clear.

The '919 patent specifies and includes in claim 15 "a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member."  There are <u>no</u> positioning posts called out in the Hammil patent, nor do they exist on the product described or illustrated in the patent.  In Par. 368, Prof. Singhose says that a "notch or downward protrusion" is "along the edge" of the panels of Hammil, but he studiously avoids noting the fact that the Hammil patent says "bottom" edge, not the side edge.  Thus, Prof. Singhose amazingly transforms a "notch or downward protrusion" the bottom edge of Hammil into a positioning post on the side edge.  He supports this transformation of Hammil by saying that without the positioning Hammil "would" have a vertical edge that is not connected all along the post. However, this is speculation on the part of Prof. Singhose, because there is nothing in Hammil itself that explains how a "notch" or "downward protrusion" NOTE: Neither of these shaped and their location corresponds to the T-shaped slot in the cross-section of Hammil, and it is not clear how a "notch" a "downward protrusion" on a bottom edge of a panel could serve as a positioning post for the side edges of the panels 30 of Hammil.

The language of element 3 of claim 15 requires the side panels to be " ***contiguously connected to one another along edge portions".***  As shown below, the panels 30 of Hammil are not contiguously connected to each other.

---

[2] The word "tube" appears  six times in the abstract, six times in the summary of the invention, seven times in claim 15, and seven times in claim 20.



The Hammil patent does say that its panels have a fabric component, but the panels are made of "of plastic" and would have to be if they are going to rely on protrusions to hold the bottom edges of the panels in grooves 21. A panel made of fabric could not be made rigid enough to be retained in the grooves.

Finally, Prof. Singhose grossly distorts the meaning of curved, as that term is used in claims 28 and 29.  He says: "The upright tubes 20 are circular and, therefore, curved." Having a circular or otherwise rounded or non-straight cross-section is NOT what a person of ordinary skill would understand the term "curved" to mean in claims 28 and 29 of the '919 patent.  "Curved" is clearly a reference to a curve along the axis of the tube and not a description of the cross-section.

More detail on these and other contentions and my counter arguments to Prof. Singhose are provided in Exhibit G.

***In summary, it is my opinion that the Hammil patent does not anticipate any of the asserted claims of the '919 patent.***

## 2.    Australian patent 715,883 to Bidwell

In his report, Prof. Singhose has cited Australian patent 715,883 to Bidwell as anticipating the asserted claims of the '919 patent. He has drawn some erroneous conclusions in relating the components cited in the '919 patent and what he has interpreted to be the components of the Bidwell patent.  Figure 1 of Bidwell is reproduced below:



As discussed above in the section addressing Hammil, both claim 15 and 20 call for tubes to be the structural corner supports of the crib.

In Par. 397, Prof. Singhose says that Bidwell "discloses upright tubes in the form of tubular retaining members 22 that satisfy this claim element." I disagree. The retaining members, as illustrated and called out as 22 on the illustration, are flexible, not structural, and therefore do not meet the claim requirements for an upright tube to be structural or to define the corners of the Bidwell device. The illustration even shows them as bent.

In a further distortion, Professor Singhose calls the corner post 20 of Bidwell the "positioning post". Yet, throughout the '919 patent, the "positioning post" is clearly a flexible rod or tube, the function of which is to hold the fabric enclosure in or along the structural member. With both the elements 20 AND 22 being flexible, there is no structure. This would pass no known standards tests for play yards.

Additional detail in response to Professor Singhose's treatment of Hammil and Bidwell as compared to the asserted claims of the '919 patent are in Exhibit G to this report.

***In summary, it is my opinion that none of combinations of prior art as listed above and explained by Prof. Singhose in Section XIII of his Report would have rendered any of claims 15, 19-21, and 27-29 of the '919 patent obvious to a person of ordinary skill in late 2003. (See also Exhibit G to this report.)***

### F.        Paragraphs  424 - 497 – '919 Patent - Troutman

In Professor Singhose's section on Troutman, there are several problems with his reliance on work done by Mr. Troutman in late 2003 and early 2004. Based on documents produced and deposition testimony: Details of my comments are presented in Exhibit H to this report. Some summary comments are provided below.

1.    Troutman's first prototype (Exhibits 6 & 7, completed December 9, 2003) was not early enough to be prior to Mr. Chen's invention, including his reduction to practice at least as early as November 17, 2003.

2.    Troutman's first prototype did not have exposed tube, but instead had foam leg covers covering upright tubes that were wrapped with fabric held in place with tape. The leg covers were clearly not structural members and were held in place with wire, as stated in Troutman Exhibit 8. In some respects, they were similar to the covers of Bidwell above.

3.    Troutman's first prototype was not something that would "work for its intended purpose" and thus would not qualify as a completed invention or a reduction to practice. In addition to the tape and wire, the prototype was admitted to be fragile (Exh. 8), and Troutman testified that as of the time of the early prototype, he and his colleagues at Kolcraft  "hadn't resolved how we were intending to attach the fabric to the leg…" Troutman 84:18-20.

4.    With regard to the second, later prototype, that device was not received by Kolcraft until January 26, 2004 (Exh. 10 & 11), which is well after Wonderland's filing date (its priority filing date was January 2, 2004).

5.    In addition, with regard to the January prototype, Mr. Troutman disavowed even to have invented the fabric attachment technique on that prototype, saying:  "But as far as saying that I created the method for attaching soft goods to tubes with a bead and a track I can't say that that is my design,…" Troutman Dep., p. 113 lines 12-15.[3]

---

[3] I note that Mr. Troutman received the January prototype of Exhibits 10 and 11 from a Chinese manufacturer with whom Kolcraft was working.  Mr. Troutman's denial, noted above, together with the timing of the receipt of that prototype several weeks after Wonderland's development of an eerily similar extruded corner tube (with an integral channel) suggests that perhaps Kolcrafts's supplier had somehow learned of Wonderland's design and adopted it.

Response Report on Validity
Wonderland v. Kids II
October 6, 2014

6.      Finally, I understand that for well over a year Kolcraft "sat on" the prototype that it received from its supplier, despite the fact that it was essentially a "final" design.  The design was complete in January of 2004, but Kolcraft did not file for a patent on its design until February of 2005. Mr. Troutman said that the delay was due to work on accessories, but I find that strange in that there is no mention of accessories in the Troutman '242 patent that Kolcraft eventually filed.  Also, it appears that Kolcraft was spurred into action when (in September of 2004) it learned that Wonderland had designed an exposed tube play yard.  I understand and believe that Kolcraft's deliberate delay in filing for its patent, and its failure to include the designs that were the reason for the delay may prevent Kids II from relying on Troutman's prototypes.

7.      I have looked at photographs of the tubes of the prototype of the Chen '919 patent taken in November of 2003 and believe that they are not easy parts to produce given the intricate design of the cross section of the tube, the curvature along the axis of the tube and the need for separate tooling to create the fastener holes, etc. This is not a one or two day extrusion die as Mr. Troutman opined in his deposition. It is obvious that considerable work was done to create this tube design and execution *before* the November Wonderland prototype and long before any of the Troutman /Kolcraft prototypes were reduced to practice..

More detail on these and other contentions and my counter arguments to Prof. Singhose are provided in Exhibit H.

***In summary, it is my opinion that neither of the two prototypes of Damon Troutman (as shown in Exhibits 6, 7 and 8 and as shown in Exhibits 10 and 11 of the Troutman Deposition) nor his patent US 7,568,242 provide a basis for anticipation of claims 15, 19-21, and 27-29 of the '919 patent. (See also Exhibit H to this report.)***

**G.      Paragraphs  498 - 856 – '919 Patent - Obviousness**

As has been stated earlier in this report over 80 pieces of prior art were considered by the USPTO in prosecuting the original '957 patent, the reissue '919 patent, and the request for *inter partes* reexamination of the '919. Professor Singhose has heavily relied on previously examined art for his contentions. In fact, much of the art was reviewed more than once by the Patent Office.  The following table show the extent of Professor Singhose's reliance on prior art references that were considered by the USPTO in the process of granting the '919 reissue patent:

| Prof. Singhose Art - '919 Obviousness Arguments | | |
| --- | --- | --- |
| (Yellow highlighting indicates Cited Art) | | |
| | Main Reference | In view of Reference |
| 1. | 6,510,570 to Hartenstine | 5,992,348 to Harding; |
| 2. | 6,510,570 to Hartenstine | 7,090,201 to Brucker; |
| 3. | 6,510,570 to Hartenstine | 5,762,403 to Robinson; |
| 4. | 4,538,309 to Gunter | 5,992,348 to Harding; |
| 5. | 4,538,309 to Gunter | 7,090,201 to Brucker; |
| 6. | 4,538,309 to Gunter | 5,762,403 to Robinson; |
| 7. | 6,510,570 to Hartenstine | 5,752,297 to Ramey; |
| 8. | 6,510,570 to Hartenstine | 1,183,819 to Keiser; |
| 9. | 6,510,570 to Hartenstine | 2,790,978 to Tigrett; |
| 10. | 4,538,309 to Gunter | 5,752,297 to Ramey; |
| 11. | 4,538,309 to Gunter | 1,183,819 to Keiser; |
| 12. | 4,538,309 to Gunter | 2,790,978 to Tigrett; |
| 13. | 6,098,217 to Hammil | 5,992,348 to Harding; |
| 14.[4] | 6,098,217 to Hammil | 6,510,570 to Hartenstine; |
| 15. | AU 715,883 to Bidwell | 6,510,570 to Hartenstine |

In **every** argument, Singhose is relying on at least one already considered or cited piece of prior art.

In a **majority** of the arguments (7 of 13) directed to the independent claims, Prof. Singhose is relying on a combination of two references, BOTH of which were cited and considered by the Examiner.

Finally, as explained in more detail in Exhibit I attached to this report, the patents that are not highlighted above are, in every case, very similar to references that were cited and considered.

What this means is that Kids II and Prof. Singhose are faced with a "clear and convincing" burden of proof at an "enhanced" level, because they are not making any

---

[4] Note arguments 14 and 15 only apply to dependent claims 28 and 29, and do not apply to independent claims 15 and 20 or other claims.

arguments that the Examiners presumably could and would have made, if they had merit, when reviewing the various "stages" of the '919 patent.

Moreover, the three "non-cited" art items (i.e., the patents not highlighted in the above table) are strikingly similar to cited art as can be seen from the following:

| NON-CITED | SIMILAR CITED |
|---|---|
| 7,090,201 to Brucker | US 5,992,348 (Harding); US 6,511,562 (Coffield); Church US 7,125,081 (also cited as US 2005-0120522 and GB 2,408,201); Mew US 2,761,153; CN 2236272Y; and Hood US 3,658,025 |
| 5,752,297 to Ramey | CN 2236272Y; US 2,790,978 (Tigrett); US 5,778,465 (Meyers); US 6,402,116 (Northup); US 1,246,544 (Chassaing) |
| 1,183,819 to Keiser | CN 2236272Y; US 2,790,978 (Tigrett); US 5,778,465 (Meyers); US 6,402,116 (Northup); US 1,246,544 (Chassaing) |

Not only does Prof. Singhose rely on non-cited art that is substantially similar to cited art, the cited art upon which he relies is also substantially similar to other cited art, which makes it unlikely that the USPTO overlooked the combinations of prior art or concepts upon which Singhose relies.  These additional similarities are identified in Exhibit I to this Report and are summarized in Exhibit J to this report.


Finally, noted in Exhibit I, Prof. Singhose rarely gives any rationale or justification for the combinations of prior art he contends would have rendered the inventions of the various claims obvious. For example, in Par. 514, Prof. Singhose says "one of ordinary skill in the art, in view of the teachings and suggestions of the '348 patent [Harding's animal bed], would have arrived at a baby crib including both "a plurality of upright tubes" and "positioning posts [] lodged inside the upright tubes," as recited by Claim 15, by way of combining the play yard in the '570 [Hartenstine] patent with elements from the '348 patent and/or by modifying certain elements in the '570 patent in view of the teachings and suggestions of the '348 patent."  However, he does not identify anything in Harding, and does not explain why a person of skill would combine a horizontal animal bed with a play yard. As someone in the field, I find this conclusion bizarre.

Response Report on Validity
Wonderland v. Kids II
October 6, 2014

In Par. 518, Prof. Singhose suggests that a person of ordinary skill would know that Harding's fabric connection would have obvious uses beyond "chew proofing" (Harding's goal).  On the other hand, in Par. 519 he suggests that a person of ordinary skill would look to Harding's animal bed to make the uprights of Hartenstine "inaccessible" (i.e., chew proof), but does not suggest why anyone would want the exterior of uprights of a play yard to be chew proof.

Such non-sequiturs and lack of justification for combining pieces of prior art occur throughout Singhose's report and are noted in Exhibit I to this report.

Additional detail in response to Prof. Singhose's treatment of the several combinations of references as compared to the asserted claims of the '919 patent are in Exhibit I to this report.

***In summary, it is my opinion that none of combinations of prior art as listed above and explained by Prof. Singhose in Section XIV of his Report would have rendered any of claims 15, 19-21, and 27-29 of the '919 patent obvious to a person of ordinary skill in late 2003. (See also Exhibit I to this report.)***

# Exhibit G

**Response Report on Validity**
**Wonderland v. Kids II**

| Singhose | Drobinski |
|---|---|
| **XIII.   THE ASSERTED CLAIMS OF THE '919 PATENT ARE ANTICIPATED IN LIGHT OF THE PRIOR ART** | |
| **A.      INTRODUCTION** | |
| 357.    The attachment of fabric to frame structures according to the embodiments described in the '919 patent in playards, playpens, or baby cribs was well-known in the art at the time of the invention of the '919 patent. (See, e.g., U.S. Patent Nos.: 6,098,217 and 7,568,242; and Australian Patent No. 715,883). As discussed in detail below, it is my opinion that at least either one of U.S. Patent No. 6,098,217 to Hammil or Australian Patent No. 715,883 to Bidwell discloses every element of Claims 15, 19-21, and 27-29 of the of the '919 patent and therefore anticipates Claims 15, 19-21, and 27-29. It is also my opinion that, before the invention defined by Claims 15, 19-21, and 27-29 of the '919 patent, the invention was made in this country by Mr. Damon Oliver Casati Troutman. | I disagree for the reasons set forth below.<br><br>I understand that the '242 patent is not prior art to the '919 patent.<br><br>I understand that he devices shown in Singhose 127 (i.e., Exhibits 10 and 11) are not prior art to the invention of the '919 patent.<br><br>I understand that the device of Exhibit 10 cannot anticipate any of the claims of the '919 patent because it lacks an enclosure member.<br><br>I also understand that Troutman and Kolcraft did not file the application that led to the '242 patent until February 23, 2005, long after the development of the prototypes shown in Troutman Exhibits 6, 7, 10 and 11. This may constitute suppression or concealment, which would preclude those items from being used to invalidate the '919 patent.<br><br>I understand that activities directed to commercialization of an invention not reflected in the patent application will not excuse the delay or rebut the presumption of suppression or concealment. Lutzker v. Plet, 843 F.2d 1364, 1368 (Fed. Cir. 1988) citing Horwath v. Lee, 564 F.2d at 952; Fitzgerald v. Arbib, 268 F.2d at 766 (CCPA 1959).<br><br>Troutman explained that the delay in filing the '242 patent related to the development of accessories, but that those accessories are not shown in the '242 patent. Troutman 145:3-146:11.\\<br><br>Finally, I understand that "Evidence that a first inventor was spurred to disclose by the activities of a second inventor has always been an important factor in priority determinations because it creates an inference that, but for the efforts of the second inventor, "the public would never have gained knowledge of [the |

| Singhose | Drobinski |
|---|---|
| | invention]." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1567 (Fed. Cir. 1996), citing *Brokaw v. Vogel*, 429 F.2d at 480 (CCPA 1970).<br><br>The email chain of Exhibit 12 to Troutman's deposition clearly suggests that almost a year after his sketch (Exh. 2) Kolcraft was spurred into activity by Wonderland's exposed tube play yard coming to market.<br><br>This means that if Troutman is shown to have made (reduced to practice) a play yard that has all the requirements of a claim of the '919 patent before Wonderland (which I don't believe to be true), there is an inference that Kolcraft suppressed or concealed Troutman's alleged invention, which I understand may prevent Kids II from relying on Troutman's work.<br><br>I have reviewed the photographs of Wonderland's prototypes of the invention of the '919 patent, which are attachments to Exhibit 5 to the deposition of Renee Wang.  Those prototypes were completed at least as early as the date of the email (November 17, 2003).  Thus, it is my understanding that even if the Troutman prototype of Exhibit 7 (dated December 9, 2003) is deemed to have all of the elements of claim 15 or 20 of the '919 patent(which I don't believe to be the case), that prototype is not early enough to pre-date Wonderland's date of invention,(November 17, 2003).[1] |
| **B.      Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| 358.    It is my opinion that U.S. Patent No. 6,098,217 to Hammil ("the '217 patent"), titled "Modular Playpen," teaches all of the elements of Claims 15, 19-21, and 27-29 of the '919 patent and therefore anticipates Claims 15, 19-21, and 27-29. 359. | I disagree for the reasons set forth below. |

[1] I understand from Wonderland's Counsel that Wonderland is entitled to rely on activities constituting reduction to practice of an invention at its facilities in Taiwan (such as those depicted in Exhibt 5 of the Deposition of Renee Wang), because: 1) effective January 1, 1995, 35 U.S.C. 104 allows proof of the date of completion of an invention in a WTO country (http://www.uspto.gov/web/offices/com/doc/uruguay/URPAPER.html) and 2) Taiwan has been a member of the World Trade Organization since 2002 (http://www.wto.org/english/thewto_e/countries_e/chinese_taipei_e.htm)

| Singhose | Drobinski |
|---|---|
| 359.    The '217 patent was filed on February 26, 1999, with an application number of 09/258,720, and issued on August 8, 2000. The '217 patent is prior art to the '919 Patent. | |
| **i.     Claim 15 of the '919 patent is anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| 360.    The '217 patent discloses a modular playpen. The '217 patent generally describes "[a] modular playpen for infants and young children comprising . . . a plurality of substantially rectangular side panels [and] a plurality of vertical uprights slidably affixed to each end of a side panel via a longitudinal groove running the length of the vertical upright, thereby forming an enclosure . . . ." ('217 patent, Abstract). Figure 1 in the '217 patent is provide below as Singhose Fig. 111. The figure illustrates a playpen 10 constructed from a plurality of side panels 30 and upright tubes 20. Notably, the outwardly facing surface of each of the upright tubes 20 has its outside surface exposed and substantially out of contact with the side panels 30.  | The uprights of Hammil are not described as tubes or tubular, and are solid posts.<br><br>Thus, they do not meet the requirement of claim 15 of the '919 patent for tubes.<br><br>The word "tube" appears  six times in the abstract, six times in the summary of the invention, and seven times in claim 15.<br><br>Hammil is a cited reference, and the file history shows that the Examiner considered Hammil, but allowed the claims over this and many other references . See WL-K2 000460. |

| Singhose | Drobinski |
|---|---|
| **Singhose Fig. 111**: Figure 1 in the '217 Patent | |
| **Claim 15 element 1:  _"A baby crib comprising:"_** | |
| 361.    The terms "playpen" and "baby crib" would be recognized as interchangeable when comparing the embodiments of the '217 patent with those in the '919 patent. For example, the '919 patent states that "a currently available baby crib is shown to comprise a bed frame structure 8 and an enclosure member 9 mounted on the bed frame structure 8 so as to define a receiving space for a baby to sleep or play." ('919 patent, Col. 1, ll. 19-22). The '217 patent describes the structural and functional equivalent of a "modular playpen for infants and young children comprising . . . a plurality of substantially rectangular side panels [and] a plurality of vertical uprights slidably affixed to each end of a side panel . . . thereby forming an enclosure." ('217 patent, Abstract). | |
| 362.    Therefore, based at least upon the structural and functional similarities between the "playpen" of the '217 patent and the "baby crib" of the '919 patent, it is my opinion that the "playpen" illustrated in Figure 1 of the '217 patent satisfies this claim element. | |
| **Claim 15 element 2:  _"a plurality of upright tubes defining corners of the baby crib, wherein each of the upright tubes has an outer wall that defines an outer contour shape of the upright tube; and;"_** | |
| 363.    The playpen 10 illustrated above in Singhose Fig. 111 has a plurality of vertical uprights 20 that define the corners of the playpen or baby crib. Each of these vertical uprights 20 comprises a tubular member having an outer wall. Further, the outer walls of the vertical uprights 20 define an outer contour shape. Therefore, it is my opinion that the playpen 10 illustrated in Figure 1 of the '217 patent satisfies this claim element. | The uprights of Hammil are not described as tubes or tubular, and are solid posts.  They are not tubes, as a person of ordinary skill in the relevant art would understand that word, which is defined in the dictionary as follows: |

| Singhose | Drobinski |
|---|---|
| | tube  🔊   *noun*   \ˈtüb, ˈtyüb\<br><br>: a long, hollow object that is used especially to control the flow of a liquid or gas<br><br>: an object shaped like a pipe<br><br>: a soft, long, narrow container that has a small opening at one end and that contains a soft material which can be pushed out by squeezing<br><br>Thus, they do not meet the requirement of claim 15 of the '919 patent for tubes.<br><br>The word "tube" appears  six times in the abstract, six times in the summary of the invention, and seven times in claim 15. |

| Singhose | Drobinski |
|---|---|
| **Claim 15 element 3:** *"an enclosure member including a plurality of side panels contiguously connected to one another along edge portions and surrounding an enclosed space adapted for receiving a baby therein; and;"* | |
| 364.    The playpen 10 illustrated above in Singhose Fig. 111 has a plurality of side panels 30. According to the '217 patent "there are an infinite number of configurations that can be formed by either matching different grooves 21 of different uprights 20 with different side panels 30 or by adding on additional panels 30, uprights 20 and cross bars 40." ('217 patent, Col. 3, ll. 57-61). Each of the side panels 30 is contiguously connected to another side panel 30 along an edge that runs in the vertical direction. Singhose Fig. 112 below provides a magnified view of the top-center portion of Figure 1 from the '217 patent. In this close-up view, the contiguous edge connection between two side panels 30 is shaded in red.  **Singhose  Fig.  112:** Magnified  View  of  Top-Center  Portion  in Figure 1 in the '217 Patent | The side panels of Hammil are not ***contiguously connected to one another along edge portions.***  con·tig·u·ous  *adjective*  \kən-ˈti-gyə-wəs, -gyü-əs\ —used to describe things that touch each other or are immediately next to each other **Full Definition of CONTIGUOUS** 1  :  being in actual contact : touching along a boundary or at a point |

| Singhose | Drobinski |
|---|---|
| 365.    An overhead view of the contiguous edge connection is illustrated in Figure 4 of the '217 patent and provided below as Singhose Fig. 113. The '217 patent describes that "[t]he vertical side of each side panel 30 slides into one of the grooves 21 of vertical upright 20." ('217 patent, Col. 3, ll. 53-55). The attachment mechanism formed by the grooves 21 and uprights 20 provide a contiguous edge connection among the side panels 30.<br><br><br><br>**Singhose Fig. 113:** Edge Connection in Figure 4 of the '217 Patent | The side panels of Hammil are not ***contiguously connected to one another along edge portions.***<br><br> |
| 366.    Referring back to Singhose Fig. 111, it is clear that the side panels 30, along with the floor pads 50, surround an enclosed space adapted to receive a baby. Therefore, it is my opinion that the playpen 10 of the '217 patent satisfies this claim element. | I disagree for the reasons set forth above. |
| **Claim 15 element 4:** *"a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member, wherein the positioning posts are lodged inside the upright tubes, the side panels extending between the upright tubes substantially out of contact with the outside surfaces of outer walls of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."* | |
| 367.    The side panels 30 in the '217 patent form an enclosure member as discussed above. According to the '217 patent, the edge portions of the side panels 30 include a type of protrusion or positioning post to secure the side panels 30 in grooves 21 in the upright tubes 20. | Hammil does not show or describe positioning posts.  The section of Hammil quoted by Singhose refers to a "notch or downward protrusion" and the quoted section refers that notch or protrusion being on the "bottom" of the edge of the side panel, not on the side |

| Singhose | Drobinski |
|---|---|
| Particularly, the '217 patent describes that the "side panels 30 can be slid from the top of an upright 20 within one of the grooves 21." ('217 patent, Col. 4, ll. 17-19). The '217 patent further describes that "[t]he actual inter-connection of the panel and upright can occur in a variety of ways. One method can be to provide a notch or downward protrusion in the bottom of the edge of the side panel 30. This protrusion would be inserted into the upright 20 first until the protrusion reaches the terminus of the groove 21. The remaining portion of the edge of the panel 30 can then slide into the remaining portion of the groove 21 until the panel 30 is secured therein." ('217 patent, Col. 4, ll. 33-40). | edge of the panel.<br><br>The actual inter-connection of the panel and upright can occur in a variety of ways. One method can be to provide a notch or downward protrusion in the bottom of the edge of the side panel 30. This protrusion would be inserted into the upright 20 first until the protrusion reaches the terminus of the groove 21. The remaining portion of the edge of the panel 30 can then slide into the remaining portion of the groove 21 until the panel 30 is secured therein. Other<br><br>Hammil Col. 2, lines 33-40<br><br>Singhose does not discuss or explain the reference to "bottom". |
| 368.    It is my opinion that the "notch or downward protrusion" along the edge of the side panels 30, as described in the '217 patent, comprises a "positioning post," as recited by Claim 15. Further, it is my opinion that this positioning post is lodged inside the upright tubes 20 to secure the side panels 30 in place. Note that the groves 21 shown in Singhose Fig. 113 have a larger cross section near the center than near the edge. This enlarged area exists to receive the positioning post found at the edge of a side panel 30. Without this enlarged area of the groove 21 and the corresponding notch, downward protrusion, or positioning post found along the edge of a side panel 30, the side panels 30 would slide out of the groove 21 when a horizontal force is applied to the side panels. As an example, such horizontal forces would be provided whenever a child pushed on the side panel 30. | While Singhose does not discuss or explain the reference to "bottom", he does try to explain that the side edges of Hammil's panels "must" have a positioning post (in the form of a notch or protrusion).<br><br>However, he ignores the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side posts, i.e., Brucker's panels are only connected at the top and bottom.<br><br>Even if it were probable (and it is not, based on Hammil's description of a notch or protrusion on the "bottom" of the panels) that Hammil's panels have protrusions on the vertical sides of the panels, probabilities are not enough to meet the requirements for anticipation. |
| 369.    An example case of a side panel potentially sliding out of the groove ("panel slip") is illustrated in Singhose Fig. 114 below. The left side of Singhose Fig. 114 includes Figure 3 from the '217 patent, where the side panel 30 is attached to the upright tube 20 via the groove 21. The right side of Singhose Fig. 114 illustrates what would happen if the side panel 30 did not have a notch, downward protrusion, or "positioning post" | While Singhose does not discuss or explain the reference to "bottom", he does try to explain that the side edges of Hammil's panels "must" have a positioning post (in the form of a notch or protrusion). |

| Singhose | Drobinski |
|---|---|
| running along its edge to secure it within the enlarged cross sectional area of the groove 21. If a side panel 30 was only secured by some means at the top and bottom, then the middle of the side panel would be pulled out of the groove 21, as illustrated at the right side of Singhose Fig. 114. In such a case, the side panel 30 would no longer form an enclosure for a baby. As such, each side panel 30 must have a "positioning post" that runs along the length of its edge. Therefore, it is my opinion that the '217 patent satisfies this claim element.  **Singhose Fig. 114:** Annotated Example of "Panel Slip" using Figure 3 of the '217 Patent | However, he ignores the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side posts, i.e., Brucker's panels are only connected at the top and bottom. Even if it were probable (and it is not, based on Hammil's description of a notch or protrusion on the "bottom" of the panels) that Hammil's panels have protrusions on the vertical sides of the panels, probabilities are not enough to meet the rigid |
| 370.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 1 of the '919 Patent and therefore anticipates Claim 1. | Claim 1 of the '919 patent is not being asserted, and Singhose has not addressed the limitation of claim 1 of the '919 patent.  To the extent he meant to say claim 15, I disagree for the reasons set forth above. |

| Singhose | Drobinski |
|---|---|
| **ii.      Claim 19 is anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| **Claim 19 element 1:  *"The baby crib according to claim 15, wherein the enclosure member is made of a fabric material."*** | |
| 371.     The section above demonstrates how the '217 patent anticipates all elements of Claim 15. The only additional issue in Claim 19 is whether or not the panels described in the '217 patent are made from fabric. The specification of the '217 specifically points out that the side panels 30 are made of fabric when it states that "[e]ach side panel 30 is substantially rectangular or square. Its sides are generally of plastic and surround a see-through nylon mesh or netting made of standard nylon material." ('217 patent, Col. 4, ll. 49-53). It is my opinion that nylon mesh is a type of fabric and would have been recognized by one of ordinary skill in the art as such. | The panels of Hammil may have a fabric component, either embedded or otherwise included, the panels are "of plastic" and would have to be if they have the protrusions that would hold the panels in the grooves 21, because a panel of fabric alone could not be made rigid enough to  be retained in the grooves.

Hammil does not teach or enable a way of attaching a fabric side wall to the uprights 20. |
| 372.     In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 19 of the '919 patent and therefore anticipates Claim 19. | I disagree for the reasons set forth above. |
| **iii.      Claim 20 is anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| **Claim 20 element 1:  *"A baby crib comprising:"*** | |
| 373.     As discussed above with regard to Claim 15, the playpen 10 shown in Figure 1 of the '217 patent, provided above as Singhose Fig. 111, satisfies this claim element. | |
| **Claim 20 element 2:  *"a frame structure including a plurality of support tubes, wherein each of the support tubes has an outer wall that defines an outer contour shape of the upright tube;"*** | |
| 374.     The playpen 10 in the '217 patent has a plurality of vertical upright tubes 20 that are support tubes for a frame structure of the playpen 10. Each of these support tubes has an outer wall. Further, these outer walls define outer contour shapes of the upright tubes. Therefore, it is my opinion that the vertical upright tubes 20 of the playpen 10 in the '217 patent satisfy this claim element. | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular. |
| **Claim 20 element 3:  *"an enclosure member including a plurality of side panels having edge portions; and"*** | |

| Singhose | Drobinski |
|---|---|
| 375.      Singhose Fig. 111 shows that the playpen 10 comprises an enclosure member including a plurality of side panels 30. According to the '217 patent "there are an infinite number of configurations that can be formed by either matching different grooves 21 of different uprights 20 with different side panels 30 or by adding on additional panels 30, uprights 20 and cross bars 40." ('217 patent, Col. 3, ll. 57-61). Each of the side panels 30 has edge portions. Therefore, it is my opinion that the enclosures formed by the side panels 30 of the playpen 10 in the '217 satisfy this claim element. | |
| **Claim 20 element 4: _"an attachment structure configured to mount and secure the edge portions of the enclosure member along the support tubes,"_** | |
| 376.      For reasons similar to those discussed above with regard to Claim 15, the edges of the enclosure member the playpen 10 are mounted to and secured by the attachment structure formed by the grooves 21 in the upright or support tubes 20 and the "positioning posts" that run along the edges of the side panels 30. Singhose Fig. 113 above shows how the attachment structure secures the enclosure member along the upright or support tubes 20, and Singhose Fig. 114 demonstrates how the enclosure member would fail if the attachment did not secure the edges of the side panels 30 along the upright or support tubes 20. | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular. |
| 377.      The '217 patent describes that "[t]he actual inter-connection of the panel and upright can occur in a variety of ways. One method can be to provide a notch or downward protrusion in the bottom of the edge of the side panel 30. This protrusion would be inserted into the upright 20 first until the protrusion reaches the terminus of the groove 21. The remaining portion of the edge of the panel 30 can then slide into the remaining portion of the groove 21 until the panel 30 is secured therein." ('217 patent, Col. 4, ll. 33-40). | Here Singhose does include the reference to "bottom", but he only speculates that the side edges of Hammil's panels have a positioning post (in the form of a notch or protrusion).

He ignores the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side posts, i.e., Brucker's panels are only connected at the top and bottom.

Even if it were probable (and it is not, based on Hammil's description of a notch or protrusion on the "bottom" of the panels) that Hammil's panels have protrusions on the vertical sides of the |

| Singhose | Drobinski |
|---|---|
|  | panels, probabilities are not enough to meet the requirements for anticipation. |
| 378.    As outlined above, it is clear that the attachment structure described in the '217 patent satisfies this claim element. | I disagree for the reasons set forth above. |
| **Claim 20 element 5: *"whereby the side panels surround an enclosed space, and each of the side panels extends generally between two of the support tubes substantially out of contact with outwardly facing surfaces of the outer walls thereof, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."*** |  |
| 379.    Singhose Fig. 111 shows that the side panels 30 of the playpen 10 in the '217 patent surround an enclosed space. Each of the side panels 30 extend between two of the support tubes 20. Further, in Singhose Fig. 113, each of the side panels 30 extends substantially out of contact with the outwardly facing surfaces of the outer walls of the support tubes 20. To clearly demonstrate this aspect of Claim 20, consider Figure 6 of the '217 patent, which is provided below as Singhose Fig. 115. Considering the support tube 20 at the upper left corner, it is clear that the two side panels 30 extending away from the corner at 90-degree angles do not touch the outer wall of the support tube 20. This quality is the same for all of the corners. Now consider the support tube 20 at the top middle of the figure, although the side panels 30 extend in opposite directions from this tube, they still do not substantially touch the outer wall of the tube. Therefore, it is my opinion that the outwardly facing surfaces of the support tubes 20 are exposed and the playpen disclosed in the '217 patent anticipates this claim element. | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular. |

| Singhose | Drobinski |
|---|---|
|  **Singhose Fig. 115:** Side Panels Substantially Out of Contact with the Outwardly Facing Surfaces of Support Tubes in Figure 6 of the '217 Patent | |
| 380.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 20 of the '919 Patent and therefore anticipates Claim 20. | I disagree for the reasons set forth above. |
| iv.    **Claim 21 is anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| Claim 21: *"The baby crib according to claim 20, wherein the attachment structure clamps the edge portions of the enclosure member inside the support tubes."* | |

| Singhose | Drobinski |
|---|---|
| 381.   The section above demonstrates how the '217 patent anticipates all elements of Claim 20. The only additional issue in Claim 21 is whether or not the attachment structure clamps the edge portions of the enclosure members inside the support tubes. | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular. |
| 382.   Recall that the '217 specification describes one method of attaching the side panels 30 to the upright or support tubes 20 by "provid[ing] a notch or downward protrusion in the bottom of the edge of the side panel 30. This protrusion would be inserted into the upright 20 first until the protrusion reaches the terminus of the groove 21. The remaining portion of the edge of the panel 30 can then slide into the remaining portion of the groove 21 until the panel 30 is secured therein." ('217 patent, Col. 4, ll. 33-40). This statement makes it clear that the attachment structure requires the edge portions of the side panels 30 to be inside the upright or support tubes 20. Furthermore, the side panels 30 cannot be pulled out of the upright or support tubes 20 sideways. To remove the side panels 30, the attachment procedure must be reversed. That is, the enclosure member must be slid upwards and out of the grooves 21 in the upright or support tubes 20. In this sense, the panels are "clamped" in the upright or support tubes 20. | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular.<br><br>Here Singhose does include the reference to "bottom", but he only speculates that the side edges of Hammil's panels have a positioning post (in the form of a notch or protrusion).<br><br>He ignores the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side posts, i.e., Brucker's panels are only connected at the top and bottom.<br><br>Even if it were probable (and it is not, based on Hammil's description of a notch or protrusion on the "bottom" of the panels) that Hammil's panels have protrusions on the vertical sides of the panels, probabilities are not enough to meet the requirements for anticipation. |
| 383.   Once inside the upright or support tubes 20, it is clear that the enclosure described in the '217 patent is "clamped" to the upright or support tubes 20 in the same manner as defined by Claim 21 of the '919 patent. In connection with clamping, the '919 patent describes that "[t]he positioning posts are mounted on the fabric member, and are inserted respectively into the receiving holes in the upright tubes. The fabric member is clamped between each of the upright tubes and a corresponding one of the positioning posts, and extends outward through the slit in each of the upright tubes." ('919 patent, Col. 1, ll. 55-60). The enclosure panels in the '919 patent cannot be pulled out of the upright tubes sideways. They must be pushed upwards along the slit in the tubes, | As discussed above the vertical uprights 20 of Hammil are not tubular and are not described or shown as being tubes or tubular.<br><br>Here Singhose does include the reference to "bottom", but he only speculates that the side edges of Hammil's panels have a positioning post (in the form of a notch or protrusion).<br><br>He ignores the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side |

| Singhose | Drobinski |
|---|---|
| until they come out of the top of the tubes. Thus, it is my opinion that this "clamping" effect in the '919 patent is the same as that disclosed in the '217 patent. | posts, i.e., Brucker's panels are only connected at the top and bottom.<br><br>Even if it were probable (and it is not, based on Hammil's description of a notch or protrusion on the "bottom" of the panels) that Hammil's panels have protrusions on the vertical sides of the panels, probabilities are not enough to meet the requirements for anticipation. |
| 384.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 21 of the '919 patent and therefore anticipates Claim 21. | I disagree for the reasons set forth above. |
| **v.      Claim 27 is anticipated by U.S. Patent No. 6,098,217 to _Hammil_** | |
| **Claim 27: _"The baby crib according to claim 20, wherein the enclosure member is made of a fabric material."_** | |
| 385.    The section above demonstrates how the '217 patent anticipates all elements of Claim 20. The only additional issue in Claim 27 is whether or not the enclosure member described in the '217 patent is made from fabric. The specification of the '217 specifically points out that the side panels 30 are made of fabric when it states that "[e]ach side panel 30 is substantially rectangular or square. Its sides are generally of plastic and surround a see-through nylon mesh or netting made of standard nylon material." ('217 patent, Col. 4, ll. 49-53). It is my opinion that nylon mesh is a type of fabric and would have been recognized by one of ordinary skill in the art as such. | While the panels of Hammil may have a fabric component, either embedded or otherwise included, the panels are "of plastic" and would have to be if they have the protrusions that would hold the panels in the grooves 21, because a panel of fabric alone could not be made rigid enough to  be retained in the grooves.<br><br>I understand that "a prior art reference cannot anticipate a claimed invention if the allegedly anticipatory disclosures cited as prior art are not enabled," _In re Antor Media Corp._, 689 F.3d 1282, 1289 (Fed. Cir. 2012).<br><br>Hammil does not teach or enable a way of attaching a fabric side wall to the uprights 20. |
| 386.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 27 of the '919 patent and therefore anticipates Claim 27. | I disagree for the reasons set forth above. |

| Singhose | Drobinski |
|---|---|
| **vi.**   **Claim 28 is anticipated by U.S. Patent No. 6,098,217 to Hammil** | |
| **Claim 28:** *"The baby crib according to claim 20, wherein the upright tubes are curved."* | |
| 387.    The section above demonstrates how the '217 patent anticipates all elements of Claim 20. The only additional issue in Claim 28 is whether or not the upright tubes described in the '217 patent are curved. Figure 4 of the '217 patent, provided above in Singhose Fig. 113, shows an overhead view of the upright or support tubes 20. The upright tubes 20 are circular and, therefore, curved. This curved nature of the upright tubes 20 is also clearly visible in the perspective view provided in Figure 3 of the '217 patent, provided above in Singhose Fig. 114. | A person of ordinary skill would understand that "curved" in the context of claim 28 means curved along the length  (about a horizontal axis), as shown and described in the '919 patent:<br><br>wall **110** defining a receiving hole **111**. To enhance the<br>25  appearance of the baby crib of the present invention, each<br>upright tube **11** is preferably curved, as best shown in FIG. **3**.<br><br>'919 patent, Col. 2, lines 24-26<br><br>60    Since the positioning posts **22** are flexible, they can follow<br>the curved configuration of the upright tubes **11** upon inser-<br>tion into the receiving holes **111**, as best shown in FIG. **4**. [At<br><br>'919 patent, Col. 60-62<br><br><br><br>To construe "curved" as having a curved cross-section, as Singhose does, is incorrect, because that construction ignores the way the term "curved" is used in the specification. |
| 388.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 28 of the '919 patent and therefore anticipates Claim 28. | I disagree for the reasons set forth above. |

| Singhose | Drobinski |
|---|---|
| **vii.    Claim 29 is anticipated by U.S. Patent No. 6,098,217 to _Hammil_** | |
| **Claim 29: _"The baby crib according to claim 15, wherein the upright tubes are curved."_** | |
| 389.    The section above demonstrates how the '217 patent anticipates all elements of Claim 20. The only additional issue here is whether or not the upright tubes described in the '217 patent are curved. Figure 4 of the '217 patent, provided above in Singhose Fig. 113, shows an overhead view of the upright or support tubes 20. The upright tubes 20 are circular and are therefore curved. This curved nature of the upright tubes 20 is also clearly visible in the perspective view provided in Figure 3 of the '217 patent, which is provided above in Singhose Fig. 114. | See comments above with respect to Claim 28. |
| 390.    In summary, it is my opinion that the '217 patent teaches all of the elements of Claim 28 of the '919 patent and therefore anticipates Claim 28. | I disagree for the reasons set forth above. |
| **C.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by Australian Patent No. 715,883 to Bidwell** | |
| 391.    It is my opinion that Australian Patent No. 715,883 to Bidwell ("the '883 patent"), titled "Retaining Member for a Cot," teaches all of the elements of Claims 15, 19-21, and 27-29 of the '919 patent and therefore anticipates Claims 15, 19-21, and 27-29. | I disagree for the reasons set forth below. |
| 392.    The '883 patent was filed on November 1, 1999, with an application number of 199957133, and issued on February 10, 2000. The '883 patent is prior art to the '919 Patent. | |
| **i.    Claim 15 is anticipated by Australian Patent No. 715,883 to Bidwell** | |
| 393.    The '883 patent discloses a retaining member for a "cot". Given that the '883 patent is an Australian patent, it should be appreciated that "cot" is intended to refer to a baby crib rather than a small, temporary canvas bed. The following is an example of the Australian usage and meaning of the term "cot": "[b]ut when Alice Fancourt walks into the | |

| Singhose | Drobinski |
|---|---|
| nursery, her terrifying ordeal begins, for Alice insists the baby in the cot is a stranger she's never seen before."[2] | |
| 394.    The fact that "cot" means baby crib is also apparent when we examine Figure 1 from the '883 patent, which is provided below in Singhose Fig. 116. The figure shows a corner of the "cot," which is clearly a playpen and not a small canvas bed. | |
|  | |
| **Singhose Fig. 116:** Figure 1 in the '883 Patent Showing a Partial Perspective View of the Corner of a Baby Crib | |
| **Claim 15 element 1: *"A baby crib comprising:"*** | |
| 395.    Given that the Australian term "cot" means "baby crib," we can also use the term interchangeably with "playpen." As a result of this | The interchangeability of crib and playpen is only applicable to the |

| Singhose | Drobinski |
|---|---|
| equivalence, and my comparison of Figure 1 from the '883 patent to the embodiments in the '919 patent, it is my opinion that that the '883 patent discloses a baby crib that satisfies this claim element. | '919 patent, because the way the term "crib" is used in this patent. |
| **Claim 15 element 2:** *"a plurality of upright tubes defining corners of the baby crib, wherein each of the upright tubes has an outer wall that defines an outer contour shape of the upright tube; and;"* | |
| 396.    Singhose Fig. 116 only shows one corner of a baby crib. However, it is apparent that the baby crib described by the '883 patent has a plurality of corners because it states that "[m]any cots are produced with an upper peripheral frame, a lower peripheral frame, and vertically extending corner posts." ('883 patent, Page 1, ll. 7-8). The use of the plural form of "post" (i.e., "posts") clearly indicates a plurality of posts. Further, the upper and lower peripheral frames would necessarily require a plurality of corner posts to be properly supported. | The corners of the Bidwell device are defined by the structural corner posts 20, not by the retaining members 22.  Thus the retaining members 22 are not "upright tubes", as a person of ordinary skill in the relevant art would understand that term as it is used in the '919 patent. |
| 397.    The baby crib corner shown in Singhose Fig. 116 includes a cylindrical tube retaining member 22. Particularly, the '883 patent states that "[t]he retaining member 22 has a tube wall 24 and a substantially cylindrical hollow interior 26." ('883 patent, Page 3, ll. 8-10). This statement, combined with the illustration found in Singhose Fig. 116, clearly indicate that the retaining members 22 of the '883 patent comprise "upright tubes." Each of these upright tubes has an outer wall. Further, the outer walls of the upright tubes define an outer contour shape. Therefore, it is my opinion that the '883 patent discloses upright tubes in the form of tubular retaining members 22 that satisfy this claim element. | The retaining member 22 of Bidwell is a clip, not an upright tube.<br><br>The language of claim 15 calling for "a plurality of upright tubes defining corners of the baby crib", especially when read in the context of the specification, means that the upright tubes are structural members, and this is what would be understood by a person of ordinary skill in the relevant art.<br><br>Thus, Bidwell's retaining member 22 does not meet the requirement of claim 15 of the '919 patent for an upright tube. |
| **Claim 15 element 3:** *"an enclosure member including a plurality of side panels contiguously connected to one another along edge portions and surrounding an enclosed space adapted for receiving a baby therein; and;"* | |

| Singhose | Drobinski |
|---|---|
| 398.    Singhose Fig. 117, provided below, shows two side panels, labeled Left and Right, of an enclosure member including a fabric sidewall 14. These side panels are contiguously connected to one another along their edge portions as labeled near the center of Singhose Fig. 117.<br><br><br><br>**Singhose Fig. 117:** Figure 1 in the '883 Patent including Annotated Enclosure Member Side Panels and Edge Portions | |

Response Report on Validity
Wonderland v. Kids II - October 6, 2014
Exhibit G

| Singhose | Drobinski |
|---|---|
| 399.     With regard to contiguously connected side panels, the '883 patent describes that "[t]he Fabric sidewall 14 passes over the corner post 20." ('883 patent, Page 3, ll. 4-5). Further, the '883 patent describes that "[a]dapted to pass over the corner post 20 is a retaining member 22 which is a generally cylindrical tube." ('883 patent. Page 3, ll. 8-9). "It [the retaining member 22] then engages over the corner post 20 as is clear from Figure 2. This is similar to a snap fit." ('883 patent, Page 3, ll. 20-21). In this context, Figure 2 from the '883 patent is provided below in Singhose Fig. 118.<br><br><br>**Singhose Fig. 118:** Figure 2 in the '883 Patent | |
| 400.     As discussed above the disclosed "cot" in the '883 patent is a baby crib. As such, the space enclosed by the fabric sidewalls or side panels 14 is adapted for receiving a baby. Therefore, it is my opinion that the enclosure formed by the fabric sidewalls or side panels 14 in the '883 patent satisfies this claim element. | |

Response Report on Validity
Wonderland v. Kids II - October 6, 2014
Exhibit G

| Singhose | Drobinski |
|---|---|
| **Claim 15 element 4: "a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member, wherein the positioning posts are lodged inside the upright tubes, the side panels extending between the upright tubes substantially out of contact with the outside surfaces of outer walls of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."** | |
| 401.   The enclosure member in the '883 patent is formed from the fabric sidewall 14. Edge portions of the enclosure member are provided where the fabric sidewall 14 passes over the corner posts 20. These regions are labeled in Singhose Fig. 117. The corner posts 20 are located on the enclosure member and serve to position the enclosure member. Therefore, it is my opinion that the plurality of corner posts 20 satisfy this claim element. | The term "positioning post" in the '919 patent would be understood by a person of ordinary skill in the relevant art to be referring to something that holds the edges of a fabric enclosure in place along a structural upright tube, but which is separate from the upright tube.<br><br>The corner posts 20 are not "lodged inside" the retaining member. The retaining member is snapped onto the corner post. |
| 402.   Further, the positioning posts 20 are lodged inside the upright tubes 22. This is apparent from Singhose Figs. 117 and 118, but it is also specifically stated in the specification of the '883 patent. The '883 patent states that "[e]xtending for the full length of retaining member 22 is a slot 28 which extends longitudinally of the retaining member 22, the slot 28 being substantially constant width along its length." ('883 patent, Page 3, ll. 13-15). "It [the retaining member 22] then engages over the corner post 20 as is clear from Figure 2. This is similar to a snap fit." ('883 patent, Page 3, ll. 20-21). | The retaining member 22 is lodged onto and removable from the exterior of the corner post 20. The corner post 20 of Bidwell is not "lodged" in the retaining member 22. It is my view that a person of ordinary skill would understand the limitation that says: "**the positioning posts are lodged inside the upright tubes**" means that the upright tube s hold and support the positioning posts, not the opposite, which is what Singhose is suggesting. |

| Singhose | Drobinski |
|---|---|
| 403.　The next limitation of this claim element is that the side panels are extending between the upright tubes substantially out of contact with the outwardly facing surface of each upright tube. Singhose Fig. 119 below provides an annotated copy of Figure 2 from the '883 patent with the outwardly facing surface of an upright tube identified. The panel extensions to other upright tubes are also been labeled in Singhose Fig. 119. Although the retaining members or upright tubes 22 are not labeled using a reference number in Singhose Fig. 118, it is clear based on a review of both Singhose Figs. 117 and 118 that the fabric sidewalls 14 extend between the retaining members or upright tubes 22 substantially out of contact with the outwardly facing surfaces of the upright tubes 22. As such, the outwardly facing surface of each of the upright tubes 22 is exposed on an outside of the enclosure member. Therefore, it is my opinion that the baby crib disclosed in the '883 patent satisfies this final claim element.<br><br><br>**Singhose Fig. 119:** Side Panels Extending Substantially Out of Contact with Outside Surfaces, Figure 1 in the '883 Patent (annotations by Singhose) | The retaining member 22 of Bidwell is a clip, not an upright tube.<br><br>The language of claim 15 calling for "a plurality of upright tubes defining corners of the baby crib", especially when read in the context of the specification, means that the upright tubes are structural members, and this is what would be understood by a person of ordinary skill in the relevant art.<br><br>Thus, Bidwell's retaining member does not meet the requirement of claim 15 of the '919 patent for an upright tube. |

| Singhose | Drobinski |
|---|---|
| 404.    In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 15 of the '919 Patent and therefore anticipates Claim 15. | I disagree for the reasons set forth above. |
| **ii.      Claim 19 is anticipated by Australian Patent No. 715,883 to *Bidwell*** | |
| **Claim 19: "The baby crib according to claim 15, wherein the enclosure member is made of a fabric material."** | |
| 405.    The section above demonstrates how the '883 patent anticipates all elements of Claim 15. The only additional issue here is whether or not the enclosure member described in the '883 patent is made from fabric. The specification of the '883 patent specifically points out that the enclosure is fabric when it states that "the present invention provides a retaining member for a cot, the cot having a substantially vertically extending corner post over which a fabric sidewall extends." ('883 patent, Page 1, ll. 22-24). | |
| 406.    In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 19 of the '919 patent and therefore anticipates | I disagree for the reasons set forth above relative to claim 15. |
| **iii.      Claim 20 of the '919 Patent is anticipated by Australian Patent No. 715,883 to *Bidwell*** | |
| **Claim 20 element 1: "A baby crib comprising:"** | |
| 407.    As discussed above with regard to Claim 15, the baby crib shown in Figure 1 of the '883 patent, provided above as Singhose Fig. 116, satisfies this claim element. | |
| ***Claim 20 element 2: "a frame structure including a plurality of support tubes, wherein each of the support tubes has an outer wall that defines an outer contour shape of the upright tube;"*** | |
| 408.    The baby crib in the '883 patent and provided in Singhose Fig. 116 above has a plurality of retaining members 22 that are support tubes for a frame structure. Each of these retaining members 22 or support tubes has an outer wall. Further, these outer walls define curved outer contour shapes. Therefore, it is my opinion that the baby crib in the '883 patent satisfies this claim element. | This claim expressly says that the support tubes are structural, when it says that the frame structure includes a plurality of support tubes.

The retaining member 22 of Bidwell is a clip, not a support tube. The language of claim 20 calling for "a frame structure including a plurality of support tubes", especially when read in the context of the specification, means that the support tubes are structural members, and this is what would be understood by a person of |

| Singhose | Drobinski |
|---|---|
|  | ordinary skill in the relevant art. |
| **Claim 20 element 3: "an enclosure member including a plurality of side panels having edge portions; and"** |  |
| 409.     Singhose Fig. 116 shows that the baby crib has an enclosure member including a plurality of side panels or fabric sidewalls 14. Two side panels are shown in Singhose Fig. 116. However, there must be additional fabric sidewalls 14 to complete an enclosure for the baby crib. Comparing the embodiments of the '919 patent to Singhose Fig. 116, it is my opinion that each of the fabric sidewalls 14 has edge portions at the corner posts 20. The edge portions near the support tubes are labeled in Singhose Fig. 117. Therefore, it is my opinion that side panels or fabric sidewalls 14 satisfy this claim element. |  |
| **Claim 20 element 4: "an attachment structure configured to mount and secure the edge portions of the enclosure member along the support tubes,"** |  |
| 410.     Singhose Fig. 117 shows two side panels of the fabric sidewall 14 that comprise the enclosure member. These side panels are contiguously connected to one another along their edge portions. With regard to this connection, the '883 patent describes that "[t]he Fabric sidewall 14 passes over the corner post 20." ('883 patent, Page 3, ll. 4-5). "Adapted to pass over the corner post 20 is a retaining member 22 which is a generally cylindrical tube." ('883 patent, Page 3, ll. 8-9). "It [the retaining member 22] then engages over the corner post 20 as is clear from Figure 2. This is similar to a snap fit." ('883 patent, Page 3, ll. 20-21). In this context, it is my opinion that an attachment structure is formed by the retaining member 22 engaging the fabric-covered corner post 20 in a "snap fit" configuration. It is my opinion that this attachment structure mounts and secures the edge portions of the fabric sidewall enclosure member along the corner posts or support tubes and satisfies this claim element. | In Par. 410, Singhose changes what he is calling the support tube. In Par. 408, Singhose refers to the retaining member 22 as the support tube, but in Par. 410, Singhose refers to the corner post as the support tube and calls the retaining member 22 the attachment structure.

Thus, Singhose's analysis of Bidwell as compared to claim 20 of the '919 patent is incorrect, because it is not consistent in what is identified as the support tube and the attachment structure. |
| **Claim 20 element 5: "*whereby the side panels surround an enclosed space, and each of the side panels extends generally between two of the support tubes substantially out of contact with outwardly facing surfaces of the outer walls thereof, such that the*** |  |

| Singhose | Drobinski |
|---|---|
| *outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."* | |
| 411.    As discussed above, the fabric sidewalls 14 in the '883 patent surround an enclosed space. According to this claim element, these fabric sidewalls 14 must extend between the retaining members or support tubes 22 substantially out of contact with the outwardly facing surfaces of the outer walls thereof. Although the retaining members or support tubes 22 are not labeled using a reference number in Singhose Fig. 118, it is clear based on a review of both Singhose Fig. 117 and Singhose Fig. 118 that the fabric sidewalls 14 extend between the retaining members or support tubes 22 substantially out of contact with the outwardly facing surfaces of the outer walls thereof. Therefore, it is my opinion that the '883 patent satisfies this claim element. | The retaining member 22 of Bidwell is a clip, not a support tube. The language of claim 20 calling for "a frame structure including a plurality of support tubes", especially when read in the context of the specification, means that the support tubes are structural members, and this is what would be understood by a person of ordinary skill in the relevant art. |
| 412.    In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 20 of the '919 patent and therefore anticipates Claim 20. | I disagree for the reasons set forth above. |
| **iv.    Claim 21 of the '919 Patent is anticipated by Australian Patent No. 715,883 to Bidwell** | |
| ***Claim 21*: "The baby crib according to claim 20, wherein the *attachment* structure clamps the edge portions of the enclosure member inside the support tubes."** | |
| 413.    The section above demonstrates how the '883 patent anticipates all elements of Claim 20. The only additional issue here is whether or not the attachment structure clamps the edge portions of the enclosure members inside the support tubes. | For the reasons set forth above, Bidwell does not have all of the elements of claim 20. |
| 414.    The specification of the '883 patent describes that "[e]xtending for the full length of retaining member 22 is a slot 28 which extends longitudinally of the retaining member 22, the slot 28 being substantially constant width along its length." ('883 patent, Page 3, ll. 13-15). "To be placed over the corner post 20 requires the slot 28 to be enlarged at one end thereof by flexing the tube wall 24." ('883 patent, Page 3, ll. 17-18). "It [the retaining member 22] then engages over the corner post 20 as is clear from Figure 2. This is similar to a snap fit." ('883 patent, Page 3, ll. 20-21). "This causes the edges of the tube wall 24 to apply pressure to the fabric sidewall 14 . . . ." ('883 patent, Page 3, ll. 24- | The retaining member 22 of Bidwell is a clip, not a support tube. The language of claim 20 calling for "a frame structure including a plurality of support tubes", especially when read in the context of the specification, means that the support tubes are structural members, and this is what would be understood by a person of ordinary skill in the relevant art.<br><br>In Par. 410, Singhose identifies the retaining member 22 as the attachment structure, and the corner post [20] of Bidwell as the support tube.  Based on these positions, the limitations of claim 20 |

| Singhose | Drobinski |
|---|---|
| 25). This "snap fit" attachment structure clamps the edge portions of the enclosure inside the support tubes. | are not met, because the attachment structure holds the fabric to the outside surface of the support tube. |
| 415.    In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 21 of the '919 patent and therefore anticipates Claim 21. | For the reasons set forth above, Bidwell does not have all of the elements of claim 21. |
| **v.        Claim 27 of the '919 Patent is anticipated by Australian Patent No. 715,883 to _Bidwell_** | |
| **_Claim 27:_ "The baby crib according to claim 20, wherein the enclosure member is made of a fabric material."** | |
| 416.    The section above demonstrates how the '883 patent anticipates all elements of Claim 20. The only additional issue here is whether or not the enclosure member described in the '883 patent is made from fabric. The specification of the '883 patent specifically points out that the enclosure is fabric when it states that "the present invention provides a retaining member for a cot, the cot having a substantially vertically extending corner post over which a fabric sidewall extends." ('883 patent, Page 1, ll. 22-24). | For the reasons above, including my responses to Par. 408, 410 and 411, I disagree. |
| 417.    In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 27 of the '919 patent and therefore anticipates Claim 27. | For the reasons set forth above, Bidwell does not have all of the elements of claim 20, and therefore does not anticipate claim 27. |
| **vi.       Claim 28 of the '919 Patent is anticipated by Australian Patent No. 715,883 to Bidwell** | |
| **_Claim 28:_ "The baby crib according to claim 20, wherein the upright tubes are curved."** | |
| 418.    The section above demonstrates how the '883 patent anticipates all elements of Claim 20. The only additional issue here is whether or not the upright tubes described in the '883 patent are curved. | For the reasons above, including my responses to Par. 408, 410 and 411, I disagree. |
| 419.    Figure 1 of the '883 patent, provided above as Singhose Fig. 116, shows a support or upright tube in the form of the retaining member 22. The retaining member 22 in Singhose Fig. 116 is curved in more than one respect. First, the retaining member 22 includes a tube wall 24 and, therefore, has a curvature about a vertical axis. Singhose Fig. 116 also shows the retaining member 22 as being curved away from the corner post 20, which gives it a curvature about a horizontal axis. Thus, | In Par. 410, Singhose identifies the retaining member 22 as the attachment structure, and the corner post [20] of Bidwell as the support tube.  Based on these positions, the limitations of claim 28 are not met, because the attachment structure (retaining member 22) holds the fabric to the outside surface of the corner post 20, which is a support tube.

The corner posts are clearly not curved, and the retaining member |

Response Report on Validity
Wonderland v. Kids II - October 6, 2014
Exhibit G

| Singhose | Drobinski |
|---|---|
| Singhose Fig. 116 highlights the ability of the retaining member 22 to be curved about a horizontal axis. Therefore, the '883 patent satisfies this claim element in more than one respect. | is capable of being bent, which is part of the reason why it is not as support tube, as Singhose seems to acknowledge in Par. 410. |
| 420.     In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 28 of the '919 patent and therefore anticipates Claim 28. | For the reasons set forth above, Bidwell does not have all of the elements of claim 20 or claim 28. |
| **vii.      Claim 29 of the '919 Patent is anticipated by Australian Patent No. 715,883 to *Bidwell*** | |
| ***Claim 29:* "The baby crib according to claim 15, wherein the upright tubes are curved."** | |
| 421.     The section above demonstrates how the '883 patent anticipates all elements of Claim 15. The only additional issue here is whether or not the upright tubes described in the '883 patent are curved. | For the reasons above, including my responses to Par. 395-397 and 401-403, I disagree. |
| 422.     Figure 1 of the '883 patent, provided above as Singhose Fig. 116, shows an upright tube in the form of the retaining member 22. The retaining member 22 in Singhose Fig. 116 is curved in more than one respect. First, the retaining member 22 includes a tube wall 24 and, therefore, has a curvature about a vertical axis. Singhose Fig. 116 also shows the retaining member 22 as being curved away from the corner post 20, which gives it a curvature about a horizontal axis. Thus, Singhose Fig. 116 highlights the ability of the retaining member 22 to be curved about a horizontal axis. Therefore, the '883 patent satisfies this claim element in more than one respect. | The corner posts 20 of Bidwell are clearly not curved, and the retaining member 22 is capable of being bent, which is part of the reason why it is not as support tube, as Singhose seems to acknowledge in Par. 410. |
| 423.     In summary, it is my opinion that the '883 patent teaches all of the elements of Claim 29 of the '919 patent and therefore anticipates Claim 29. | For the reasons set forth above, Bidwell does not have all of the elements of claim 15 or claim 29. |

Response Report on Validity
Wonderland v. Kids II - October 6, 2014
Exhibit G