Exhibit 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WONDERLAND
NURSERYGOODS CO., LTD.

      Plaintiff,

v.

KIDS II, INC.

      Defendant.

CIVIL ACTION NO:

1:13-CV-1114-TWT

## REBUTTAL REPORT OF WILLIAM SINGHOSE, PH.D.
## REGARDING THE INVALIDITY OF THE
## ASSERTED CLAIMS OF U.S. PATENT NOS. 6,954,949 AND RE43,919

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................5
II.     QUALIFICATIONS AND COMPENSTATION ...........................7
III.    ADDITIONAL MATERIALS CONSIDERED.............................8
IV.     PRELIMINARY ISSUES ON REBUTTAL.................................9

A.      Lack of Clarity in the Drobinski Report...........................................9
B.      Incorrect Statements and Assumptions Regarding the Subject Matter of the
        Patents-in-Suit.................................................................................10
C.      Incorrect Statements and Assumptions Regarding the Subject Matter of the
        Patents-in-Suit.................................................................................16

V.      LEVEL OF ORDINARY SKILL IN THE ART...........................29
VI.     SECONDARY INDICIA OF NONOBVIOUNESS .....................39
VII.    EVIDENCE OF CONTEMPORANEOUS INVENTION ...........50
VIII.   INDEFINITENESS .................................................................53
IX.     THE ASSERTED CLAIM OF THE '949 PATENT IS ANTICIPATED IN
        LIGHT OF THE PRIOR ART..................................................57

A.      INTRODUCTION ...........................................................................57
B.      Claim 1 of the '949 Patent is anticipated by U.S. Patent No. 914,309 to Ross
        72
C.      Claim 1 of the'949 Patent is anticipated by U.S. Patent No. 5,722,477 to
        Richter.............................................................................................85
D.      Claim 1 of the'949 Patent is anticipated by U.S. Patent No. 7,055,192 to
        Waters ..............................................................................................96

X.      THE ASSERTED CLAIM OF THE '949 PATENT is OBVIOUS IN LIGHT
        OF THE PRIOR ART............................................................111

A.      INTRODUCTION .........................................................................111
B.      Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 5,615,427 to
        Huang in view of Mark's Standard Handbook for Mechanical Engineers .115
C.      Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 5,615,427 to
        Huang in view of U.S. Patent No. 7,055,192 to Waters.............................127

D.    Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 5,615,427 to Huang in view of U.S. Patent No. 914,309 to Ross .....................................131

E.    Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 5,615,427 to Huang in view of U.S. Patent No. 6,317,907 to Wang ...............................137

F.    Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 6,317,907 to Wang in view of U.S. Patent No. 5,615,427 to Huang ...............................141

G.    Claim 1 of the'949 Patent is Obvious over U.S. Patent No. 4,376,318 to Cirillo in view of U.S. Patent No. 5,615,427 to Huang.............................145

XI.    THE ASSERTED CLAIMS OF THE '919 PATENT ARE ANTICIPATED IN LIGHT OF THE PRIOR ART ...............................................................148

A.    INTRODUCTION ......................................................................................148

B.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by U.S. Patent No. 6,098,217 to Hammil ................................................................158

C.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by Australian Patent No. 715,883 to Bidwell..................................................171

D.    Before the invention defined by Claims 15, 19-21, and 27-29 of the of the '919 Patent, the invention was made in this country by another inventor who did not abandon, suppress, or conceal it.......................................................180

XII.    THE ASSERTED CLAIMS OF THE '919 PATENT ARE OBVIOUS IN LIGHT OF THE PRIOR ART....................................................................193

A.    INTRODUCTION ......................................................................................193

B.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 5,992,348 to Harding ....................................................................................................209

C.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 7,090,201 to Brucker......................................................................................................219

D.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 5,762,403 to Robinson ...................................................................................................224

E.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 5,992,348 to Harding ....................................................................................................230

F.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 7,090,201 to Brucker237

G.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 5,762,403 to Robinson ...................................................................................................................241

H.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 5,752,297 to Ramey ...................................................................................................................247

I.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 1,183,819 to Keiser ...................................................................................................................255

J.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 6,510,570 to Hartenstine in view of U.S. Patent No. 2,790,978 to Tigrett ...................................................................................................................262

K.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 5,752,297 to Ramey ...................................................................................................................267

L.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 1,183,819 to Keiser ...................................................................................................................271

M.    Claims 15, 19-21, and 27-29 of the '919 Patent are Obvious over U.S. Patent No. 4,538,309 to Gunter in view of U.S. Patent No. 2,790,978 to Tigrett .275

N.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are Obvious over U.S. Patent No. 6,098,217 to Hammil in view of U.S. Patent No. 5,992,348 to Harding ...................................................................................................................278

O.    Claims 28 and 29 of the of the '919 Patent are Obvious over U.S. Patent No. 6,098,217 to Hammil in view of U.S. Patent No. 6,510,570 to Hartenstine ...................................................................................................................281

P.    Claims 28 and 29 of the of the '919 Patent are Obvious over Australian Patent No. 715,883 to Bidwell in view of U.S. Patent No. 6,510,570 to Hartenstine ........................................................................................... 283

## I.     INTRODUCTION

1.      I, Dr. William Singhose, have been retained as a technical expert by the law firm of Thomas | Horstemeyer LLP on behalf of Defendant Kids II, Inc. ("Kids II") in connection with the above-captioned lawsuit to provide analysis and opinions regarding the technology relevant to U.S. Patent No. 6,954,949 ("the '949 patent") and RE43,919 ("the '919 patent") (collectively, the "Patents-in-Suit"). Specifically, after submitting an initial opinion on the invalidity of the asserted claims of the Patents-in-Suit on August 26, 2014 ("Initial Report"), I have been asked to respond to the "Response Report – Validity of Selected Asserted Claims of U.S. Patent Numbers 6,954,949 & RE 43,919" submitted by Mr. Jerry Drobinski on October 6, 2014 ("Drobinski Response").  The following is my response entitled "Rebuttal Report of Dr. William Singhose, Ph.D. Regarding the Invalidity of the Asserted Claims of U.S. Patent Nos. 6,954,949 and RE43,919.

2.      As set forth in my Initial Report, I understand based on its Infringement Contentions dated July 24, 2013 that Plaintiff Wonderland Nurserygoods Co., Ltd. ("Wonderland") asserts that Kids II infringes: (i) Claim 1 of the '949 patent; and (ii) Claims 15, 19, 20, 21, 27, 28, and 29 of the '919 patent

(collectively, "the Asserted Claims").[1] I have been asked to provide an independent analysis regarding whether the prior art teaches or suggests the subject matter of the Asserted Claims. For the reasons explained in my Initial Report and in detail below, it is my opinion that each of the Asserted Claims of the Patents-in-Suit are invalid as anticipated, pursuant to 35 U.S.C. § 102, obvious, pursuant to 35 U.S.C. § 103, and/or indefinite, pursuant to 35 U.S.C. § 112. Furthermore, as explained more fully and in detail below, it is further my opinion that Mr. Drobinski has failed to rebut my opinions regarding the invalidity of the Asserted Claims.

3.      This Rebuttal Report, in addition to my Initial Report, sets forth my opinions on invalidity as of October 16, 2014. I understand that I may be called upon in this case to render other opinions in response to additional positions taken by Plaintiff's experts, including but not limited to, those related to infringement, damages, or other issues where Plaintiff has the burden of proof. I reserve the right to supplement this Rebuttal Report in light of additional information made available to me, including but not limited, any supplemental reports that may be necessary to respond to any reports or assertions provided by Plaintiff, to address

---

[1] Mr. Drobinski states in the Drobinski Report that he reviewed Wonderland's Amended Contentions of Infringement dated December 19, 2013. (*See* Drobinski Report, p. B-2). I understand from counsel, however, that Wonderland never supplemented its infringement contentions dated July 24, 2013.

any late produced information or documents from Plaintiff, or any other appropriate reason for me to supplement this Rebuttal Report.

## II.     QUALIFICATIONS AND COMPENSATION

4.      As in the Initial Report, the opinions I provide herein are my own and are based on my education, experience, training, and skill that I have accumulated over the course of my career working in the fields of product design and manufacturing; my legal and factual research in this matter; the information and materials I reviewed and considered in connection with the preparation of my Initial Report and this Rebuttal Report; and my understanding of the knowledge, creativity, and experience of a person of ordinary skill in the art.

5.      My curriculum vitae, which, among other things, details my degrees, employment history, teaching experience, scholarly accomplishments, professional contributions, grants and contracts, and honors and awards, is attached to my Initial Report as Exhibit 1. Further, my testimony over the past four years, as well as a summary of my qualifications, is set forth in Section II of my Initial Report. I have addressed Mr. Drobinski's incorrect assumptions and statements relating to my qualifications, experience, and the level of ordinary skill in the art in more detail in Section V below.

that is stronger, more rigid, safer, and better resists deflection when the child is placed in the playpen, as well as a playpen that utilizes an inner column to attach a fabric boundary sheet) without undue experimentation.

287.   Mr. Drobinski also asserts that: "If Cirillo were to be modified based on Huang, it would be fitted with a nesting bassinet, and this would make the folding of Cirillo very complicated, perhaps impossible." (Drobinski Report, p. F-59). Mr. Drobinski assertion is misplaced. As discussed above, my proposed modification does not require the use of the nesting bassinet of Huang.

288.   Mr. Drobinski also asserts that if the "inner column is enclosed inside a tunnel of fabric to support the enclosure. This would make Cirillo very difficult to fold." (Drobinski Report, pp. 50-51). Mr. Drobinski does not actually explain why it would prevent the folding shown in the '318 patent. Notably, many playpens have legs or support tubes inside a tunnel of fabric and fold just fine. Thus, Mr. Drobinski has not offered any useful insight on this issue.

289.   Thus, it is my opinion that the '318 patent in view of the '427 patent discloses all elements of Claim 1 of the '949 patent and renders Claim 1 obvious.

## XI.   THE ASSERTED CLAIMS OF THE '919 PATENT ARE ANTICIPATED IN LIGHT OF THE PRIOR ART

## A.   INTRODUCTION

220.   As outlined in Section XIII of my Initial Report, the attachment of fabric to frame structures according to the embodiments described in the '919 patent was well-known in the art when the '919 patent was filed.  Further, as discussed in detail below, it is my opinion that Mr. Drobinski failed in the Drobinski Report to rebut my opinions on the invalidity of the Asserted Claims of the '919 patent.

221.   On pages 51-60 of the Drobinski Report and Exhibits G and H to the Drobinski Report, Mr. Drobinski presents three main points of rebuttal to my opinions on the invalidity of the Asserted Claims of the '919 patent by way of anticipation.  These opinions can be summarized as follows:[6]

i.   Some of the prior art references cited to and discussed in my Initial Report were considered by the Examiner during the prosecution history of the '919 patent.  Thus, the Examiner considered the Asserted Claims of the '919 patent to be patentable over those references.

ii.   Some of the prior art references cited to and discussed in my Initial Report are cumulative with others that were considered

---

[6] For the reasons provided below, I do not agree with Mr. Drobinski's main points of rebuttal or think they are persuasive.  I have provided the listing of Mr. Drobinski's main points of rebuttal only as the context for my reply.

by the Examiner.  Thus, the Examiner would have considered

the Asserted Claims of the '919 patent to be patentable over

those cumulative references.

iii.   One of ordinary skill in the art would not have recognized

certain prior art elements identified in my Initial Report as

"positioning posts," as recited in Claim 15.

222.   Before turning to a detailed, reference-by-reference, analysis of the

technical and legal errors and deficiencies in Mr. Drobinski's rebuttal, I will

present condensed responses to Mr. Drobinski's three main points of rebuttal

above.

223.   First, although Mr. Drobinski notes that some of the prior art

references discussed in my Initial Report were considered by the Examiner during

the prosecution history of the '919 patent (*See*, *e.g.*, Drobinski Report, pgs. 57 and

58 and Exhibit J), Mr. Drobinski has offered no evidence as to the manner in which

the Examiner considered those prior art references individually or in the particular

combinations presented in my Initial Report.  To the extent that Mr. Drobinski

makes assumptions about the Examiner's consideration of these references (or

assumptions regarding the Examiner's "job"), I do not find a basis for such

assumptions.  (*See*, *e.g.*, Drobinski Report, Exhibit I, pg. 4, "[i]f the Examiner

believed that these two references, in combination, rendered the invention of the

'919 patent obvious, his job would have required him to reject the claims, but he did not"). In my review of the prosecution history, I noted the various references that were considered by the Examiner (*i.e.*, by seeing the Examiner's initials next to a list of reference numbers). However, this information does not provide much indication, if any, as to the manner in which the Examiner considered such references.[7] Furthermore, I do not see how the Examiner's indication that references were considered, individually, leads Mr. Drobinski to the conclusion that the Examiner considered the prior art *as I have presented it* in my Initial Report.

224.   Of the 77 references listed on the '919 patent (*i.e.*, the references considered by way of the Examiner's initials on the PTO-892 and 1449 forms), the prosecution history of the '919 patent does not provide any indication as to the manner in which those 77 references were considered individually or in combination with each other, with the exception of *only three references* relied upon in the substantive 35 U.S.C. §§ 102 and 103 rejections.  (*See* '919 patent

---

[7] In the prosecution history of the '919 patent, I have identified PTO-892 and 1449 forms in which references were indicated as being "considered" by the Examiner on January 21, 2009, June 23, 2009, December 28, 2010, May 30, 2012, November 30, 2012, and December 14, 2012.  On the PTO-892 and 1449 forms, the Examiner either initialed each reference individually or initialed an entire page of references collectively to indicate that the references were considered, without any substantive discussion as to the manner in which the references were considered.

Prosecution History, Office Actions dated January 21, 2009, June 23, 2009, March 17, 2010, December 28, 2010, July 12, 2011, and May 30, 2012).  Particularly, among the Office Actions issued by the Examiner, the Examiner provided insight into his line of reasoning only with respect to U.S. Patent No. 4,848,843 ("the '843 patent"), U.S. Patent No. 4,105,244 ("the '244 patent"), and U.S. Patent No. 2,784,420 ("the '420 patent").  Thus, while I recognize that various references were identified by the Examiner as being considered, individually, on the PTO-892 and 1449 forms, I cannot say that I follow or share in Mr. Drobinski's opinion of what that consideration was.[8]

225.   Although Mr. Drobinski highlights, on page 58 of the Drobinski Report, certain prior art references I relied upon in my Invalidity Report that were considered, individually, on the PTO-892 and 1449 forms, none of those highlighted references include the '843, '244, or '420 patents.  Stated differently, none of the prior art references I relied upon in my Invalidity Report are the same as those relied upon by the Examiner in the substantive rejections during prosecution of the '919 patent.  Thus, we have very little (if any) insight as to the

---

[8]  I have been advised and understand that, in district court litigation, patents are often invalidated in view of prior art that was cited and, sometimes, even considered substantively during prosecution.  Further, in the context of reexaminations, "[a] combination of old and new art supports a substantial new question of patentability" in reexamination.  *See*, *e.g.*, MPEP § 2258.01.

manner in which the prior art references in my Invalidity Report were considered by the Examiner.

226.   Beyond the fact that we have little, if any, indication as to the manner in which the Examiner considered the references listed on the PTO-892 and 1449 forms, we have *no indication* as to the manner in which the Examiner would have considered the unconsidered prior art references I relied upon in my Initial Report. In forming my opinions as to the anticipation and obviousness of the Asserted Claims of the '919 patent, I referenced in some detail eight (8) prior art references not considered by the Examiner during the prosecution of the '919 patent.[9]  (*See* Initial Report, Sections XIII and XIV).  These 8 unconsidered prior art references were applied in at least 8 detailed opinions on the anticipation and/or obviousness of the Asserted Claims of the '919 in my Initial Report.[10]

---

[9]  Here, I refer to the prior art referenced in my Initial Report under 35 U.S.C. § 102(a), (b), (e) and/or 103(a) to invalidate the Asserted Claims of the '919 patent. It is also my opinion that the Asserted Claims of the '919 patent are invalid under 35 U.S.C. § 102(g)(2), based on the prior invention by Mr. Damon Troutman, as described in my Initial Report at Section XIII.D.

[10]  Further, it is my opinion that one of ordinary skill in the art would have considered the '919 patent invalid as obvious in view of, for example, the conceded "prior art" baby crib structure illustrated in Figure 1 of the '919 patent in place of one or more of the "considered" references, such as U.S. Patent No. 6,510,570, U.S. Patent No. 4,538,309, or U.S. Patent No. 6,098,217.  Also, in forming my opinions as to the anticipation and obviousness of the Asserted Claims of the '949 patent, I referenced in detail seven (7) prior art references not considered by the Examiner during the prosecution of the '919 patent.  It is my

227.   On page 10 of his Report, Mr. Drobinski suggests that "[s]ome courts have said that the burden is 'enhanced' when the challenger is relying on cited art," citing *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011). However, I understand that Mr. Drobinski may have been improperly informed by Wonderland's counsel when he states: "There is no mention of the enhanced burden applicable when the party challenging the patent is relying on prior art that has already been considered." (Drobinski Report, p. C-7, n.1). It is my understanding that Mr. Drobinski's statement that there is an "enhanced burden" if the invalidity argument relies on the same prior art considered during examination by the USPTO may be incorrect. (Drobinski Report, p. C-7, n.1). I understand from counsel that a more recent case has indicated that, whether a reference was previously considered by the USPTO, the burden of proof is the same: "clear and convincing evidence." Moreover, I also understand from counsel that it could be reasonable to give more weight to new arguments or references that were not explicitly considered by the PTO when determining whether a defendant has met its burden of providing clear and convincing evidence of invalidity.

---

opinion that one of ordinary skill in the art would have also considered the '919 patent invalid as obvious in view of one or more of those 7 prior art references, including but not limited to U.S. Patent No. 5,615,427, U.S. Patent No. 6,317,907, or U.S. Patent No. 4,376,318, in place of one or more of the "considered" references, such as U.S. Patent No. 6,510,570, U.S. Patent No. 4,538,309, or U.S. Patent No. 6,098,217.

228.   As my second condensed response, it is my opinion that Mr. Drobinski has failed to fully consider what type of prior art references one of ordinary skill in the art would (or would not) consider "cumulative" with others. For example, on page 59, Mr. Drobinski compares various "non-cited" references (*i.e.*, references not considered by the Examiner) to "similar cited" references (*i.e.*, references "considered" by the Examiner) in an effort to suggest that the "non-cited" references are cumulative in view of the "similar cited" references.

229.   Mr. Drobinski's line of reasoning, however, in finding the "non-cited" references to be cumulative is misplaced for several reasons.  Mr. Drobinski has failed to provide any substantive analysis, comparison, or reason as to why the "non-cited" references are cumulative in view of the "similar cited" references. After a comparison of the "non-cited" references to the "similar cited" references, it is my opinion that, even where two of the references are directed to a similar field or the solution of a similar problem, each describes, suggests, and presents different information in a different way.[11]  Thus, they are significantly different and not cumulative.

---

[11] At least in the context of reexaminations, "[a] cumulative reference is one that substantially reiterates verbatim the teachings of a reference that was previously relied upon or discussed in a prior Office proceeding.  However, a repetitive reference is a rare occurrence since most references teach additional information or

230.   Further, it is apparent that Mr. Drobinski has failed to carefully compare the "non-cited" references to the "similar cited" references before dismissing the "non-cited" references as being cumulative.  For example, on page 59 of the Drobinski Report, Mr. Drobinski identifies U.S. Patent No. 7,125,081 ("the '081 patent"), which was considered by the Examiner, as being similar to U.S. Patent No. 7,090,201 patent ("the '201 patent"), which was not considered, in an apparent attempt to suggest that the '201 patent is cumulative in view of the '081 patent.  What Mr. Drobinski fails to consider, however, is that the '081 patent, filed November 16, 2004, does not even constitute prior art to the '919 patent, whereas the '201 patent, having a priority date of October 18, 2002, does.  Thus, the '201 patent is not at all cumulative in view of the '081 patent, because the '201 patent is prior art to the '919 patent and the '081 patent is not.

231.   Finally, as my third condensed response, I do not share Mr. Drobinski's limited opinion as to what may or may not encompass "positioning posts," as recited in Claim 15.   In his report, Mr. Drobinski suggests that one of ordinary skill in the art would not identify a tube at the corner of a crib or playpen as a positioning post.  The problem with Mr. Drobinski's analysis in this regard is that he offers no definition of (or even suggestion as to) what a positioning post is.

---

present information in a different way than other references, even though the references may address the same general subject matter."

It is my opinion that the term "positioning post" is not a term of art that would be recognized by one of ordinary skill in the art.  For example, a Google® search of the term "positioning post" produced the hypertext page link and image results below, none of which appear to be representative of anything described in the '919 patent.



232.   Without an art-accepted definition of the term "positioning post," we are left with dictionary definitions and the specification of the '919 patent.  I note that there is no entry in the Merriam-Webster Dictionary for "positioning post" as a singular term.[12]  Looking to the specification of the '919 patent, the specification

---

[12] http://www.merriam-webster.com/dictionary/positioning%20post

157

provides that "[t]he positioning posts are mounted on the fabric member, and are inserted respectively into the receiving holes in the upright tubes," such that "[t]he fabric member is clamped between each of the upright tubes and a corresponding one of the positioning posts."  ('919 patent; Col. 1, ll. 55-60).  The specification of the '919 patent further provides that the positioning posts may be "formed as a flexible tube, such as a plastic or metal tube," but "need not be made of flexible materials."  ('919 patent; Col. 2, ll. 39-42, and Col. 3, l. 29).  Thus, in light of the specification, it is my opinion that a plain and ordinary meaning of the term is a "flexible or inflexible post upon which fabric is mounted."

233.   With this plain and ordinary meaning of the term "positioning post" in view of the specification of the '919 patent, I do not share Mr. Drobinski's opinion of what may or may not encompass "positioning posts," as recited in Claim 15, in the prior art.  In contrast, as detailed below, I think one of ordinary skill in the art would recognize any of the various upright tubes, elongated members, retention members, retaining rods, *etc*. in the prior art as "positioning posts," as recited in Claim 15.

## B.   Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by U.S. Patent No. 6,098,217 to Hammil

234.   It is my opinion that U.S. Patent No. 6,098,217 to Hammil ("the '217 patent"), titled "Modular Playpen," anticipates Claims 15, 19-21, and 27-29 of the

'919 patent, and Mr. Drobinski has failed in the Drobinski Report to rebut my

opinion in this regard.[13]

### i. Claim 15 of the '919 patent is anticipated by U.S. Patent No. 6,098,217 to Hammil

235.   As a preliminary matter, on page 3 in Exhibit G of the Drobinski

Report, Mr. Drobinski notes that the Asserted Claims of the '919 patent were

allowed although the Examiner "considered" the '217 patent during prosecution of

the '919 patent.  However, the file history of the '919 patent provides little, if any,

indication as to the manner in which the Examiner considered the '217 patent.

Particularly, the file history of the '919 patent does not provide any indication as to

whether the Examiner considered the '217 patent as I have considered and mapped

it to meet the Asserted Claims of the '919 patent, as provided in my Initial

Report.[14]

---

[13] In this and the remaining subsections in Section XI, I provide a more detailed, reference-by-reference and/or limitation-by-limitation, analysis of Mr. Drobinski's comments in the Drobinski Report and Exhibits G and H to the Drobinski Report. I note that, among the body of and in Exhibits G and H, Mr. Drobinski does not attempt to refute my invalidity arguments as to each element of each Asserted Claim of the '919 patent for every prior art reference in my Initial Report.  Thus, my detailed analysis here is generally limited to a reply to Mr. Drobinski's comments in the Drobinski Report, and not every element of every claim is covered below.

[14]  Here, I again point out that the Examiner did not rely upon or discuss the '217 patent in any substantive rejection under 35 U.S.C. §§ 102 or 103.

236.   Further, regardless of whether the '919 patent was allowed by the Examiner after "considering" the '217 patent, the standard of review for anticipation under 35 U.S.C. § 102 does not take into account or hinge upon such "consideration".  Instead, it is my understanding that, if the '217 patent describes every element of Claim 15 of the '919 patent, then It is invalid as anticipated by the prior art.

**Claim 15 element 2:** *"a plurality of upright tubes defining corners of the baby crib, wherein each of the upright tubes has an outer wall that defines an outer contour shape of the upright tube; and;"*

237.   On page 52 of his report, Mr. Drobinski suggests that I have "avoid[ed] the requirements of the claims by calling the solid posts of the Hammil patent 'tubes' which they surely are not."  In other words, Mr. Drobinski argues that the uprights 20 in the '217 patent are not "upright tubes," as recited in Claim 15.  However, Mr. Drobinski makes an unjustified assumption that the vertical uprights of the '217 patent are "solid" posts.  In my review of the specification of the '217 patent, however, I find no indication that the uprights 20 are solid.  In fact, the uprights of portable supports are often hollow so that they are more lightweight.  Further, I did not find any express definition of the term "upright tube" in the specification of the '919 patent that would tend to exclude the uprights 20 in the '217 patent from being covered by Claim 15.

238.   Further, on page 5 of Exhibit G of the Drobinski Report, Mr. Drobinski argues that the uprights 20 in the '217 patent are not "upright tubes," as recited in Claim 15, with reference to a dictionary definition of the word "tube."[15] Again, he uses his faulty assumption that the uprights are "solid."  Mr. Drobinski does not at all contrast or juxtapose the definition with the uprights 20 in the '217 patent.  For example, Mr. Drobinski does not suggest that the uprights 20 in the '217 patent are not tubes because they are not "hollow" as noted in the definition. Thus, it appears that Mr. Drobinski may view the meaning of "upright tubes," as recited in Claim 15, to include tubes which are solid, as well as ones which are hollow.  If not, Mr. Drobinski would have taken the opportunity to distinguish the uprights 20 in the '217 patent as being solid or not hollow, at least to the extent that he could find such evidence in the '217 patent.  Absent such argument, I again note the striking similarities between the shape, structure, and purpose of the uprights 20 in the '217 patent and the upright tubes 11 illustrated and described in the '919 patent.

> **Claim 15 element 3:** *"an enclosure member including a plurality of side panels contiguously connected to one another along edge portions and surrounding an enclosed space adapted for receiving a baby therein; and;"*

---

[15] Mr. Drobinski does not cite to any particular dictionary or source for the definition provided at page 5 in Exhibit G.

239.   On page 52 in the Drobinski Report, Mr. Drobinski suggests that "the panels 30 of Hammil are not contiguously connected to each other."  However, the plain and ordinary meaning of contiguous according to Merriam-Webster's Dictionary is as follows:[16]



240.   In this case, as illustrated in Figure 1 of the '217 patent, the side panels 30 in the '217 patent touch along the boundary of the uprights 20, thereby satisfying the first definition given above.  In other words, other than the uprights 20 themselves, which are in actual contact with the side panels 30 and join them, no space or openings exist between any two side panels 30.  As such, in the '217

---

[16] http://www.merriam-webster.com/dictionary/contiguous

patent, the side panels 30 are contiguously connected by the uprights 20 in an

unbroken sequence, which is compatible with the third definition above.  As an

example of side panels which are not "contiguously connected," I would direct Mr.

Drobinski to Figure 1A of U.S. Patent No. 5,722,477, which illustrates an

enclosure member including a plurality of panels 4 that are not contiguously

connected in an unbroken sequence.

241.   Further, on page 6 in Exhibit G, Mr. Drobinski argues that the side

panels 30 in the '217 patent are not "contiguously connected to one another," as

recited in Claim 15, with reference to a dictionary definition of the word

"contiguous."[17]  However, for the reasons discussed above, the side panels 30 are

contiguously connected by the uprights 20 in an unbroken sequence.

**Claim 15 element 4:** *"a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member, wherein the positioning posts are lodged inside the upright tubes, the side panels extending between the upright tubes substantially out of contact with the outside surfaces of outer walls of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."*

242.   As noted in paragraph 368 of my Initial Report, it is my opinion that

the "notch or downward protrusion" described at column 4, lines 33-40, of the '217

patent comprises a "positioning post," as recited in Claim 15.  Particularly, the

---

[17] Mr. Drobinski does not cite to any particular dictionary or source for the definition provided at page 6 in Exhibit G.

'217 patent describes that "[t]he actual inter-connection of the panel and upright can occur in a variety of ways.  One method can be to provide a notch or downward protrusion in the bottom of the edge of the side panel 30.  This protrusion would be inserted into the upright 20 first until the protrusion reaches the terminus of the groove 21.  The remaining portion of the edge of the panel 30 can then slide into the remaining portion of the groove 21 until the panel 30 is secured therein." ('217 patent; Col. 4, ll. 33-40).

243.   On page 52 in the Drobinski Report, Mr. Dobinski suggests that the "notch or downward protrusion" is not a "positioning post."  However, Mr. Drobinski offers no distinction between the "notch or downward protrusion" described in the '217 patent and any "positioning post" as recited in Claim 15. Instead, Mr. Drobinski suggests that they are not the same because the "notch or downward protrusion" is only provided on the "bottom" and not the "side" edge of the side panel 30.

244.   First, because the '217 patent describes that the "notch or downward protrusion [is] in the bottom of the edge of the side panel 30" at column 4, lines 34-37, it is clear that such protrusion is provided on the side panel 30.  This meets the limitation of positioning posts "provided on the enclosure member at locations corresponding to edge portions" in Claim 15.  Specifically, the '217 patent describes that the notch or downward protrusion is provided *in the bottom of the*

edge of the *side panel 130* **and is entirely silent** as to it being on a ***bottom*** panel, as suggested on page 52 of the Drobinski Report.

245.    Second, I note that Claim 15 recites "positioning posts provided on the enclosure member at locations corresponding to edge portions," but does not define any relative position or extent to which such positioning post is provided at a location corresponding to edge portions.  As such, Claim 15 <u>does not require</u> positioning posts provided at locations corresponding to *entire* edge portions of side panels.  Even if that were the case (which it is not), page 199 in my Initial Report outlines my opinion that the notch or downward protrusion in the '217 patent extends along the length of the edge of the side panel 30, referring to Singhose Fig. 114.

246.    Further, on page 8 in Exhibit G, Mr. Drobinski states that I "ignore[] the fact that other portable fences, such as Brucker US 7,090,201 have no connection between the panel and the side posts."  It is my understanding that, if the '217 patent describes each and every element of Claim 15 of the '919 patent, then it is invalid as anticipated by the prior art.  I do not follow Mr. Drobinski's point with regard to how the cited reference Brucker, U.S. Patent No. 7,090,201 ("the '201 patent"), pertains to or bears upon the anticipation of the Asserted Claims of the '919 patent by the '217 patent.

165

**ii.      Claim 20 is anticipated by U.S. Patent No. 6,098,217 to**
*Hammil*

**Claim 20 element 2:** *"a frame structure including a plurality of support tubes, wherein each of the support tubes has an outer wall that defines an outer contour shape of the upright tube;"*

247.    For reasons similar to those discussed above with regard to element 2 of Claim 15, it is my opinion that the uprights 20 in the '217 patent cover the "support tubes" as recited in Claim 20.  More particularly, I find striking similarities between the shape, structure, and purpose of the uprights 20 in the '217 patent and the upright tubes 11 illustrated and described in the '919 patent. Further, as discussed above, Mr. Drobinski does not suggest that the uprights 20 in the '217 patent are not tubes because they are not "hollow."  Thus, it appears that Mr. Drobinski may view the meaning of "support tubes," as recited in Claim 20, to include tubes which are solid, as well as ones which are hollow.  If not, Mr. Drobinski would have taken the opportunity to distinguish the uprights 20 in the '217 patent as being solid or not hollow, to the extent that he could find such evidence in the '217 patent.  Absent such argument, I again note the striking similarities between the shape, structure, and purpose of the uprights 20 in the '217 patent and the upright tubes 11 illustrated and described in the '919 patent.

**Claim 20 element 4:** *"an attachment structure configured to mount and secure the edge portions of the enclosure member along the support tubes,"*

248.   For reasons similar to those discussed above with regard to element 4 of Claim 15, it is my opinion that the "notch or downward protrusion" described at column 4, lines 33-40, of the '217 patent comprises an "attachment structure," as recited in Claim 20.  Again, I do not need to "speculate" that such notch or downward protrusion is on the side panel 30 and not a bottom panel, as Mr. Drobinski argues on page 11 in Exhibit G.  In contrast, the '217 patent makes clear that the notch or downward protrusion is provided *in the bottom of the edge of the side panel 130* **and not** on a ***bottom*** panel.  ('217 patent; Col. 4, ll. 34-37).  Finally, it is my understanding that, if the '217 patent describes each and every element of Claim 20 of the '919 patent, then it is invalid as anticipated by the prior art.  I do not follow Mr. Drobinski's point with regard to how the '201 patent pertains to or bears upon the anticipation of the Asserted Claims of the '919 patent by the '217 patent.

### iii.     Claim 21 is anticipated by U.S. Patent No. 6,098,217 to *Hammil*

**Claim 21:** *"The baby crib according to claim 20, wherein the attachment structure clamps the edge portions of the enclosure member inside the support tubes."*

249.   On pages 13-15 in Exhibit G of the Drobinski Report, Mr. Drobinski attempts to rebut my opinion on the anticipation of Claim 21 of the '919 patent in

view of the '217 patent.  However, Mr. Drobinski does not raise any points other than those previously raised with regard to Claims 15 or 20.

### iv.      Claim 27 is anticipated by U.S. Patent No. 6,098,217 to *Hammil*

**Claim 27:**  *"The baby crib according to claim 20, wherein the enclosure member is made of a fabric material."*

250.   As noted in my Initial Report in paragraph 385, the specification of the '217 specifically points out that the side panels 30 are made of fabric when it states that "[e]ach side panel 30 is substantially rectangular or square.  Its sides are generally of plastic and surround a see-through nylon mesh or netting made of standard nylon material." ('217 patent; Col. 4, ll. 49-53).  It is my opinion that nylon mesh is a type of fabric and would have been recognized by one of ordinary skill in the art as such.

251.   On page 15 in Exhibit G of the Drobinski Report, Mr. Drobinski acknowledges that "the panels of Hammil may have a fabric component," but suggests that the "notch or downward protrusion" described at column 4, lines 34-37, of the '217 patent "would have to be" formed from plastic "to be rigid enough to be maintained in the grooves."  First, I note that Claim 27 is directed to and further defines the "enclosure member" of Claim 20 and not the "attachment structure."  Thus, Claim 27 is not related to what type of material the "attachment structure" of Claim 20 is made of.  Accordingly, Mr. Drobinski's argument appears

168

to be misplaced because he failed to properly construe Claim 27.  Even that being the case, in one preferred embodiment of the '919 patent, the attachment structure is in fact described as "plastic."  ('919 patent; Col. 2, l. 41.)

252.   Then, ignoring the (previously recognized) fact that an attachment structure (*i.e.*, the notch or downward protrusion) is used in the '217 patent to hold the side panels 30, Mr. Drobinski goes on to suggest that, "because fabric alone could not . . . be retained in the grooves," the '217 patent may not be enabled.  Mr. Drobinski goes on to suggest that the '217 patent and could not anticipate Claim 27 of the '919 patent if the "allegedly anticipatory disclosures . . . are not enabled," citing to *In re Antor Media Corp*. 689 F. 3d 1282, 1289 (Fed. Cir. 2012).  As advised by counsel, it is my understanding that the '217 patent is enabled so long as its disclosure enables one of ordinary skill in the art to make or use the disclosed described modular playpen without undue experimentation.  I find no reason why one of ordinary skill in the art could not routinely make or use the modular playpen described in the '217 patent without undue experimentation, given the predictability of the materials described in its construction.  Thus, I do not share in Mr. Drobinski's opinion that "Hammil does not teach or enable a way of attaching a fabric side wall to the uprights 20."

> **v.      Claim 28 is anticipated by U.S. Patent No. 6,098,217 to
> *Hammil***

**Claim 28:** *"The baby crib according to claim 20, wherein the upright tubes are curved."*

253.    On page 16 in Exhibit G of the Drobinski Report, Mr. Drobinski suggests that "[a] person of ordinary skill would understand that 'curved' in the context of claim 28 means curved along the length."  In my reading of Claim 28, however, I do not find the words "along the length."  Further, in my review of the intrinsic record of the '919 patent, I did not find any requirement that Claim 28 defines the curvature of upright tubes along their length.  To the extent that Claim 28 does not define them as curved along their length, I stand by my opinion that Figure 4 of the '217 patent shows that the upright tubes 20 are circular and, therefore, curved.

254.    To the extent that Claim 28 defines tubes as being curved along their length, I have addressed that type of curvature in other parts of my Initial Report, including but not limited to Sections XIV.B-D, H-J, N, O, and P.

### vi.        Claim 29 is anticipated by U.S. Patent No. 6,098,217 to *Hammil*

**Claim 29:** *"The baby crib according to claim 15, wherein the upright tubes are curved."*

255.    With regard to Claim 29, on page 17 in Exhibit G, Mr. Drobinski refers back to his arguments for Claim 28.  Similarly, I refer to my reply for Claim 28 above.  Specifically, in my review of the intrinsic record of the '919 patent, I

did not find any requirement that Claim 29 defines the curvature of tubes along

their length.  To the extent that Claim 29 does not define tubes as being curved

along their length, I stand by my opinion that Figure 4 of the '217 patent shows

that the upright tubes 20 are circular and, therefore, curved.  To the extent that

Claim 29 defines tubes as being curved along their length, I have addressed that

type of curvature in other parts of my Initial Report, including but not limited to

Sections XIV.B-D, H-J, N, O, and P.

### C.    Claims 15, 19-21, and 27-29 of the of the '919 Patent are anticipated by Australian Patent No. 715,883 to Bidwell

256.    It is my opinion that Australian Patent No. 715,883 to *Bidwell* ("the

'883 patent"), titled "Retaining Member for a Cot," anticipates Claims 15, 19-21,

and 27-29 of the '919 patent, and Mr. Drobinski has failed in the Drobinski Report

to rebut my opinion.

### i.    Claim 15 of the '919 patent is anticipated by Australian Patent No. 715,883 to Bidwell

**Claim 15 element 1: *"A baby crib comprising:"***

257.    On pages 18 and 19 in Exhibit G of the Drobinski Report, Mr.

Drobinski states that "[t]he interchangeability of crib and playpen is only

applicable to the '919 patent, because the way the term 'crib' is used in this

patent."  Thus, Mr. Drobinski acknowledges that the cot described in the '883

patent is a "baby crib" as recited in Claim 15 of the '919 patent.  I do not, however,

follow Mr. Drobinski's apparent suggestion that the cot described in the '883 patent is not interchangeable or applicable to the playpen of the '919 patent.

**Claim 15 element 2:** *"a plurality of upright tubes defining corners of the baby crib, wherein each of the upright tubes has an outer wall that defines an outer contour shape of the upright tube; and;"*

258.   On page 19 in Exhibit G of the Drobinski Report, Mr. Drobinski states that "[t]he corners of the Bidwell device are defined by the structural corner posts 20, not by the retaining members 22."  Mr. Drobinski also states that "[t]he retaining members 22 are not 'upright tubes'."

259.   First, I do not share Mr. Drobinski's opinion that the retaining members 22 do not define corners of the crib in the '883 patent.  As illustrated in Figure 1 in the '883 patent, it is the retaining members 22 that are visible at the corners of the crib and, thus, define the corners.

260.   Second, I do not share Mr. Drobinski's opinion that the retaining members 22 in the '883 are not "upright tubes," as recited in Claim 15.  In fact, the '883 patent describes that "[a]dapted to pass over the corner post 20 is a retaining member 22 which is a generally cylindrical *tube*." (emphasis added) ('883 patent; pg. 3, ll. 8-9).

261.   Finally, I do not share Mr. Drobinski's opinion that the "upright tubes," as recited in Claim 15, impart the meaning of or call for structural support at the corners of a crib, as Mr. Drobinski suggests.  In contrast to Mr. Drobinski's

172

opinion on this point, it is still my understanding that this claim term is to be afforded its plain and ordinary meaning to one of ordinary skill in the art.  In that context, it is my opinion that the term "upright tube," as recited in Claim 15, is merely directed to a tube that is upright, which is what the '883 patent unequivocally states, without any recitation of, or specific requirement for, structural support.  To the extent that the term "upright tube" in Claim 15 imparts or calls for a meaning that includes structural support (a construction which I find no basis for), Mr. Drobinski does not attempt to define what type, or magnitude, of support is required.  In my view, that support may be for holding (*e.g.*, clamping) fabric, supporting (*e.g.*, holding, clamping, or lodging) another tube, or for supporting a top rail of a crib or playpen, for example.  Thus, for the reasons provided in my Initial Report, it is still my opinion that the retaining members 22 in the '883 patent meet or cover the "upright tubes" recited in Claim 15.

> **Claim 15 element 4:** ***"a plurality of positioning posts provided on the enclosure member at locations corresponding to the edge portions of the enclosure member, wherein the positioning posts are lodged inside the upright tubes, the side panels extending between the upright tubes substantially out of contact with the outside surfaces of outer walls of the upright tubes, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."***

262.   On page 22 in Exhibit G of the Drobinski Report, Mr. Drobinski states that "[t]he corner posts 20 [in the '883 patent] are not 'lodged inside' the retaining member [22]."  Mr. Drobinski then attempts to distinguish the structure of the '883

patent from that defined by Claim 15 by stating that "[t]he retaining member 22 is lodged onto and removable from the exterior of the corner post 20." That is, Mr. Drobinski relies upon semantics to argue that the corner posts 20 are not *lodged inside* the retaining members 22, because, instead, the retaining members 22 are *lodged onto* the corner posts 20. I do not find any distinction based on Mr. Drobinski's line of reasoning.

263. On page 22 of his report, Mr. Drobinski goes on to state that "'the positioning posts are lodged inside the upright tubes' means that the upright tube s [sic] hold and support the positioning posts." (emphasis omitted). Mr. Drobinski's definition agrees with my opinion that the structure of the '883 patent anticipates the positioning posts in Claim 15, because the retaining members 22 hold and support the corner posts 20 in the '883 patent. The '883 patent states that the retaining member 22 "engages over the corner post 20 as is clear from Figure 2. This is similar to a snap fit." ('883 patent; Page 3, ll. 20-21).

264. Finally, although Mr. Drobinski goes on to state on page 23 that "[t]he retaining member 22 of Bidwell is a clip, not an upright tube," the '883 patent in fact describes that the "retaining member 22 . . . is a generally cylindrical *tube*," without using the word "clip." (emphasis added) ('883 patent; pg. 3, ll. 8-9). Here, failing to distinguish the corner posts 20 in the '883 patent from positioning posts as recited in Claim 15, Mr. Drobinski again suggests that the retaining members 22

174

are not upright tubes notwithstanding the fact that the '883 patent uses that very word to describe them.  I do not share Mr. Drobinski's opinion.

### ii. Claim 19 is anticipated by Australian Patent No. 715,883 to Bidwell

**Claim 19 element 1:** ***"The baby crib according to claim 15, wherein the enclosure member is made of a fabric material."***

265.   On page 24 in Exhibit G of the Drobinski Report, Mr. Drobinski does not raise any points other than those previously raised with regard to Claim 15.

### iii. Claim 20 is anticipated by Australian Patent No. 715,883 to Bidwell

**Claim 20 element 2:** ***"a frame structure including a plurality of support tubes, wherein each of the support tubes has an outer wall that defines an outer contour shape of the upright tube;"***

266.   On page 24 in Exhibit G, Mr. Drobinski states that "[t]his claim expressly says that the support tubes are structural, when it says that the frame structure includes a plurality of support tubes" and "[t]he retaining member 22 of Bidwell is a clip, not a support tube."

267.   To the extent that the term "support tube" in Claim 20 calls for a tube that provides some support, Mr. Drobinski does not attempt to define what type or magnitude of support is required.  In my view, that support may be for holding (*e.g.*, clamping) fabric, supporting (*e.g.*, holding, clamping, or lodging) another tube, or for supporting a top rail of a crib or playpen, for example.  I note that the

175

'883 patent describes that "the edges of tube wall 24 [of the retaining member 22] apply pressure to the fabric sidewall 14 immediately adjacent the corner post 20," "the retaining member 22 forces the fabric sidewall 14 around the corner post 20 and thus holds it tightly in relation to the corner post 20," and the "retaining member 22 extends for the full height of the corner post 20 from the foot 18 to the corner member 16." ('883 patent; pg. 3, l. 24, to pg. 4, l. 6).  Thus, because each retention member 22 in the crib described in the '883 patent supports and holds the fabric sidewall 14 around a corner post 20 and extends the full height of the corner post 20 from the foot 18 to the corner member 16, the retention member 22 supports both the fabric and the corner members 16.  Thus, it is still my opinion that the retaining members 22 in the '883 patent meet or cover the "support tubes" recited in Claim 20.

268.   Further, if Mr. Drobinski's opinion is that the retaining members 22 in the '883 patent are not "tubes," then I do not agree.  In fact, the '883 patent describes that "[a]dapted to pass over the corner post 20 is a retaining member 22 which is a generally cylindrical *tube*." (emphasis added) ('883 patent; pg. 3, ll. 8-9).

**Claim 20 element 4: *"an attachment structure configured to mount and secure the edge portions of the enclosure member along the support tubes,"***

176

269.   On page 25 in Exhibit G of the Drobinski Report, Mr. Drobinski states that "In Par. 408, Singhose refers to the retaining member 22 as the support tube, but in Par. 410, Singhose refers to the corner post as the support tube and calls the retaining member 22 the attachment structure."

270.   Here, it appears that Mr. Drobinski has misunderstood my opinion in paragraphs 408 and 410 in my Initial Report, if not twisted my opinion for his argument.  It is my opinion that the corner posts 20 in the '883 patent comprise "an attachment structure," as recited by Claim 20, and that the retaining members 22 in the '883 patent comprise "support tubes," as recited by Claim 20.  This is because, as stated in the '883 patent, the fabric sidewall 14 is forced around the corner post 20 by the retaining member 22 "and thus holds it tightly in relation to the corner post 20" ('883 patent; pg. 4, ll. 1-6).

**Claim 20 element 5:** *"whereby the side panels surround an enclosed space, and each of the side panels extends generally between two of the support tubes substantially out of contact with outwardly facing surfaces of the outer walls thereof, such that the outwardly facing surface of each of the upright tubes is exposed on an outside of the enclosure member."*

271.   With regard to element 5 of Claim 20 on page 26 in Exhibit G, Mr. Drobinski does not raise any points other than those previously raised with regard to other elements of Claim 20.

     **iv.**       **Claim 21 is anticipated by Australian Patent No. 715,883 to Bidwell**

**Claim 21:** *"The baby crib according to claim 20, wherein the attachment structure clamps the edge portions of the enclosure member inside the support tubes."*

272.   With regard to Claim 21 on page 26 in Exhibit G, Mr. Drobinski does not raise any points other than those previously raised with regard to Claim 20. Particularly, Mr. Drobinski does not provide any reasoning as to why the corner posts 20 do not clamp the fabric sidewall 14 inside the retaining members 22 in the '883 patent.  It seems that, if the retaining members 22 clamp the fabric sidewall 14 with the corner posts 20, then the corner posts 20 must also clamp the fabric sidewall 14 with the retaining members 22.

> **v.**     **Claim 27 is anticipated by Australian Patent No. 715,883 to Bidwell**

**Claim 27:**  *"The baby crib according to claim 20, wherein the enclosure member is made of a fabric material."*

273.   With regard to Claim 27 on page 27 in Exhibit G, Mr. Drobinski does not raise any points other than those previously raised with regard to Claim 20.

> **vi.**     **Claim 28 is anticipated by Australian Patent No. 715,883 to Bidwell**

**Claim 28:** *"The baby crib according to claim 20, wherein the upright tubes are curved."*

274.   With regard to Claim 28 on pages 27 and 28 in Exhibit G, Mr. Drobinski merely states that "[t]he corner posts are clearly not curved, and the retaining member is capable of being bent, which is part of the reason why it is not

178

a support tube." In this context, to the extent that Mr. Drobinski implicitly suggests it, I did not find any requirement that Claim 28 defines the curvature of upright tubes along their length. To the extent that Claim 28 does not define them as being curved along their length, I stand by my opinion that the retaining members 22 in the '883 patent are, at least in part, circular is shape and, therefore, curved.

275.   To the extent that Claim 28 defines tubes as being curved along their length, I have addressed that type of curvature in other parts of my Initial Report, including but not limited to Section XIV.P.

### vii.    Claim 29 is anticipated by Australian Patent No. 715,883 to Bidwell

**Claim 29:** *"The baby crib according to claim 15, wherein the upright tubes are curved."*

276.   With regard to Claim 29 on page 29 in Exhibit G, Mr. Drobinski merely states that "[t]he corner posts are clearly not curved, and the retaining member is capable of being bent, which is part of the reason why it is not a support tube." In this context, to the extent that Mr. Drobinski implicitly suggests it, I did not find any requirement that Claim 29 defines the curvature of upright tubes along their length. To the extent that Claim 29 does not define them as being curved along their length, I stand by my opinion that the retaining members 22 in the '883 patent are, at least in part, circular is shape and, therefore, curved.

179

277.   To the extent that Claim 29 defines tubes as being curved along their length, I have addressed that type of curvature in other parts of my Initial Report, including but not limited to Section XIV.P.



OUTSIDE COUNSELS EYES ONLY

Dated:  October 16, 2014

By: _____
Dr. William Singhose